IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

ANNIKEN PROSSER

*Plaintiff - Appellant*

v.

ALEX AZAR, II

*Defendant - Appellee*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN IN CASE NO. 1:20-CV-00194, JUDGE
WILLIAM C. GREISBACH

APPELLANT'S SEPARATELY BOUND APPENDIX

PARRISH LAW OFFICES

James C. Pistorino
   (Counsel of Record)
788 Washington Road
Pittsburg, PA 15228
Telephone: (412) 561-6250
james@dparrishlaw.com

FOLEY & LARDNER LLP

David B. Goroff
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-5160
dgoroff@foley.com

*Attorneys for Plaintiff-Appellant Anniken Prosser*

*Oral Argument Requested*

## CERTIFICATE PURSUANT TO CIRCUIT RULE 30(d)

The undersigned, counsel for Plaintiff-Appellant, certifies that all of the materials required by Circuit Rule 30(a) and (b) are included in the Plaintiff-Appellant's Appendix.

Dated: November 12, 2020

*/s/ David B. Goroff*
David B. Goroff

# TABLE OF CONTENTS TO APPENDICES

Page ID
Number

## SHORT APPENDIX

*District Court Decision and Order on Motion and Cross-Motion for Summary Judgment*
  dated July 6, 2020 (Doc. 21)........................................................................ SA001

*District Court Decision and Order Denying Motion for Reconsideration*
  dated September 24, 2020 (Doc. 29) ............................................................ SA0017

*District Court Decision and Order Granting Motion for Summary Judgment for Lack of Standing*
  dated October 21, 2020 (Doc. 40) ................................................................ SA0022

*District Court Text Only Order Denying as Moot Motion to Dismiss*
  dated October 21, 2020 (Doc. 41) ................................................................ SA0024

*District Court Judgment in a Civil Case*
  dated October 21, 2020 (Doc. 42) ................................................................ SA0025

## SEPARATELY BOUND APPENDIX

*Complaint,*
  dated February 7, 2020 (Doc. 1) ................................................................. A0001

*Declaration of James Pistorino in Support of Motion for Summary Judgment*
  dated April 11, 2020 (Doc. 8) ..................................................................... A0011

*Excerpts from Request for ALJ Hearing, dated March 27, 2019, and Transmittal of Pre-Hearing Brief, dated April 10, 2019*
  Exhibit H to Pistorino Declaration, filed April 11, 2020 (Doc. 8-8) ............ A0014

*Decision of ALJ Kimberley Woodward in ALJ Appeal No. 1-8416188648, dated May 16, 2019*
  Exhibit I to Pistorino Declaration, filed April 11, 2020 (Doc. 8-9) ............... A0019

*Excerpts from Request for ALJ Hearing, dated March 19, 2019, and Transmittal of Pre-Hearing Brief, dated April 10, 2019*
  Exhibit J to Pistorino Declaration, filed April 11, 2020 (Doc. 8-10) ............ A0029

*Decision of ALJ Lissette Figueroa in ALJ Appeal No. 1-8380637906, dated June 27, 2019*
  Exhibit K to Pistorino Declaration, filed April 11, 2020 (Doc. 8-11)............ A0033

*Excerpts from Request for ALJ Hearing, dated January 27, 2020, and Transmittal of Pre-Hearing Brief, dated February 20, 2020*
  Exhibit L to Pistorino Declaration, filed April 11, 2020 (Doc. 8-12) ............ A0049

*Decision of ALJ Adalberto Sardinas in ALJ Appeal No. 3-9079666355, dated March 18, 2020*
  Exhibit M to Pistorino Declaration, filed April 11, 2020 (Doc. 8-13) ........... A0060

*Excerpts from Request for ALJ Hearing, dated March 21, 2019, and Transmittal of Pre-Hearing Brief, dated April 20, 2019*
  Exhibit N to Pistorino Declaration, filed April 11, 2020 (Doc. 8-14) ........... A0071

*Decision of ALJ J. Grow in ALJ Appeal No. 1-8390277469, dated June 19, 2019*
  Exhibit O to Pistorino Declaration, filed April 11, 2020 (Doc. 8-15) ............ A0075

*Excerpts from Medicare Appeal Council Appeal in ALJ Appeal No. 1-8390277469, dated July 12, 2019, and Request for Escalation, dated January 2, 2020*
  Exhibit P to Pistorino Declaration, filed April 11, 2020 (Doc. 8-16) ............ A0082

*Answer to Complaint*
  dated April 20, 2020 (Doc. 10) ....................................................................... A0089

*Notice of Appeal*
  dated October 22, 2020 (Doc. 43) ................................................................. A0103

42 U.S.C. § 405 ................................................................................................... A0106

42 U.S.C. § 1395k ............................................................................................... A0141

42 U.S.C. § 1395ff ............................................................................................... A0145

42 U.S.C. § 1395hh ............................................................................................. A0169

42 U.S.C. § 1395pp ............................................................................................. A0173

42 C.F.R. § 401.109 ............................................................................................ A0177

42 C.F.R. § 405.1012 .......................................................................................... A0179

*Response to Plaintiff's First Set of Interrogatories in John Thumann v. Alex Azar, Case No. 1:20-cv-00125*
  dated October 26, 2020 ................................................................................. A0182

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

DAVID CHRISTENSON
  5754 Clevendon Lane
  Oshkosh, WI  54904,

ANNIKEN PROSSER
  W2973 Farmstead Drive
  Appleton, WI  54915,

              *Plaintiffs,*

      v.                             Case No. 20-cv-194

ALEX AZAR, in his capacity as Secretary
of the United States Department of Health
and Human Services,
  200 Independence Avenue, S.W.
  Washington, DC 20201,

              *Defendant.*

---

# COMPLAINT

---

      Plaintiffs DAVID CHRISTENSON and ANNIKEN PROSSER (collectively, "Plaintiffs"), by their undersigned counsel, bring this action against Defendant Alex Azar, in his official capacity as Secretary of the United States Department of Health and Human Services (hereinafter, "the Secretary"), to obtain declaratory and injunctive relief for violations of federal law. Plaintiffs make the following allegations based on the investigation of counsel, information and belief, and on personal knowledge:

## I.   <u>SUMMARY</u>

      1.     Tragically, each of the two Plaintiffs is suffering from a particularly deadly form of brain cancer, glioblastoma multiforme (GBM), and they are seeking coverage for life-saving treatment. In a particularly cruel twist, the Secretary is forcing Plaintiffs to prove that they are entitled to the same treatment on a monthly basis, and then the Secretary's decisions differ from

month to month with no predictable pattern. The Secretary is playing a game of chance with the Plaintiffs' lives: maybe this month they will get life-saving treatment or maybe they won't.

2. The main issue is this case is whether collateral estoppel prevents the Secretary from re-litigating issues already lost in administrative proceedings involving the same parties?

3. The Secretary has asserted that his regulations preclude collateral estoppel and that month-to-month differing decisions on Plaintiffs' life-saving care are not arbitrary and capricious even though the facts and/or circumstances have not changed. These positions are wholly without merit under well-established issue preclusion law. *U.S. v. Stauffer Chemical Co.*, 464 U.S. 165 (1984); *Astoria Federal Savings & Loan v. Solimino*, 501 U.S. 104 (1991)

4. The other issue is whether it is arbitrary and capricious under basic principles of administrative law for the Secretary to issue conflicting decisions when the facts and/or circumstances have not changed and where the Secretary has determined multiple times that coverage of a medical device to treat Plaintiffs' brain cancer was appropriate

## II.    JURISDICTION

5. This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g) and 1395ff. Each of the Plaintiffs is filing suit after final decisions of the Medicare Appeals Council (acting on behalf of the Secretary) denying coverage of their Medicare claims (and, therefore, have exhausted their administrative remedies), the amount-in-controversy is more than $1,630 (42 U.S.C. §§ 1395ff(b)(1)(E)(i) and 1395ff(b)(1)(E)(iii)), and this suit was filed within 60 days of the Secretary's final decisions, as a result of escalation. See 42 C.F.R. § 405.1016(f).

6. Venue is proper in this district pursuant to 42 U.S.C. § 405(g) because this action is being brought in the district of Plaintiffs' residence.

### III.    PARTIES

7.      Plaintiff David Christensen is an individual and a resident of the State of Wisconsin. Mr. Christensen is eligible for Medicare on the basis of age or disability as previously determined by the Secretary.

8.      Plaintiff Anniken Prosser is an individual and a resident of the State of Wisconsin. Ms. Prosser is eligible for Medicare on the basis of age or disability as previously determined by the Secretary.

9.      Defendant Alex Azar is sued in his official capacity as the Secretary of Health and Human Services.

### IV.    LEGAL BACKGROUND

10.     The doctrine of mutual collateral estoppel applies to the government and may bar the government from re-litigating facts/issues the government previously litigated and lost. *See U.S. v. Stauffer Chemical Co.*, 464 U.S. 165 (1984).

11.     Moreover, collateral estoppel may be based not only on litigation in federal or state courts but also on proceedings before an agency, when the agency is acting in a judicial capacity. In *Astoria Federal Savings & Loan Assoc. v. Solimino*, 501 U.S. 104, 107-8 (1991), the Supreme Court held that:

> We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality. When an administrative agency is acting in a judicial capacity and resolves dispute issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution. The principle holds true when a court

3

has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity.

12.    Numerous courts have applied collateral estoppel to Federal agency decisions. *Manitowoc Cranes LLC v. Sany America Inc.,* 2017 WL 6327551, *2 (E.D. Wis. 2017), *citing B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S.Ct. 1293, 1303 (2015); *see, e.g., Brewster v. Barnhart*, 145 Fed.App'x. 542 (6th Cir. 2005) (SSA ALJ bound by prior determination).

## V.    **FACTUAL BACKGROUND**

### **Tumor Treatment Field Therapy (TTFT)**

13.    Glioblastoma multiforme (GBM) is an unusually deadly type of brain cancer. Without treatment, survival is typically three months. With traditional treatment, the survival rate at two years after treatment is ~31%, while at five years, only ~5% of patients are living.

14.    More recently, a process for treating GBM using alternating electric fields has been developed. This is known as tumor treatment field therapy (TTFT). Alternating electric fields interfere with tumor cell replication and have been shown to dramatically increase the period during which the GBM does not progress, as well as overall survival rates.

15.    In ground-breaking papers published in the Journal of the American Medical Association (JAMA) in 2015 and 2017, TTFT was shown to increase the two-year survival rate by more than 38% and to nearly triple the five-year survival rate.[1]

16.    TTFT was the first significant advance in treating GBM in more than a decade. TTFT has become the standard of care for treating GBM and essentially all private insurers

---

[1] *See Stupp, et al.*, "MAINTENANCE THERAPY WITH TUMOR-TREATING FIELDS PLUS TEMOZOLOMIDE VS. TEMOZOLOMIDE ALONE FOR GLIOBLASTOMA: A RANDOMIZED CLINICAL TRIAL", JAMA, Vol. 314, No. 23, pgs. 2535-43 (December 15, 2015); *Stupp, et al.*, "EFFECT OF TUMOR TREATING FIELDS PLUS MAINTENANCE TEMOZOLOMIDE VS. MAINTENANCE TEMOZOLOMIDE ALONE ON SURVIVAL IN PATIENTS WITH GLIOBLASTOMA", JAMA, Vol. 318, No. 23, pgs. 2306-2316 (December 19, 2017).

cover TTFT. It saves and/or extends GBM patients' lives, in some instances, by years. Between January 2016 and December 2018, at least 93 scientific papers were published demonstrating the effectiveness of TTFT. It is given a level one recommendation in the National Comprehensive Cancer Network (NCCN) guidelines, *i.e.*, there is consensus, among the experts, based on a high level of evidence, that TTFT is a recommended intervention.

17. The sole supplier of the equipment that delivers Tumor Treatment Field Therapy Novocure, Inc. which manufactures the Optune system. The Optune TTFT system is rented on a monthly basis. Thus, after a patient is prescribed the Optune system, they will have separate monthly claims for Medicare coverage.

18. Sadly, there is no known cure for GBM and patients prescribed TTFT treatment must continue that treatment for the rest of their hopefully extended lives.

<div align="center"><strong>The Medicare Appeals Process</strong></div>

19. Plaintiffs are enrolled in the medical benefit commonly known as "Original Medicare." Claims submitted by beneficiaries are subject to a five (5) level appeal process, that can (and typically does) take more than a year. At the first stage, a beneficiary submits a claim. If the claim is denied, the beneficiary can request "redetermination." If the claim is still denied, the beneficiary can request "reconsideration." If the claim is still denied, the beneficiary can appeal to an Administrative Law Judge (ALJ). If the ALJ denies the claim, the beneficiary can appeal to the Medicare Appeals Council (MAC). Finally, if the claim is still denied, the beneficiary can file suit in district court.

20. While the statues and regulations require both ALJs and the MAC to issue decisions within 90 days, those deadlines are routinely missed. Thus, beneficiaries seeking

coverage are often thrown into a multi-year effort to obtain final decisions in their cases before they can seek relief in a federal court.

a.     **Facts Specific to Mr. Christenson**

21.    Plaintiff David Christenson has been diagnosed with a GBM and, after receiving other treatment, has been prescribed TTFT.

22.    Mr. Christenson has previously received three favorable decisions from ALJs which determined that TTFT is medically reasonable and necessary for him and is a covered benefit.  ALJ Appeal Nos. 1-8285652321 (April 2, 2019), 1-8416229632 (June 6, 2019), and 1-8637714249 (September 11, 2019).  The Secretary did not appeal any of those decisions and they have become final.

23.    Despite the prior favorable rulings, ALJ Watson issued a decision on September 12, 2019 in ALJ Appeal No. 1-8630709341 holding that TTFT is not medically reasonable and necessary for Mr. Christenson and, therefore, denying coverage.

24.    Mr. Christenson timely appealed ALJ Watson's decision on September 18, 2019. When no decision was received within 90 days, Mr. Christenson filed a notice of escalation pursuant to 42 C.F.R. § 405.1016(f) on January 3, 2020.

25.    On January 22, 2020, the Medicare Appeals Council (MAC) responded indicating that they could not timely issue a decision and that judicial review was authorized within 60 days of the letter.

26.    Accordingly, Mr. Christenson is entitled to judicial review.

b.     **Facts Specific to Ms. Prosser**

27.    Plaintiff Anniken Prosser has been diagnosed with a GBM and, after receiving other treatment, has been prescribed TTFT.

28.     Ms. Prosser has previously received a favorable ALJ decision determining that TTFT is medically reasonable and necessary for her and is a covered benefit.  ALJ Appeal No. 1-8416188648.  The Secretary did not appeal that decision and it has become final.

29.     Despite the prior favorable, ALJ Grow issued a decision on June 19, 2019 in ALJ Appeal No. 1-8390277469 holding that TTFT is not medically reasonable and necessary for Ms. Prosser and, therefore, denying coverage.

30.     Ms. Prosser timely appealed ALJ Grow's decision on July 12, 2019.  When no decision was received within 90 days, Ms. Prosser filed a notice of escalation on January 2, 2020 pursuant to 42 C.F.R. § 405.1016(f). No response has been received to date.

31.     On January 22, 2020, the Medicare Appeals Council (MAC) responded indicating that they could not timely issue a decision and that judicial review was authorized within 60 days of the letter.

32.     Accordingly, Ms. Prosser is entitled to judicial review.

**VI.  <u>LEGAL CAUSES OF ACTION</u>**

<div align="center">

**COUNT I**
**<u>Violation of 42 U.S.C. §405(g)</u>**
(contrary to law)

</div>

33.     Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as contrary to law, as arbitrary and capricious, an abuse of discretion, and unsupported by the evidence, and issue an order finding that Plaintiffs' claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.

<div align="center">

**COUNT II**
**<u>Violation of 5 U.S.C. § 706(1)</u>**
(unlawfully withheld or unreasonably delayed)

</div>

34.     Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as unlawfully withheld or unreasonably delayed and unsupported by the evidence, and

issue an order finding that Plaintiffs' claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.

## COUNT III
### Violation of 5 U.S.C § 706(2)(A)
(arbitrary and capricious, abuse of discretion, not in accordance with law)

35.     Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law, and issue an order finding that Plaintiffs' claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.

## COUNT IV
### Violation of 5 U.S.C § 706(2)(C)
(in excess of statutory jurisdiction, authority, or limitations or short of statutory right)

36.     Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as in excess of the Secretary's authority and limitations and short of Plaintiffs' statutory rights and issue an order finding that Plaintiffs' claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.

## COUNT V
### Violation of 5 U.S.C § 706(2)(D)
(without observance of procedure required by law)

37.     Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as done without observance of the procedure required by law and issue an order finding that Plaintiffs' claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.

## COUNT VI
### Violation of 5 U.S.C § 706(2)(E)
(not supported by substantial evidence)

38.     Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as not supported by substantial evidence and issue an order finding that Plaintiffs'

8

claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.

## VII. <u>REQUEST FOR DECLARATORY JUDGMENT</u>

39.     It is appropriate to declare the rights and legal relations of both Plaintiffs regarding payment of the past and future monthly claims for Tumor Treatment Field Therapy by the Medicare program.

## VIII.  <u>JURY DEMAND</u>

40.     PLAINTIFFS DEMAND A JURY TRIAL.

## IX.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs ask that this Court:

A.      Enter a declaratory judgment:

    (1)     Holding that the Secretary is precluded by principles of collateral from re-litigating whether Tumor Treatment Field Therapy treatment for Plaintiffs is a covered benefit;

    (2)     Holding that, in light of the prior decisions granting coverage, the denials at issue in this case are arbitrary and capricious;

    (3)     Holding that TTFT is medically reasonable and necessary for each of the Plaintiffs and a covered Medicare benefit;

B.      Enter an order directing the Secretary to cover the claims at issue in this case.

C.      Enter a permanent injunction directing the Secretary to cover future monthly claims for Tumor Treatment Field Therapy made on behalf of the Plaintiffs.

D.      Award attorneys' fees and costs to Plaintiffs as permitted by law.

E.      Provide such further and other relief that this Court deems appropriate.

9

Dated:  February 7, 2020

Respectfully submitted,

PARRISH LAW OFFICES
*Attorneys for Plaintiffs*
By: James C. Pistorino
*(Admission to E.D. Wisconsin forthcoming)*
788 Washington Road
Pittsburgh, PA 15228
Telephone: (412) 561-6250
james@dparrishlaw.com


DAVIS & PLEDL, SC
*Attorneys for Plaintiffs*
By: Robert Theine Pledl
By: Victoria Davis Davila
1433 N. Water Street – Suite 400
Milwaukee, WI 53202
Telephone: (414) 488-1354
rtp@davisandpledl.com
vldd@davisandpledl.com

DAVID CHRISTENSON and
ANNIKEN PROSSER

    *Plaintiffs,*

v.

ALEX AZAR II, in his official capacity as the
Secretary of the Department of Health and
Human Services.

    *Defendant.*

Case No. 20-cv-194

DECLARATION OF JAMES PISTORINO
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, James C. Pistorino, hereby declare as follows:

1.      I am an attorney with the law form of Parrish Law Office, counsel to the plaintiff

in the above-captioned case. I am over eighteen years of age and not a party to this case.

2.      Attached, as Exhibit A, are true and correct copies of excerpts from the Request

for an ALJ Hearing submitted February 5, 2019 and the transmittal of a pre-hearing brief dated

March 5, 2019.

3.      Attached, as Exhibit B, is a true and correct copy of a decision dated April 2,

2019 by ALJ Thomas Tyler in ALJ Appeal No. 1-8285652321.

4.      Attached, as Exhibit C, are true and correct copies of excerpts from the Request

for an ALJ Hearing submitted March 26, 2019 and the transmittal of a pre-hearing brief dated

April 10, 2019.

5.      Attached, as Exhibit D, is a true and correct copy of a decision dated June 6, 2019

by ALJ Richard Zettel in ALJ Appeal Nos. 1-8416270832 and 1-8416229632.

1

6.       Attached, as Exhibit E, are true and correct copies of excerpts from the Request for an ALJ Hearing submitted June 14, 2019 and transmittal of a pre-hearing brief dated July 5, 2019.

7.       Attached, as Exhibit F, is a true and correct copy of a decision dated September 12, 2019 by ALJ Scott Watson in ALJ Appeal No. 1-8630709341.

8.       Attached, as Exhibit G, are true and correct copies of excerpts from a Medicare Appeals Council appeal in ALJ Appeal No. 1-8630709341 dated September 18, 2019 as well a Request for Escalation dated January 3, 2020.

9.       Attached, as Exhibit H, are true and correct copies of excerpts from a Request for an ALJ Hearing dated March 27, 2019 and a transmittal of a pre-hearing brief dated April 10, 2019.

10.       Attached, as Exhibit I, is a true and correct copy of a decision dated May 16, 2019 by ALJ Kimberley Woodyard in ALJ Appeal No. 1-8416188648.

11.       Attached, as Exhibit J, are true and correct copies of excerpts of a Request for an ALJ Hearing dated March 19, 2019 and transmittal of a pre-hearing brief dated April 10, 2019.

12.       Attached, as Exhibit K, is a true and correct copy of a decision dated June 27, 2019 by ALJ Lissette Figueroa in ALJ Appeal No. 1-8380637906.

13.       Attached, as Exhibit L, are true and correct copies excerpts of a Request for an ALJ Hearing dated January 27, 2020 and a transmittal of a pre-hearing brief dated February 20, 2020.

14.       Attached, as Exhibit M, is a true and correct copy of a decision dated March 18, 2020 by ALJ Adalberto Sardinas in ALJ Appeal No. 3-9079666355.

2

15.     Attached, as Exhibit N, are true and correct copies of excerpts of a Request for an ALJ Hearing dated March 21, 2019 and transmittal of a pre-hearing brief dated April 20, 2019.

16.     Attached, as Exhibit O, is a true and correct copy of a decision dated June 19, 2019 by ALJ J. Grow in ALJ Appeal No. 1-8390277469.

17.     Attached, as Exhibit P, are true and correct copies of excerpts from a Medicare Appeals Council appeal in ALJ Appeal No. 1-8390277469 dated July 12, 2019 as well a Request for Escalation dated January 2, 2020

I declare under penalty of perjury that the foregoing is true and correct.


Executed:  April 11, 2020

James C. Pistorino

3

# EXHIBIT H

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

March 27, 2019

***VIA PRIORITY MAIL***

DHHS – OMHA
Centralized Docketing
**Attn: Beneficiary Mail Stop**
200 Public Square, Suite 1260
Cleveland, OH 44114-2316

# BENEFICIARY APPEAL

**RE:     Request for ALJ Hearing**
**Beneficiary:  Anniken Prosser**
                       **W2973 Farmstead Dr.**
                       **Appleton, WI  54915**
**Dates of Service:  8/16/2018; 9/16/2018; 10/16/2018**
**HICN:  4R87U71QM75**
**Medicare Appeal No: 1-8285761650**
**Date of QIC Decision:  March 19, 2019**
**Device:  Tumor Treatment Field Therapy (E0766)**
**Supplier:  Novocure, Inc.**
**Our Ref: 19-53**

Dear Claims Coordinator:

As an authorized representative of the above-captioned Medicare beneficiary, Anniken Prosser, I hereby appeal to an Administrative Law Judge the above-captioned decision rendered by the Qualified Independent Contractor ("QIC") C2C Innovative Solutions, Inc. for the claims submitted for tumor treatment field therapy ("TTFT") for a glioblastoma. **If possible, pursuant to 42 C.F.R. § 405.1006(e), Appellant requests that the immediate case be consolidated with another case pending before Judge Figueroa for the same beneficiary for the same device (ALJ Appeal No. 1-8380637906) in the interest of OMHA efficiency.**

The QIC rendered nonsensical denials, stating "the medical documentation of the efficacy of this device is not within the usual scope and breath (sic) of current medical literature with peer acknowledgement and review." The QIC also asserts that although the DMACs acknowledged a valid reconsideration request was filed, LCD L34823 remains applicable until the DMACs retire it or issue a new LCD.

Ms. Prosser was diagnosed with a glioblastoma in 2016. She had surgery and was treated with radiation and chemotherapy. Her clinician also prescribed TTFT. TTFT disrupts and corrupts the division of cancer cells and leads to the death of such cells. In 2011 and 2015, the FDA approved, through its more rigorous review process, a device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. During the clinical trial for newly diagnosed glioblastomas the TTFT results were so compelling that at the interim analysis, the Data Safety Monitoring Board recommended that those not receiving TTFT be able to cross over to receive the treatment. The FDA agreed. Notably, the DME MAC medical directors have asserted that they do not interpret the LCD as applying to cases of newly diagnosed glioblastoma. Please see Att. C to the reconsideration request.

The published, peer-reviewed literature shows the improved clinical survival and the progression-free survival of patients who receive TTFT for their glioblastoma. TTFT for glioblastoma is included in the National Comprehensive Cancer Network ("NCCN") guidelines and is considered the standard of care for newly diagnosed glioblastoma. Hundreds of treating physicians, in all 50 states, have prescribed TTFT. TTFT is covered by all the large national payers. Medicare has paid for numerous claims for medically indistinguishable beneficiaries.

The QIC's determination is nonsensical. The seminal articles showing the effectiveness of the treatment/device were published in JAMA, one of the most prestigious journals in the country based on "impact factor." JAMA is a peer-reviewed publication, thus the assertion that the documentation lacks review is belied by the evidence. Multiple peer-reviewed articles show the effectiveness of the device, to the QIC's comment regarding scope and breadth. The inclusion of TTFT in the NCCN guidelines is "peer acknowledgment and review."

With respect to the LCD, the enclosed documents show that the LCD has not kept pace with the current peer-reviewed literature, regulatory status, consensus of experts, scientific evidence or adoption by the relevant medical community. As noted in the QIC decision, an LCD which conflicts with the standard of care must be "based on sufficient evidence to convincingly refute evidence presented in support of coverage." No such evidence exists. Indeed, the list of documents supporting the LCD shows that the DMACs have not considered any of the regulatory approvals, peer-reviewed literature, or consensus statements that have issued since 2014. Please see attached CMS Exhibit List from LCD Record.

On March 6, 2019, the Carrier Advisory Committee recommended Medicare coverage of TTFT. The experts found that the peer-reviewed literature showed the treatment was safe and effective. The experts did not find that the studies were limited in number or biased. Most of the published clinical research on a medical intervention is sponsored in the United States. Indeed, Medicare often requires industry to sponsor certain studies as a condition of coverage. A cursory review of the literature supporting most LCDs shows that they are sponsored studies. Industry sponsorship does not make a peer-reviewed study, written by academic authors, "not non-biased" such that Medicare should not consider it.

If you have any questions or the items appended to the underlying reconsideration requests were not forwarded to your offices by the QIC, please do not hesitate to contact us at (412) 561-6250.

Yours very truly,

Debra M. Parrish on behalf of
Ms. Anniken Prosser

Enclosures:

Attachment A: Appointment of Representative Form
Attachment B: Certificate of Service
Attachment C: Exhibit List from LCD Record

cc: Ms. Anniken Prosser

Novocure, Inc., c/o Justin Kelly
195 Commerce Way
Portsmouth, NH 03801
(603-501-4299)

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

April 10, 2019

### *VIA PRIORITY MAIL*

Judge Kimberley Woodyard
Office of Medicare Hearings and Appeals
Kansas City Field Office
601 E. 12th St., Suite 221
Kansas City, MO 64106

> **RE:** **Prehearing Brief**
> **ALJ Appeal No. 1-8416188648**
> **Appellant/Beneficiary: A. Prosser**
> **Service: E0766**
> **Dates of Services: 8/16/18, 9/16/18, 10/16/18**
> **Hearing Date: TBD**
> **Our Ref. No.: 19-53**

Dear Judge Woodyard:

In anticipation of the scheduling of the above-captioned case, please find attached a prehearing brief to aid in your analysis. We have compiled (1) additional studies from 2018 and 2019 and (2) textbook chapters from medical textbooks since the filing of the reconsideration request, which are included on the attached CD. The LCD Record Exhibit List detailing the documents considered by the contractor for L34823 is also included.

If you have any questions regarding the foregoing, please do not hesitate to contact me at (412) 561-6250. We appreciate your consideration.

Respectfully submitted,

Debra M. Parrish
Attorney for A. Prosser

Enclosures:

Attachment A: Prehearing Brief
Attachment B: CD containing:
-LCD Record Exhibit List
-TTFT bibliography for GBM & additional peer-reviewed studies from 2018 & 2019 -
(aside from those previously submitted with the reconsideration request)
-Medical school textbook excerpts

cc: Ms. A. Prosser

# EXHIBIT I



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City Field Office**
**Kansas City, Missouri**

| Appeal of: | **A. Prosser** | ALJ Appeal No.: | **1-8416188648** |
|---|---|---|---|
| Beneficiary: | **A. Prosser** | Medicare Part: **B** | |
| DOS: | **8/16/2018**<br>**9/16/2018**<br>**10/16/2018** | | |
| HICN: | **\*\*\*\*\*9206A** | Before: | **Kimberley Woodyard**<br>U.S. Administrative Law Judge |

## DECISION

Upon a *de novo* review of the record, this Administrative Law Judge enters a **FULLY FAVORABLE** decision for the Appellant, Anniken Prosser. Ms. Prosser is entitled to coverage for Tumor Treatment Field Therapy (E0766).

### FINDINGS OF FACT AND
### HISTORY OF THE CASE

Ms. Prosser, was thirty-four years old at the time of services. (Exh. 2, p. 1). On February 14, 2016, MRI results showed Ms. Prosser had a large left cystic temporal mass. *Id*. Two weeks later, she underwent a left craniotomy. *Id*. The post-operative diagnosis was "GBM" (glioblastoma multiforme). *Id*.

In May 2016, Ms. Prosser completed radiation with Editha Kruegar, MD, and concurrent Temodar chemotherapy with Jasleen Randhawa, MD. (Exh. 2, p. 1). In June 2016, adjuvant Temodar chemotherapy was continued, and Optune TTFields therapy was started. *Id*. By April 2017, she had completed twelve cycles of Temodar chemotherapy, and Optune TTFields therapy was continued. *Id*.

On March 15, 2018, Jennifer Connelly, MD, examined Ms. Prosser. (Exh. 2, pp. 1-4). Dr. Connelly found Ms. Prosser was neurologically intact and radiographically stable, and she was tolerating TTFields well with excellent compliance. (Exh. 2, p. 4). Brain imaging showed similar

results compared to the previous images. *Id*. There were no new lesions, and no evidence of abnormal vascularity. *Id*. Dr. Connelly recommended continuing with Optune TTFields. *Id*.

On June 2016, Ms. Prosser began using Optune therapy treatment. (Exh. 5, p. 1,649). On April 13, 2018, and on October 11, 2018, Dr. Connelly signed an Optune Prescription Form renewing the Optune treatment prescription for an additional six months. (Exh. 5, pp. 1,650-1,651). The record includes invoices for Optune for August 16, 2018, September 16, 2018, and October 16, 2018. (Exh. 2, pp. 1,645-1,647).

### *Optune Background*

When Optune is turned on, it creates low-intensity, wave-like electric fields call Tumor Treating Fields, or TTFields. (*See* https://www.optune.com/discover-optune/how-optune-works). These TTFields are delivered by transducer arrays to the location of a GBM tumor. *Id*. TTFields interfere with GBM tumor cell division. *Id*. This action slows or stops GBM cells from dividing, and may destroy them. *Id*. Optune with temozalomide is indicated for the treatment of adult patients with *newly diagnosed* supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard of care chemotherapy. (*See* https://www.optune.com/hcp/therapy/moa). *Id*. For treatment of patients who have *recurrent* GBM, Optune is indicated following histologically-confirmed or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. *Id*. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted. *Id*. Ms. Prosser is *newly diagnosed* with the disease. (Exh. 2, p. 1).

On April 8, 2011, Optune, previously called NovoTTF-100A System, received pre-market approval from the FDA for treatment of glioblastoma for use in patients with recurrent glioblastoma, based upon the result of a large randomized, controlled trial of patients with recurrent GBM.[1] (Exh. 5, pp. 32-36). The overall survival and progression-free survival to chemotherapy with minimal toxicity and an improvement in patients' quality of life, is demonstrated, compared to that of chemotherapy. *Id*. On October 5, 2015, the Provider received premarket approval from the FDA for use of Optune in patients newly diagnosed with glioblastoma.[2] (Exh. 5, pp. 37-40).

The record includes National Comprehensive Cancer Network publications that provide clinical practice oncology guidelines from 2013 through 2018 for the management of both newly diagnosed and recurring central nervous system cancers.[3] (Exh. 5, pp. 14-29). Alternating electric field therapy was considered an effective treatment option for recurrent glioblastomas and oligodendrogliomas. (Exh. 5, p. 15). Along with (1) palliative support care, (2) systemic

---

[1] http://www.accessdata.fda.gov/cdrh_docs/pdf10/p100034a.pdf.

[2] http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034S013a.pdf.

[3] National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology, *Central Nervous System Cancers*, version 1.2018.

chemotherapy, and (3) surgery or reirradiation, alternating electric field therapy is considered a fourth modality of cancer treatment. *Id.*

A 2012 article summarized results from a study comparing NovoTTF-100A (Optune) treatment to a physician's choice of chemotherapy treatment in recurrent glioblastoma cases.[4] (Exh. 5, pp. 1,803-1,813).

> This is the first controlled trial evaluating an entirely novel cancer treatment modality delivering electric fields rather than chemotherapy. No improvement in overall survival was demonstrated, however efficacy and activity with this chemotherapy-free treatment device appears comparable to chemotherapy regimens that are commonly used for recurrent glioblastoma. Toxicity and quality of life clearly favoured TTF.

(Exh. 5, p. 1,804).

Within three years, studies showed significant advancements. On December 15, 2015, the Journal of the American Medical Association (JAMA) published an article analyzing the results of a phase III clinical trial related to TTFT.[5] (Exh. 5, pp. 1,518-1,526). The analysis of the clinical trial with 315 participants showed that adding TTFT to maintenance temozolomide in a population with new onset glioblastoma "significantly prolonged progression-free and overall survival." (Exh. 5, p. 1,525). After conclusion of the study, patients in the control group with ongoing maintenance therapy were offered TTFT therapy. (Exh. 5, p. 1,521).

On December 19, 2017, JAMA published an article that reports the findings of a phase III clinical trial involving 695 participants with glioblastoma.[6] (Exh. 5, pp. 1,529-1,550). The conclusion was:

> In the final analysis of this randomized clinical trial of patients with glioblastoma who had received standard radio-chemotherapy, the addition of TTFields [Optune] to maintenance temozolomide chemotherapy vs maintenance temozolomide alone, resulted in statistically significant improvement in progression-free survival and overall survival. These results are consistent with the previous interim analysis.

(Exh. 5, p. 1,549). The author noted that the findings were in contrast to the more than twenty-three randomized trials conducted during the previous decade that evaluated novel agents or

---

[4] Stupp, Roger, M.D. et al., *NovoTTF-100A Versus Physician's Choice Chemotherapy In Recurrent Glioblastoma: A Randomized Phase III Trial Of A Novel Treatment Modality*, European Journal of Cancer, Volume 48, Issue 14, pp. 2192-2201 (September 2012).

[5] Stupp, Roger, M.D. et al., *Maintenance Therapy With Tumor-Treating Field Plus Temozolomide vs Temozolomide Alone for Glioblastoma A Randomized Clinical Trial*, JAMA (December 15, 2015).

[6] Stupp, Roger, M.D. et al., *Effect of Tumor-Treating Field Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma*, JAMA (December 19, 2017).

intensified treatment strategies for treatment of patients with newly diagnosed glioblastoma, and failed to demonstrate improved survival. (Exh. 5, pp. 1,548-1,549).

A 2018 article summarizes a study in which patients with newly diagnosed glioblastoma participated in a study conducted from July 2009 through November 2014, and were followed through December 2016.[7] (Exh. 5, pp. 1,551-1,559). Compared to patients in the temozolomide-alone part of the study, participants who received TTFields (Optune) had significantly longer deterioration-free survival in global health status, physical and emotional functioning, pain, and leg weakness. (Exh. 5, pp. 1,557-1,558).

The Medicare Administrative Contractor, initially and on redetermination, denied the claim for the services. The Qualified Independent Contractor (QIC) denied reconsideration of the claim on March 19, 2019. Both the Administrative Contractor and the QIC found that, based on the available documentation, Medicare requirements outlined in the LCD were not met. Ms. Prosser, filed a request for hearing before an Administrative Law Judge (ALJ) on March 27, 2019. (Exh. 3, pp. 1-3). Since the request was timely and the amount in controversy met the jurisdictional requirements for an ALJ hearing, 42 C.F.R. §§ 405.1002(a)(1), 405.1006(b)(1), this ALJ has jurisdiction to conduct the *de novo* review and issue a decision. 42 C.F.R. § 405.1000(d).

By Notice of Hearing served on April 4, 2019, the appeal was scheduled to be heard on May 29, 2019. As of the date of this decision, no contractor has responded to the Notice of Hearing.

An ALJ may decide a case on the record without hearing if an examination of the record supports a finding in favor of the Appellant on every issue. 42 C.F.R. § 405.1038(a). Inasmuch as this ALJ issues this decision as wholly favorable, no hearing will be held.

The issues before the ALJ include all the issues brought out in the initial determination, coverage determination, or organization determination; redetermination; or reconsideration that were not decided entirely in the Appellant's favor, for the claims or other appealed matters specified in the request for hearing. The issue was whether all Medicare coverage requirements have been met warranting payment for the Tumor Treatment Field Therapy.

## Legal Framework

### I. ALJ Review Authority

#### A. Jurisdiction

A party dissatisfied with the decisions of the Medicare contractor and the Qualified Independent Contractor is entitled to a hearing before the Secretary of the Department of Health

---

[7] Taphoorn, Martin, MD et al., *Influence of Treatment With Tumor-Treating Fields on Health-Related Quality of Life of Patients With Newly Diagnosed Glioblastoma*, JAMA (February 1, 2018).

and Human Services, Social Security Act § 1869(b)(1)(A), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner, 42 C.F.R. § 405.1002. The request for hearing is timely if filed within sixty days after receipt of a Qualified Independent Contractor decision. 42 C.F.R. § 405.1014(c). The minimum amount in controversy required for hearing before an Administrative Law Judge are published in the Federal Register.

### B. Scope of Review

The issues before the ALJ include all the issues brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in the Appellant's favor. 42 C.F.R. § 405.1032(a).

### C. Standard of Review

The ALJ conducts a *de novo* review of each claim at issue and makes a decision based on the hearing record. 42 C.F.R. § 405.1000(d).

## II. Principles of Law

### A. Statutes and Regulations

Medicare Part B provides coverage to eligible beneficiaries for all or part of the cost of "medical and other health services," a term that is defined by the Social Security Act as including, among many other things, durable medical equipment. *See* Social Security Act § 1832(a)(1)(B); 42 C.F.R. §410.10(h). Notwithstanding any other provision of Title XVIII of the Social Security Act, no payment may be made under parts A or B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. Social Security Act § 1862(a)(1)(A). Similarly, Medicare precludes payment to any claimant unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." Social Security Act § 1833(e).

### B. Policy and Guidance

The Social Security Act vests in the Secretary the authority to make coverage decisions. Under that authority, CMS issues National Coverage Determinations (NCDs) that state whether specific medical items, services, treatment procedures, or technologies may be paid for by Medicare. In the absence of a specific NCD, the Medicare contractor is responsible for determining whether an item or service is reasonable and necessary. (See preface to Coverage Issues Manual (reprinted at 54 Fed. Reg. 34555 (Aug. 21, 1989)). Accordingly, in addition to looking to the binding statutory and regulatory authority, this ALJ must accord substantial deference to manuals, program memoranda and other issuances issued by the Center for Medicare and Medicaid Services (CMS) and its carriers and intermediaries. 42 C.F.R. § 405.1062. Thus, the ALJ looks to the Local Coverage Determinations (LCD), if any, and the Medicare Benefit Policy Manual.

Historically, in making coverage determinations, CMS has interpreted the terms "reasonable and necessary" to mean that the item or service in question is safe and effective and not experimental. CMS has further determined that the relevant tests for applying these terms are whether the item or service has been proven safe and effective based on authoritative evidence, or alternatively, whether the item or service is generally accepted in the medical community as safe and effective for the condition for which it is used. 54 Fed. Reg. 4304 (Jan. 30, 1989); 60 Fed. Reg. 48417 (Sept. 19, 1995); see also 52 Fed. Reg. 15,560 (Apr. 29, 1987). Indeed, CMS has provided guidance in the *Medicare Program Integrity Manual* (CMS Pub. 100-08) (*MPIM*) to assist contractors in developing LCDs to aid in creating relevant tests and guidance. The *MPIM* contemplates that, in making a determination as to whether an item or service is reasonable and necessary, contractors will analyze whether the item or service is safe and effective, and not experimental or investigational. *MPIM*, Ch. 13 at § 13.5.1. Contractors shall consider a service reasonable and necessary if the contractor determines that the service is:

- Safe and effective;

- Not experimental or investigational; and

- Appropriate, including the duration and frequency that is considered appropriate for the service.

The *MPIM* further instructs contractors to base LCDs on the strongest evidence available at the time the determination is issued. In order of preference, this includes:

- Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and ALJs and the Medicare Appeals Council are not bound by CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case. 42 C.F.R. § 405.1062(a).

- General acceptance by the medical community (standards of practice), supported by sound medical evidence based on:

> o Scientific data or research studies published in peer-reviewed medical journals;

> o Consensus of expert medical opinion (i.e., recognized authorities in the field); or

> o Medical opinion derived from consultations with medical associations or other health care experts.

*Id.* at § 13.7.1. The Manual further explains:

> Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community. Testimonials indicating such limited acceptance, and limited case studies distributed by sponsors with financial interest in the outcome, are not sufficient evidence of general acceptance by the medical

community. The broad range of available evidence must be considered and its quality shall be evaluated before a conclusion is reached.

*Id.*

There is a Local Coverage Determination stating CMS' guidance for Tumor Treatment Field Therapy: CGS Administrators, LLC, Local Coverage Determination, LCD L34823, Tumor Treatment Field Therapy (TTFT) (January 2017). This LCD provides, without elucidation, that tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.[8] The related Policy Article states that tumor treatment field therapy devices are covered under the Durable Medical Equipment benefit and must meet the reasonable and necessary requirements set out in the related LCD to be eligible for reimbursement. CGS Administrators, LLC, Local Coverage Article for Tumor Treatment Field Therapy Article A52711 (Article A52711) (January 2017).

## **Analysis**

The issue is whether the Tumor Treatment Field Therapy services are entitled to coverage. Pursuant to section 405.1032(a) of the regulations (42 C.F.R.), the unfavorable findings of the contractors are the issues before this ALJ. Both the Medicare Contractor and the QIC found, that based on the available documentation, Medicare requirements outlined in the LCD were not met. (Exh. 1, pp. 10, 31).

There is no NCD specific to TTFT. This ALJ, therefore, looks to the relevant LCD for guidance. ALJs are not bound by LCDs and will give substantial deference to the policies if they are applicable to a particular case. 42 C.F.R. § 405.1062. If an ALJ declines to follow an LCD in a particular case, the ALJ must explain the reasons why the policy was not followed. *Id.*

Ms. Prosser, in her prehearing brief, argues that the LCD L34823 does not apply to newly diagnosed glioblastoma cases. However, the LCD is silent on the type of glioblastoma and does not differentiate between newly diagnosed and recurrent glioblastoma. Consequently, LCD L34834 is applicable to this case, and I decline to follow it for multiple reasons. TTFT has been shown to be safe and effective for use in patients with recurrent and newly diagnosed glioblastoma, and it is medically reasonable and necessary to treat Ms. Prosser's condition.

LCD L34834 denies coverage for tumor treatment field therapy as not reasonable and necessary, omitting entirely the literature references in the prior LCDs. Data from the FDA, phase III clinical trials, and NCCN guidelines show the LCD, at best, is behind the medical literature curve – at least as applied to Ms. Prosser. The *Medicare Program Integrity Manual* (CMS Pub. 100-08) (*MPIM*) provides more appropriate, relevant, and helpful guidance for making a determination as to whether an item or service is reasonable and necessary, and not experimental or investigational. *MPIM*, Ch. 13 at § 13.5.1.

---

[8] This latest version of the LCD, omits entirely the literature previously shown in the 2016 LCD (an update from the 2015 version, which is not markedly distinguishable).

Applying that guidance, this ALJ first finds that the Optune device received FDA premarket approval for use in patients with recurrent glioblastoma on April 8, 2011. On October 5, 2015, the FDA gave premarket approval for use of Optune in patients with newly diagnosed glioblastoma. Premarket approval (PMA) entails the following:

> PMA is the most stringent type of device marketing application required by FDA. The applicant must receive FDA approval of its PMA application prior to marketing the device. PMA approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).[9]

While FDA premarket approval does not establish that the device is medically reasonable and necessary pursuant to Medicare requirements, it does ensure that the FDA has closely examined the device and its application. The FDA determined that sufficient scientific evidence existed to provide the FDA with assurance that the device was safe and effective for its intended use both in patients with recurrent and newly diagnosed glioblastoma. From this perspective, the use of the device meets Medicare guidance requiring that a device be proven safe and effective based on authoritative evidence.

Medicare does not pay for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member. Social Security Act § 1862(a)(1). To be reasonable and necessary, the procedure must be safe and effective and not experimental. The FDA approval, along with the other evidence below, supports the conclusion that the device is safe, and not experimental or investigational.

Second, this ALJ has reviewed clinical studies in the record related to the use of the Optune device. With respect to patients newly diagnosed with glioblastoma, results of a phase III study released in a December 15, 2015, JAMA article showed that adding TTFT to maintenance temozolomide significantly prolonged progression-free and overall survival. Significantly, patients in the control group in the JAMA-reported study crossed over to the combined therapy group for TTFT treatment due to the improvement in outcomes seen. The results from these phase III trials also led to FDA approval for the Optune device. These trials showed that the Optune device was safe, non-investigational and effective. It is noteworthy that the 2015 study contains proof of efficacy. These trials show that the Optune device is appropriate for treatment of Ms. Prosser's glioblastoma.

Third, the use of TTFT is generally accepted by the medical community. In the 2015 version of the National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology Central Nervous System Cancers guidelines, alternating electric field therapy is a treatment option suggested for glioblastoma. This suggestion was found in a treatment guideline from a national cancer organization, not evidence based on an individual physician treating a single patient in a clinical setting. As such, TTFT treatment is generally accepted in the medical community as safe and effective for the treatment of recurrent glioblastoma.

---

[9]http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissi ons/PremarketApprovalPMA/default.htm

Overall, a review of the literature available supports that the Optune device is safe and effective and not investigational/experimental. The use of the Optune device in populations with recurrent glioblastoma or newly diagnosed glioblastoma was proven effective and appropriate through phase III clinical trials. The use of the Optune device appears in national cancer treatment guidelines for treatment of glioblastoma, showing general acceptance by the medical community. A number of commercial health plans also now cover TTFT. (Exh. 5, pp. 692-1,421).

For the reasons stated above, Optune (TTFT) has been shown to be safe and effective, and is not experimental. Medicare coverage is thus available for the tumor treatment field therapy.

## Conclusions of Law

Medicare coverage exists for the Optune Tumor Treatment Field Therapy services (E0766) provided to the Beneficiary for dates of service August 16, 2018, September 16, 2018, and October 16, 2018.

## Order

The Medicare Contractor shall process the claim in accord with this decision.

**IT IS SO ORDERED.**

**MAY 1 6 2019**

Dated: _____

**Kimberley Woodyard**
U.S. Administrative Law Judge

# EXHIBIT J

# PARRISH LAW OFFICES

788 Washington Road
Pittsburgh, Pennsylvania 15228-2021
www.dparrishlaw.com

412.561.6250
Fax 412.561.6253
E-mail: info@dparrishlaw.com

March 19, 2019

**VIA PRIORITY MAIL**

DHHS – OMHA
Centralized Docketing
**Attn: Beneficiary Mail Stop**
200 Public Square, Suite 1260
Cleveland, OH 44114-2316

# BENEFICIARY APPEAL

**RE:   Request for ALJ Hearing**
**Beneficiary:  Anniken Prosser**
       **W2973 Farmstead Drive**
       **Appleton, WI 54915**
       **HICN: 4R87U71QM75**
       **Device: Tumor Treatment Field Therapy (E0766)**
       **Supplier: Novocure, Inc.**
       **Dates of Service: 5/16/18, 6/16/18, 7/16/18**
       **Medicare Appeal No: 1-8251666390**
       **Date of QIC Decision: March 15, 2019**
       **Our Ref:  19-52**

Dear Claims Coordinator:

As an authorized representative of the above-captioned Medicare beneficiary, Anniken Prosser, I hereby appeal to an Administrative Law Judge the above-captioned decision rendered by the Qualified Independent Contractor ("QIC") C2C Innovative Solutions, Inc. for the claim submitted for tumor treatment field therapy ("TTFT") for a glioblastoma. The QIC denied the claim stating "the medical documentation of the efficacy of this device is not within the usual scope and breadth of current medical literature with peer acknowledgement and review." The QIC found the "clinical trials to be limited in number and asserted the clinical trials were biased because they were funded by Novocure. The QIC also asserts that although the DMACs acknowledged a valid reconsideration request was filed, LCD L34823 remains applicable until the DMACs retire it or issue a new LCD.

The published, peer-reviewed literature shows the improved clinical survival and the progression-free survival of patients who receive TTFT for their glioblastoma. TTFT for glioblastoma is included in the National Comprehensive Cancer Network ("NCCN") guidelines and is considered the standard of care for newly diagnosed glioblastoma. Hundreds of treating

physicians, in all 50 states, have prescribed TTFT. TTFT is covered by all the large national payers. Medicare has paid for numerous claims for medically indistinguishable beneficiaries.

The QIC's determination is nonsensical. The seminal articles showing the effectiveness of the treatment/device were published in JAMA, one of the most prestigious journals in the country based on "impact factor." JAMA is a peer-reviewed publication, thus the assertion that the documentation lacks review is belied by the evidence. Multiple peer-reviewed articles show the effectiveness of the device to there is scope and breadth. The inclusion of TTFT in the NCCN guidelines is "peer acknowledgment and review."

Finally, it is customary in the United States for clinical trials to be sponsored. Indeed, Medicare often requires industry to sponsor a study as a condition of Medicare coverage. Industry sponsored clinical trials underpin most Medicare LCDs. In the present case, the authors of the papers are at academic institutions and the paper went through peer-review thus eliminating or managing any bias that may have derived from the studies' sponsorship. A standard that precludes consideration of industry-sponsored research for purposes of Medicare coverage would preclude consideration of most of the biomedical research, a clearly absurd result.

In either event, on March 6, 2019, the Medicare Carrier Advisory Committee voted to extend Medicare coverage of TTFT based on the studies completed in 2017. Thus, no basis exists for denying coverage.

Yours very truly,

Debra M. Parrish TTT

Debra Parrish on behalf of
Ms. Anniken Prosser

Enclosures:
    Attachment A: Appointment of Representative Form
    Attachment B: Certificate of Service

cc:    Ms. Anniken Prosser
       Novocure, Inc.

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

April 10, 2019

### *VIA PRIORITY MAIL*

Judge Lissette Figueroa
Office of Medicare Hearings and Appeals
Miami Field Office
51 SW 1st Ave., Suite 1536
Miami, FL 33130

> **RE:** **Prehearing Brief**
> **ALJ Appeal No. 1-8380637906**
> **Appellant/Beneficiary: A. Prosser**
> **Service: E0766**
> **Dates of Services: 5/16/18, 6/16/18, 7/16/18**
> **Hearing Date: TBD**
> **Our Ref. No.: 19-52**

Dear Judge Figueroa:

In anticipation of the scheduling of the above-captioned case, please find attached a prehearing brief to aid in your analysis. We have compiled (1) additional studies from 2018 and 2019 and (2) textbook chapters from medical textbooks since the filing of the reconsideration request, which are included on the attached CD. The LCD Record Exhibit List detailing the documents considered by the contractor for L34823 is also included.

If you have any questions regarding the foregoing, please do not hesitate to contact me at (412) 561-6250. We appreciate your consideration.

Respectfully submitted,

Debra M. Parrish
Attorney for A. Prosser

Enclosures:
    Attachment A: Prehearing Brief
    Attachment B: CD containing:
        -LCD Record Exhibit List
        -TTFT bibliography for GBM & additional peer-reviewed studies from 2018 & 2019 -
        (aside from those previously submitted with the reconsideration request)
        -Medical school textbook excerpts

cc:    Ms. A. Prosser

# EXHIBIT K



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami Field Office**

| Appeal of: | **Parrish Law Firm on behalf of A. Prosser** | ALJ Appeal No.: **1-8380637906** |
|---|---|---|
| Beneficiary: | **Anniken Prosser** | **Medicare Part B** |
| HICN: | **\*\*\*\*\*4857A** | Before: **Lissette M. Figueroa** U.S. Administrative Law Judge |

## DECISION

After carefully considering the evidence and arguments presented in the record and at the hearing, a **FAVORABLE** decision is entered in the appeal of A. Prosser. (Appellant).

### Procedural History

Novocure submitted claims to Medicare for an E0766 (electrical stimulation device used cancer treatment) for the dates of services of May 16, 2018, June 16, 2018, and July 16, 2018. The claims were initially denied on May 23, 2018, because Medicare guidelines were not met. Redetermination request was made to CGS, the Medicare Contractor with jurisdiction. On September 27, 2018, 2018, CGS concluded the following:

> Medicare does not cover tumor treatment field therapy (E0766) or therapy supplies (A4555) as the currently published studies in the medical literature do not clearly document the effectiveness of this device per LCD L34823. (Exhibit 1, pages 21-23).

On January 22, 2019, the Parrish Law Firm informed the Qualified Independent Contractor (QIC); it was representing Ms. Prosser and requested a reconsideration of the previous denial. On March 15, 2019, the QIC affirmed the Plan. (Exhibit 1, pages 1-13).

The QIC completed a review of the Manuals; peer review language submitted by the Appellant, and the LCD, yet still determined the requested service was denied as not reasonable and necessary. The QIC did acknowledge that DME MACs have found a "request for newly diagnosed glioblastoma as valid; however the DMEs have bot issued a new LCD providing coverage for newly diagnosed glioblastoma." (Exhibit 1, pages 9-10).

On March 21, 2019, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's timely Request for Medicare Hearing by an Administrative Law Judge (ALJ) from the Beneficiary's representative. (Exhibit 3, pages 1-4). The remaining amount in controversy meets the jurisdictional

requirements for a hearing before OMHA.[1] Therefore, the jurisdictional predicates are met and the claim for ambulance services, which is covered by this decision, is properly before the ALJ for *de novo* review.

Ms. Parrish submitted additional items (peer review literature, LCD, and prior ALJ decisions) with the Request for Hearing and same were admitted into the record as Exhibit 5 and Exhibit 6.

On May 28, 2019, the undersigned conducted a telephone hearing from the OMHA Miami Field Office. The QIC was provided with a notice of hearing, but did not attend. Attendees at the hearing included: Bridget Noonan, Esq. as Counsel for the Beneficiary and Mr. Timothy Parks on behalf of Novocure. Subsequent to the hearing, Ms. Parrish submitted the proposed LCD for newly diagnosed glioblastomas and this was admitted into the record as Exhibit 7.

## Issues

1) The appeal presents the following issue: Is the appellant entitled to Medicare reimbursement under Part B of Title XVIII of the Social Security Act (the Act) for the tumor treatment field therapy furnished to the appellant on the dates of service of May 16, 2018, June 16, 2018, and July 16, 2018? In other words, are such services within a covered category under 1861(s)(3) of the Act, and if so, are such services not otherwise excluded from coverage under §1862(a)(1) of the Act?

2) Whether payment can otherwise be made to the Appellant pursuant to the waiver of liability provisions under Section 1879 of the Act and 42 C.F.R. § 411.406, if it is determined that the item was not medically reasonable and necessary under Section 1862 (a)(1) of the Act.

## Findings of Fact

1. Physician progress note dated February 16, 2017, described the Beneficiary as a 33-year-old female that presented to her physician for follow-up evaluation and management of a left temporal Grade 4 astrocytoma[2]. Neuro-oncology exam revealed the following: 1) a history of migraines which started in her 20's possibly secondary to Crohn's medication; 2) intractable migraine on February 14, 2016, and MRI which showed a left cystic temporal mass; 3) left craniotomy- GBM on February 25, 2016; 4) completed radiation with concurrent temodar; 5) adjuvant temodar; and

---

[1] 67 Fed. Reg. 62478 (October 7, 2002) and 70 Fed. Reg. 11423 (March 8, 2005)

[2] Grade IV astrocytoma is also called glioblastoma or GBM and is the most aggressive type of nervous system tumor. It is also referred to as glioblastoma multiforme because of its wide variety of appearances under the microscope. Rarely, non-glial tissue elements can exist in a glioblastoma. The most common variant of GBM showing these additional tissue elements is called a mixed glioblastoma-sarcoma, or gliosarcoma. GBM occurs most often in adults between the ages of 50 and 80, is more common in men, and accounts for 23% of all primary brain tumors. Grade IV astrocytoma: The three main forms of treatment for GBM are surgery and radiation or chemotherapy. These treatments may be used alone or in combination with one another. The initial treatment in most cases is surgical excision and removal of as much as the tumor as possible (resection). Often, only a portion of the tumor can be safely removed because malignant cells may have spread to surrounding brain tissue. Because surgery cannot completely remove a tumor, radiation therapy and chemotherapy are used following surgery to continue treatment.

The FDA has approved Temozolomide (Temodar) for the treatment of adults with GBM. Temozolomide is used concurrently with radiation therapy, and for a period after completion of radiotherapy. For more information, contact:

https://rarediseases.org/rare-diseases/astrocytoma/

6) start of Optune TTFields. (Exhibit 2, page 34). Past medical history included Crohn's disease, and Wolff-Parkinson-White Syndrome[3] (1999). Physician's plan included a continuation of Optune TTFields, adjuvant temodar, and RTC 2 months with MRI. (Exhibit 2, page 37).

2. Physician progress note dated March 15, 2018, showed the Beneficiary presented for follow-up. The physician indicated the Beneficiary was neurologically intact and radiographically stable and was tolerating TTFields. Recommendation was to continue Optune TTFields and RTC 3 months with MRI. (Exhibit 2, pages 1-4).

3. Optune Prescription Form dated April 13, 2018, indicated the physician ordered a 6-month prescription for the Beneficiary due to glioblastoma multiforme. (Exhibit 2, pages 41-42).

4. The Beneficiary signed Optune Service Agreement and delivery confirmation on May 19, 2016. (Exhibit 1, pages 44-63A).

5. Invoices from Novocure were submitted to Medicare for dates of service: May 16, 2018, June 16, 2018, and July 16, 2018. (Exhibit 2, pages 39-41).

6. The Parrish Law Firm submitted literature and Professional Studies. (See Exhibit 5).

## **Legal Framework**

### **I.    ALJ Review Authority**

#### ***A.   Jurisdiction***

Individuals or organizations dissatisfied with the reconsideration of an initial determination are entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS) provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner. Act § 1869(b)(1)(A).

In implementing this statutory directive, the Secretary has delegated the authority to administer the nationwide hearings and appeals system for the Medicare program to OMHA. 70 Fed. Reg. 36386, 36387 (June 23, 2005). The ALJs within OMHA issue the final decisions of the Secretary, except for decisions reviewed by the Medicare Appeals Council. *Id.*

---

[3] In Wolff-Parkinson-White (WPW) syndrome, an extra electrical pathway between your heart's upper and lower chambers causes a rapid heartbeat. The extra pathway is present at birth and rare.

The episodes of fast heartbeats usually are not life threatening, but serious heart problems can occur. Treatment can stop or prevent episodes of fast heartbeats. A catheter-based procedure (ablation) can permanently correct the heart rhythm problems. Most people with an extra electrical pathway experience no fast heartbeat. This condition, called Wolff-Parkinson-White pattern, is discovered only by chance during a heart exam. Although WPW pattern is often harmless, doctors might recommend further evaluation before children with WPW pattern participate in high-intensity sports.
https://www.mayoclinic.org/diseases-conditions/wolff-parkinson-white-syndrome/symptoms-causes/syc-20354626

For requests filed on or after January 1, 2018, the AIC threshold for requests for Administrative Law Judge hearings will remain at $160, and the AIC threshold for seeking judicial review will increase to $1,600. The notice is available at https://www.gpo.gov/fdsys/pkg/FR-2017-09-29/pdf/2017-20883.pdf.

### B. Scope of Review

For all appeals stemming from a QIC, the ALJ appeals process is governed by 42 C.F.R. §§ 405.1000 *et seq.* 42 C.F.R. § 405.1032 states, "[t]he issues before the administrative law judge include all the issues brought out in the initial, reconsidered, or revised determination that were not decided entirely in your favor. However, if evidence presented before or during the hearing causes the administrative law judge to question a fully favorable determination, he or she will notify you and will consider it an issue at the hearing."

### C. Standard of Review

The ALJ conducts a de novo review of each claim at issue and issues a decision based on the hearing record. 42 C.F.R. § 405.1000(d) and Section 557 of the Administrative Procedure Act. A de novo review requires the ALJ to review and evaluate the evidence without regard to the findings in the prior determinations on the claim and make an independent assessment in reliance upon the evidence and controlling laws. All laws and regulations pertaining to the Medicare and Medicaid programs, including, but not limited to Titles XI, XVIII, and XIX of the Social Security Act and applicable implementing regulations, are binding on ALJ's. 42 CFR § 405.1063. The burden of proving each element of a Medicare claim lies with the Appellant and is by preponderance of the evidence (i.e. satisfied through the submission of sufficient evidence in accordance with Medicare rules). See e.g., Sections 1814(a)(1), 1815(b), and 1833(e) of the Act; see also 42 C.F.R. § 424.5(a)(6), 42 C.F.R. § 405.1018, 42 C.F.R. § 405.1028, and 42 C.F.R. § 405.1030.

## II.    Principles of Law

### A. Statutes and Regulations

Section 1831 of the Act establishes a supplementary insurance program for the aged and disabled. This insurance program, commonly referred to as Part B of Medicare, is financed through premium payments by enrollees together with contributions from funds appropriated by the Federal Government. §1831; *42 U.S.C. 1395j.* The program allows for the reimbursement of physicians' services including surgery, consultation, and office visits. §1861(q); *42 U.S.C. 1395x(q)*

The standard for payment of these services is found in section 1862(a)(1)(A) of the Act. There, the Act states that no payment may be made "…for items and services…[which] are reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Section 1833(e) of the Act provides that payment will not be made unless sufficient information is furnished to determine the amounts due to the provider. *See also* 42 CFR §424.5(6).

Section 1862(a)(1)(A) of the Act provides that "[n]otwithstanding any other provision of the Act, no payment shall be made for any expenses incurred for items and services that are not reasonable and

Case 1:20-cv-00194-WCG   Filed 04/11/20   Page 5 of 16   Document 8-11
A0037

necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *See also* 42 C.F.R. §411.15(k).

Section 1862(a)(12) of the Act provides that no payment may be made for services in connection with the care, treatment, filling, removal, or replacement of teeth or structures directly supporting teeth, except that payment may be made under part A in the case of inpatient hospital services in connection with the provision of such dental services if the individual, because of his underlying medical condition and clinical status or because of the severity of the dental procedure, requires hospitalization in connection with the provision of such services.

Section 1866(a)(1)(A)(i) of the Act provides that "[a]ny provider of services (except a fund designated for purposes of section 1814(g) and section 1835(e)) shall be qualified to participate under this title and shall be eligible for payments under this title if it files with the Secretary an agreement not to charge, except as provided in paragraph (2), any individual or any other person for items or services for which such individual is entitled to have payment made under this title (or for which he would be so entitled if such provider of services had complied with the procedural and other requirements under or pursuant to this title or for which such provider is paid pursuant to the provisions of section 1814(e)) of the Act." *See also* 42 C.F.R. §489.1 *et seq.* (setting forth the terms and limitations on provider agreements).

Section 1879 of the Act limits the liability of the Beneficiary and providers of services if the services are found to be not medically reasonable and necessary under Section 1862(a)(1)(A) or care was custodial in nature under Section 1862(a)(9) of the Act. Payment will only be made pursuant to this section if neither the Beneficiary nor the provider knew or could reasonably have been expected to know that the services were not covered. *See also* 42 C.F.R. §411.404; 42 C.F.R. §411.406.

### *B. Policy and Guidance*

Section 1871(a)(2) of the Act states that unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. However, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of medical items and services in the form of manuals and local medical review policies (LMRPs) or local coverage determinations (LCDs).

Section 1869(f)(1) of the Act provides that NCDs are binding upon Administrative Law Judges. *See also* 42 CFR §405.1060. *Medicare National Coverage Determinations Manual, Pub. 100-03, Ch. 1, sec. 280* ("NCD 280.1") provides a mandatory statement as to what constitutes equipment that the meets the definition of DME, as follows:

"The term DME is defined as equipment which:

* Can withstand repeated use; i.e., could normally be rented and used by successive patients;
* **Is primarily and customarily used to serve a medical purpose**;
* Generally is not useful to a person in the absence of illness or injury; and,

* Is appropriate for use in a patient's home."

Section §1869(f)(2) of the Act provides that Administrative Law Judges will give substantial deference to LCDs, LMRPs, or CMS program guidance when applicable, and if they do not follow the policy they must explain why in their decision. *See also* 42 CFR §405.1062. The Local Coverage Determination Policy applicable to this case. The LCD at issue is L34823 and Policy Article 52711.

### L34823

In addition to the "reasonable and necessary" criteria contained in this LCD, there are other payment rules, which are discussed in the following documents that must also be met prior to Medicare reimbursement:

- The LCD-related Standard Documentation Requirements Article, located at the bottom of this policy under the Related Local Coverage Documents section.
- The LCD-related Policy Article, located at the bottom of this policy under the Related Local Coverage Documents section.

- Refer to the Supplier Manual for additional information on documentation requirements.
- Refer to the DME MAC web sites for additional bulletin articles and other publications related to this LCD.

For the items addressed in this LCD, the "reasonable and necessary" criteria, based on Social Security Act § 1862(a)(1)(A) provisions, are defined by the following coverage indications, limitations and/or medical necessity.

Tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.

### GENERAL

A Detailed Written Order (DWO) (if applicable) must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving a completed DWO, the claim shall be denied as not reasonable and necessary.

An item/service is correctly coded when it meets all the coding guidelines listed in CMS HCPCS guidelines, LCDs, LCD-related Policy Articles, or DME MAC articles. Claims that do not meet coding guidelines shall be denied as not reasonable and necessary/incorrectly coded.

Proof of delivery (POD) is a Supplier Standard and DMEPOS suppliers are required to maintain POD documentation in their files. Proof of delivery documentation must be made available to the Medicare contractor

### Policy Article 52711

Code E0766 describes devices that generate electromagnetic fields utilized in the treatment of cancer. The electromagnetic energy generated is transmitted to the body by means of surface

electrodes or transducers.

This code is inclusive of all associated supplies necessary for the effective use of code E0766 including, but not limited to, transducers/surface electrodes, lead wires, adhesive patches, connectors, conductive gel and skin preps.

### *Proposed changes to LCD DL34823*

On May 9, 2019, The Centers for Medicare and Medicaid Services (CMS) assigned to the Durable Medical Equipment Medicare Administrative Contractors (DME MACs) the task of developing Local Coverage Determinations (LCDs) for Durable Medical Equipment, Prostheses, Orthoses, and Supplies (DMEPOS). The DME MACs are proposing a revision to the **Tumor Treatment Field Therapy (TTFT LCD L34823)** to cover newly diagnosed glioblastoma multiforme (GBM).

The proposed policy extends coverage for use of TTFT as a treatment option for Medicare beneficiaries with newly diagnosed GBM when certain coverage criteria are met. Stakeholders may read the details of the proposed TTFT LCD posted on the Medicare Coverage Database (Reference DME MAC DL34823). The entire LCD should be completely reviewed prior to the submission of written comments.

*Medicare Benefit Policy Manual, Pub. 100-02 ("CMS Pub. 100-02"), Ch. 15, §110.1,* also provides guidance pertaining to Medicare coverage of DME, and explains that

Expenses incurred by a beneficiary for the rental or purchases of durable medical equipment (DME) are reimbursable if the following three requirements are met:

- The equipment meets the definition of DME (§110.1);
- The equipment is necessary and reasonable for the treatment of the patient's illness or injury or to improve the functioning of his or her malformed body member (§110.1); and
- The equipment is used in the patient's home.

*Ch. 15, §110.1(A)* further explains as follows:

- Equipment, which is primarily and customarily used for a nonmedical purpose, may not be considered "medical" equipment for which payment can be made under the medical insurance program. This is true even though the item has some remote medically related use. For example, in the case of a cardiac patient, an air conditioner might possibly be used to lower room temperature to reduce fluid loss in the patient and to restore an environment conducive to maintenance of the proper fluid balance. Nevertheless, because the primary and customary use of an air conditioner is a nonmedical one, the air conditioner cannot be deemed medical equipment for which payment can be made.

- Other devices and equipment used for environmental control or to enhance the environmental setting in which the beneficiary is placed are not considered covered DME. These include, for example, room heaters, humidifiers, dehumidifiers, and electric air cleaners. Equipment, which serves comfort or convenience, functions or is primarily for the convenience of a person caring for the patient, such as elevators, stairway elevators, and posture chairs, do not constitute medical equipment. Similarly, physical fitness

equipment (such as an exercycle), first-aid **or precautionary-type equipment (such as preset portable oxygen units)**, self-help devices (such as safety grab bars), and training equipment (such as Braille training texts) **are considered nonmedical in nature**.

*Medicare Program Integrity Manual, Pub. 100-08, ("CMS Pub. 100-08"), Ch. 5,* provides guidance as to documentation for DME claims, including the requirement of both physician orders for DME and supporting documentation for medical necessity and delivery. *Ch. 5,* also provides guidance as to patient documentation requirements to support that Medicare coverage criteria for items of DME have been met.

> For any DMEPOS [Durable Medical Equipment Prosthetics Orthotics and Supplies] item to be covered by Medicare, the patient's medical record must contain sufficient documentation of the patient's medical condition to substantiate the necessity for the type and quantity of items ordered and for the frequency of use or replacement (if applicable). The information should include the patient's diagnosis and other pertinent information including, but not limited to, duration of the patient's condition, clinical course (worsening or improvement), prognosis, nature and extent of functional limitations, other therapeutic interventions and results, past experience with related items, etc. . . . neither a physician's order nor a CMN [certificate of medical necessity] . . . nor a supplier prepared statement nor a physician attestation by itself provides sufficient documentation of medical necessity, even though it is signed by the treating physician or supplier. There must be information in the patient's medical record that supports the medical necessity for the item and substantiates the answers on the CMN (if applicable) . . . or information on a supplier prepared statement or physician attestation (if applicable). . . . The patient's medical record is not limited to the physician's office records. It may include hospital, nursing home, or HHA records and records from other health care professionals. *CMS Pub. 100-08, Ch. 5, §5.7.*

*Medicare Program Integrity Manual, Pub. 100-08 ("CMS Pub. 100-08"), Ch. 13, §13.5.1* explains the reasonable and necessary provisions in LCDs as follows:

> Contractors shall describe in the draft LCD the circumstances under which the item or service is reasonable and necessary under 1862(a)(1)(A). Contractors shall consider a service to be reasonable and necessary if the contractor determines that the service is:
> - Safe and effective;
> - Not experimental or investigational (exception: routine costs of qualifying clinical trial services with dates of service on or after September 19, 2000 which meet the requirements of the Clinical Trials NCD are considered reasonable and necessary); and
> - Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:
>   o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;
>   o Furnished in a setting appropriate to the patient's medical needs and condition;
>   o Ordered and furnished by qualified personnel;
>   o One that meets, but does not exceed, the patient's medical need; and
>   o At least as beneficial as an existing and available medically appropriate alternative.

Case 1:20-cv-00194-WCG   Filed 04/11/20   Page 9 of 16   Document 8-11
A0041

I have given substantial deference to the Centers for Medicare and Medicaid Services (CMS) manuals implementing the Medicare program, which are of persuasive importance and instructive and influential. Specific to the instant case is the Medicare Benefit Policy Manual, Publication 100-2, Chapter 15, Covered and Other Health Services, §110 Durable Medical Equipment; and the Medicare Claims Processing Manual, Publication 100-4, Chapter 20, Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS). *See also* CFR §405.1062.

## Analysis

I have reviewed the criteria necessary for Medicare coverage of tumor treatment field therapy, established in accordance with the statutory and regulatory provisions of Part B of Title XVIII of the Social Security Act, and I have determined that the services at issue met such criteria. For the reasons set forth below, I find that the tumor treatment field therapy administered to the appellant on the dates of service at issue was medically reasonable and necessary.

In this appeal, Ms. Noonan (Parrish Law Firm) and Mr. Timothy Parks (Novocure) testified as to the pertinent medical facts concerning this Beneficiary. Ms. Noonan indicated additional appeals were submitted by the Parish Law firm and from the supplier. In reference to the facts, the following was noted:

> Mr. Parks spoke to the Beneficiary and as of April 10, 2019, the Beneficiary is stable and is doing quite well. Her response to treatment is impressive. Beneficiary was listed as a 33-year-old female and clinical condition was determined on February 14, 2014. MRI showed large left cystic temporal illness. On February 25, 2016, she underwent a left craniotomy, which confirmed her condition was that of glioblastoma. In May 2016, she completed chemotherapy and radiation with concurrent temodar. On June 16, 2016, she started Optune TTFields. In April 2017, she completed 12 cycles of temodar and continued with TTFields. MRIs have remained stable with no progression. On March 2018- March 2019, she has been stable. In December 2018, her tumor was shown to have reduced in size. Her ECOG/WHO score was listed as "0" meaning she was able to carry on all predisease performance without restriction. Her Karnofsky Performance score was an 80% with indicated the Beneficiary could carry on normal activity and to work.

## REVIEW OF THE DEVICE AND REGULATIONS

Medicare is a defined benefit program, which means that it does not cover all available medical services and supplies.[4] Instead, Medicare coverage is limited to those medical services and supplies identified by Congress, by the Secretary of Health and Human Services, and by CMS in implementing Congressional directives. For example, Medicare does not cover medical services that are experimental or investigational.[5]

---

[4] *Consultants in Pain Medicine, P.A.* (December 2014). In general, although MAC decisions have no precedential value, the decisions may serve as a guidepost to disposition of similar cases. 70 Fed. Reg. 11420, 11449 (Mar. 8, 2005); *see also Vidant Medical Center,* (MAC March 2014).

[5] S*ee also* Medicare Program Integrity Manual, Publication 100-08, Chapter 13, §13.5.1.

### *OPTUNE DEVICE*

The TTFT Optune device (E0766) is a portable, wearable medical device that produces alternating electrical fields, tumor treating field ("TTFields") within the brain by means of electrically insulated surface transducer arrays placed on the scalp. The TTFields disrupt the rapid cell division exhibited by cancer cells supporting tumor growth inhibition without damage to normal neuronal function or structure or any systemic toxicity.

### *FDA CLEARANCE*

At the hearing, Ms. Noonan argued that the FDA approved, through its more rigorous review process, a device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. In support of her argument, the Parrish Law Firm submitted a letter generated by the Center for Devices and Radiological Health of the FDA on October 5, 2015, which states in pertinent part as follows:

> This device is indicated as a treatment for adult patients (22 years or older) with histologically confirmed glioblastoma multiforme (GBM). Optune™ (formerly the NovoTTF-100A System) with Temozolomide is indicated for treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation together with concomitant standard of care chemotherapy. (Exhibit 5)

At the outset, I find that FDA clearance of a device is not synonymous with Medicare coverage.[6] The regulations state that "CMS *may consider* for Medicare coverage" FDA approved devices "that have been categorized as non-experimental/investigational."[7] The regulations further clarify that CMS uses FDA categorization *"as a factor"* in making coverage decisions. [8] Thus, under Medicare regulations, the fact that a device, Optune™, may be deemed non-experimental by virtue of its FDA classification means, as a threshold matter, only that it is eligible to be considered for Medicare coverage. [9]

This conclusion is further reinforced by the statements published by CMS and the FDA in the Federal Register explaining the difference between CMS review of a medical device as compared to reviews conducted by the FDA for pre-market approval.[10] Specifically, each process operates under different statutory standards and asks different questions to meet its respective mandates. [11] Moreover, CMS serves a different function by providing health insurance to protect the nation's aged and disabled. Under §1862(a)(1) of the Act, CMS makes determinations regarding the coverage of specific items and services. In short, CMS must decide: "what items and services it can and should pay for; how it should accomplish the payment; and how much to pay."[12] Thus, FDA clearance of an item or service does not preclude CMS or its contractors, in analyzing whether a particular item or service is medically reasonable and necessary, from making an independent inquiry into whether the item or service is safe and effective and not experimental or investigational.[13] Nor does it preclude CMS or its contractors from inquiring whether the

---

[6] *In the Case of Vision Quest Industries, Inc.,* (MAC June 2012).

[7] *See* 42 C.F.R. §405.201(a)(2).

[8] *See* 42 C.F.R. §405.201(a)(1).

[9] *In the Case of Vision Quest Industries, Inc.,* (MAC June 2012).

[10] *See* 68 Fed. Reg. 55634 (Sept. 26, 2003); *See also* 75 Fed. Ref. 57045.

[11] *Id.; See also* MPIM, Publication 100-08, Chapter 13, §5.1.

[12] *In the Case of Vision Quest Industries, Inc.,* (MAC June 2012).

[13] *Id.*

item or service is supported by *"[p]ublished authoritative evidence derived from definitive randomized clinical trials or other definitive studies."*[14]

Therefore, although Optune™ received FDA approval or clearance for treatment of newly diagnosed glioblastoma multiforme, the appellant's medical condition, I find that such FDA approval/clearance alone does not generally entitle a device to Medicare coverage. Accordingly, I find that FDA clearance for Optune™ by itself does not establish that the device meets Medicare coverage requirements; i.e., that it has been shown to be a medically reasonable and necessary treatment for treatment of newly diagnosed glioblastoma multiforme.

## *NCCN GUIDELINES*

Ms. Noonan further argued that TTFT for glioblastoma is included in the National Comprehensive Cancer Network ("CNNC") guidelines and is considered the standard of care for newly diagnosed glioblastoma.

> **THE NATIONAL COMPREHENSIVE** Cancer Network (NCCN) has updated its Clinical Practice Guidelines in Oncology for Central Nervous System Cancers (NCCN Guidelines®) to recommend alternating electric field therapy (also known as tumor-treating fields, Optune) in combination with temozolomide as a category 1 treatment for patients with newly diagnosed glioblastoma. The NCCN panel members made this recommendation in conjunction with Temozolomide after maximal safe resection and completion of radiation therapy.
>
> The updated recommendation follows the publication of a phase III trial that demonstrated improvement in 5-year survival results with the combination therapy in *The Journal of the American Medical Association.*[1] The study showed the combination therapy significantly improved survival outcomes compared with Temozolomide alone.
>
> More than 1,800 patients with glioblastoma are receiving therapy with tumor-treating fields as of December 31, 2017, and more than 7,000 patients with glioblastoma have received such treatment to date. Physicians at more than 700 cancer centers in the United States, and at more than 1,100 medical institutions globally, have been certified to prescribe this radiation therapy to patients with newly diagnosed and recurrent glioblastoma.
>
> **More on Therapy With Tumor-Treating Fields**
>
> THERAPY WITH tumor-treating fields is intended as a treatment for adult patients 22 years of age or older with histologically confirmed glioblastoma multiforme. In combination with Temozolomide, it is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard-of-care chemotherapy.[15] https://www.ascopost.com/issues/april-25-2018/updated-nccn-guidelines-for-newly-diagnosed-glioblastoma/

---

[14] *Consultants in Pain Medicine, P.A.* (December 2014); *In the Case of Vision Quest Industries, Inc.,* (MAC June 2012).
[15] Effect of tumor-treating fields plus maintenance Temozolomide vs maintenance Temozolomide alone on survival in patients with glioblastoma. JAMA 318:2306-2316, 2017.

Case 1:20-cv-00194-WCG   Filed 04/11/20   Page 12 of 16   Document 8-11
A0044

Nearly all studies showed a significant negative relationship between advancing age and duration of postoperative survival.8–18 In a 2005 report of a study by Korshunov et al,18 the percentage of patients younger than age 40 years who survived more than five years was 34%, compared with 6% for patients age 40 years old and older. The researchers suggested age 40 years as the most appropriate cutoff for dividing patients with GB into groups according to prognosis. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3037140/

The applicable NCCN guidelines further state that all recommendations are category 2A unless otherwise indicated. It is undisputed that the FDA approved Optune™ for treatment of newly diagnosed glioblastoma multiforme, the appellant's medical condition. Moreover, the NCCN guidelines recommend treatment of methylated glioblastoma with the use alternative electric field therapy. Such recognition is Category 2A, which establishes that "based upon lower-level evidence, there is uniform NCCN consensus that the intervention is appropriate."[16] "The MBPM guidelines at 50.4.5.B[17] specifically state that, for purposes of the NCCN, a use will be medically accepted if the indication is a Category 1 or Category 2A designation.

## *PEER REVIEW LITERATURE*

The appellant contends that the NovoTTF 100-A System is reasonable and necessary and not investigational or experimental based on clinical studies, abstracts and publications. In making a determination as to whether the NovoTTF-100A System is reasonable and necessary, i.e., safe and effective, and not experimental or investigational, only evidence that was in existence on or before the dates of service at issue is relevant. The appellant must prove that the NovoTTF-100A System was medically reasonable and necessary when the service was furnished.

The Appellant has submitted documentation confirming that the Optune device received an initial April 2011 FDA pre-market approval and later October 2015 FDA pre-market approval supplement. Additional studies and literature have been submitted pertaining to the efficacy of tumor treating fields therapy for indications stated in those FDA approvals, including use of the Optune Device for treatment of recurrent Glioblastoma which has not responded to standard therapy (per the April 2011 FDA approval) and for treatment of newly diagnosed Glioblastoma (per the October 2015 FDA approval supplement). (*See* CD attachment at Exhibit 5).

Appellant submitted additional and relevant material in support of his appeal such as the article from the Journal of the American Medical Association (JAMA) titled Maintenance Therapy with Tumor-Treating Fields Plus Temozolomide Vs. Ternozolomide Alone for Glioblastoma — A Randomized Clinical Trial. The article describes the superior results in progression free survival as well as overall survival of glioblastoma patients using TTFields. This trial shows that the Optune device was safe, non-investigational and effective. Moreover, this trial shows that the Optune device was appropriate for this individual Enrollee's needs, specifically the treatment of newly discovered glioblastoma.

---

[16] *See https://www.nccn.org/professionals/physician_gls/categories_of_consensus.aspx* (last visited on 2/5/2019).
[17] In note that the aforementioned Medicare Manual provision refers to drugs and biological, not durable medical equipment; however, I find that it clearly explains the NCCN category designations, which apply to this case.

Additional material submitted by the Beneficiary also shows the medical community generally accepts the use of TTFT. In the 2016 version of the National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology Central Nervous System Cancers guidelines, alternating electric field therapy is a treatment option suggested for glioblastoma: This suggestion was found in a treatment guideline from a national cancer organization, not evidence based on an individual physician treating a single patient in a clinical setting.

## Applicable Medicare Regulations: LCD L34823

In this case, as in all Medicare appeals, the appellant has the burden to establish that she is entitled to Medicare payment. The regulations are clear that it is the responsibility of the supplier to furnish sufficient information to determine whether payment is due and the amount of payment.[18] The governing LCD clearly states that "**tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.**" At the hearing, Ms. Noonan argued that the LCD was not applicable because it had not been updated since 2013 and that the DME MAC medical director had indicated that "the policy did not apply to newly diagnosed glioblastoma." In support of her argument, Ms. Parrish submitted a letter from CGS Administrators, LLC, which was addressed to Novocure and states in pertinent part as follows:

> The DME MAC Medical Directors received your June 20, 2018, e-mail to Dr. Robert Hoover requesting a formal reconsideration of the TTFT Local Coverage Determination (LCD) coverage criteria.

> Currently, the TTFT LCD includes language indicating that the coverage of TTFT for recurrent glioblastoma multiforme (GMB) is not reasonable and necessary. Coverage for newly diagnosed GBM is not addressed. Your letter asks that we revise the LCD to allow coverage for recurrent GBM and add coverage for newly diagnosed GBM.

*Proposed changes to LCD DL34823*--On May 9, 2019, The Centers for Medicare and Medicaid Services (CMS) assigned to the Durable Medical Equipment Medicare Administrative Contractors (DME MACs) the task of developing Local Coverage Determinations (LCDs) for Durable Medical Equipment, Prostheses, Orthoses, and Supplies (DMEPOS). The DME MACs are proposing a revision to the **Tumor Treatment Field Therapy (TTFT LCD L34823)** to cover newly diagnosed glioblastoma multiforme (GBM).

An ALJ is not bound by contractor LCDs or CMS program guidance, such as program memoranda and manual instructions, "but will give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062(a). An ALJ must explain the reason for not following such a policy in a specific case. 42 C.F.R. § 405.1062(b). Any decision to disregard a policy "applies only to the specific claim being considered and does not have precedential effect." (Id.)

Based upon the facts of this case, and giving appropriate deference to the LCD policy guidance, I decline to follow the LCD in this case, and instead find that the Optune device will be considered reasonable and necessary as specifically applied to the Beneficiary's diagnosis and treatment regimen. In declining to follow the pertinent LCD, I have considered the following criteria, as suggested by Medicare manual

---

[18] *See* §1833(e) of the Social Security Act; 42 C.F.R. §424.5(a)(6).

Case 1:20-cv-00194-WCG Filed 04/11/20 Page 14 of 16 Document 8-11
A0046

guidance: (1) whether the device can be expected to make a meaningful contribution to the treatment of the patient's illness or injury or to the improvement of his or her malformed body member; (2) whether the device can be considered a reasonable treatment, considering expense versus therapeutic benefits, comparative cost of feasible alternatives, and whether the device serves the same purpose as other available equipment or alternatives; (3) whether all features of the device are required for treatment of the Beneficiary's condition; and, (4) the period of time the DME will be considered medically necessary, which is generally based on the physician's estimate of the time that his or her patient will need the equipment. *CMS Pub. 100-02, Ch. 15, §110.1(c).*

Moreover, the LCD, as currently published does not cite any studies, articles or other sources for this determination, or specify any specific diagnoses for which the treatment will be considered as not reasonable and necessary. It makes no distinction between recurrent glioblastoma or newly discovered glioblastoma, and the lack of sources or information on which the determination was based makes it unascertainable. In addition, no reference is made in the LCD Sources of Information and Basis for Decision to several of the more recent studies and guidelines, including the more recent pivotal study and resulting October 2015 FDA pre-market approval supplement allowing the Optune device to be used for newly diagnosed GBM, and the additional even more recent literature and established guidelines supporting such use. NCCN Guidelines for Anaplastic Gliomas/Glioblastoma for 2017 and 2018 category of evidence 2A (based upon lower-level evidence, there is uniform NCCN consensus that the intervention is appropriate), the Mayo Clinic's information on Glioblastoma, and the fact that numerous commercial insurers cover the treatment.[19] (List of commercial insurers that cover TTFT in CD).

Applying the aforementioned criteria, a review of the medical record clearly demonstrates that the Appellant is a 34 year-old woman who is being treated for newly diagnosed, glioblastoma and has undergone debulking as well as total resection, followed by adjuvant TMZ treatment. Additionally, her physician documented that her KPS scale score was 80% and her Echo score was 0. Consequently, after a careful and thorough review of Appellant's arguments and the evidence in the record, the I find the use of the Optune device for an FDA approved indication can be expected to make a meaningful contribution to the treatment of Appellant's glioblastoma. In fact, the treatment was and is being provided under the supervision of an oncology specialist. The physician recommended treatment with the Optune device to halt the progression of her disease, which has proven successful. Mr. Timothy Parks testified to and the MRI supports that the Beneficiary had no appreciable evidence of worsening residual or recurrent lesion. Lastly proposed LCD changes to DL34823 show that two Contractors: Noridian and CGS have looked to allow coverage to newly diagnosed glioblastoma patients and the Beneficiary meets the criteria for coverage.

The undersigned understands Medicare often times lags behind other insurers in covering new medical technologies but it is unreasonable to deny Medicare coverage to this beneficiary in view of the extensive literature, favorable clinical trials, national adoption by other health plans and applicable NCCN Guidelines support. Therefore, the record supports the claimed Optune device treatment was safe and effective and clinically appropriate. Accordingly, the device is reasonable and necessary for the treatment of Appellant's glioblastoma.

---

[19] Glioblastoma, Mayo Clinic, *see* https://www.mayoclinic.org/diseases-conditions/glioblastoma/cdc-20350148

## CONCLUSIONS OF LAW

The Appellant's use of the Optune device, HCPCs Code E0766, during dates of service meets requirements for Medicare Part B DME coverage because the device is shown to: meet the definition of durable medical equipment, to have been reasonable and necessary for the treatment of the Beneficiary's GBM, and to have been for use in the Beneficiary's home. *See Sections 1832(a)(1), 1834(a)(13), 1861(n),(s)(6), 1862(a)(1)(A) of Title XVIII 42 C.F.R. §410.38(a); CMS Pub. 100-02, Ch. 15, §110 et seq..*

## ORDER

The Medicare Contractor is **DIRECTED** to process the claim in accordance with this decision.

SO ORDERED.

Dated: **JUN 2 7 2019**

Lissette M. Figueroa
U.S. Administrative Law Judge

# EXHIBIT L

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

January 27, 2020

***VIA PRIORITY MAIL***

DHHS – OMHA
Centralized Docketing
**Attn:  Beneficiary Mail Stop**
200 Public Square, Suite 1260
Cleveland, OH 44114-2316

# BENEFICIARY APPEAL

**RE:    Request for ALJ Hearing**
**Beneficiary:  Anniken Prosser**
                **W2973 Farmstead Dr.**
                **Appleton, WI  54915**
**HICN:  4R87U71QM75**
**Device:  Tumor Treatment Field Therapy (E0766)**
**Supplier:  Novocure, Inc.**
**Dates of Service:  5/16/2019; 6/16/2019; 7/16/2019; 8/16/2019**
**Medicare Appeal No:  1-9079666355**
**Date of QIC Decision:  January 21, 2020**
**Our Ref:  19-719**

Dear Claims Coordinator:

As an authorized representative of the above-captioned Medicare beneficiary, I hereby appeal to an Administrative Law Judge the above-captioned decision rendered by the Qualified Independent Contractor ("QIC") Maximus Federal Services, Inc. for the claims submitted for tumor treatment field therapy ("TTFT") for a glioblastoma.  The QIC denied the claims arguing that the device is not reasonable and necessary per LCD L34823.  For the reasons stated below, the LCD should not be applied against the beneficiary.

For reference, the DME contractors have issued a revised coverage policy for TTFT.  They concede that the evidence to support coverage was in place by 2017 at the latest, given their reliance on the Stupp 2017 publication of the EF-14 trial results, which was a study that incorporated newly diagnosed and recurrent patients.  When the LCD revisions were published, an LCD challenge was pending before the Civil Remedies Division.  Under 42 C.F.R. §426.420(b), "a contractor may revise an LCD under review to remove or amend the LCD provision listed in the complaint through the reconsideration process before the ALJ issues a decision regarding the LCD.  Revising an LCD under review to remove the LCD provision in question has the same effect as a decision under §426.460(b)."  Under §426.460(b), an ALJ finds

that an LCD is not valid under the reasonableness standard. Accordingly, the claim must be adjudicated without application of the invalid LCD. See §426.460(b)(1)(i) and (iv). If the LCD is revised, as in the case with LCD L34823, the revised LCD is applied to services that are performed <u>after</u> the effective date of the revised LCD. See §426.460(b)(1)(ii).

Moreover, in a separate administrative proceeding challenging LCD L34823, the Administrative Law Judge with jurisdiction over the case issued an interim ruling, based upon his independent assessment of the LCD record, that the LCD record is insufficient to support the validity of the LCD (CRD C-19-396 Order). A copy of the Order was attached to the reconsideration request on CD. The LCD record is devoid of any developments after 2014 in the treatment of patients diagnosed with a glioblastoma.

The beneficiary was diagnosed with a glioblastoma and her clinician prescribed TTFT. TTFT disrupts and corrupts the division of cancer cells and leads to the death of such cells. In 2011 and 2015, the FDA approved, through its more rigorous review process, a device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. During the clinical trial for newly diagnosed glioblastomas, such as that of Ms. Prosser, the TTFT results were so compelling that at the interim analysis, the Data Safety Monitoring Board recommended that those not receiving TTFT be able to cross over to receive the treatment. The FDA agreed.

The published, peer-reviewed literature shows the improved clinical survival and the progression-free survival of patients who receive TTFT for their glioblastoma. TTFT for glioblastoma is included in the National Comprehensive Cancer Network ("NCCN") guidelines and is considered the standard of care for newly diagnosed glioblastoma. Hundreds of treating physicians, in all 50 states, have prescribed TTFT. TTFT is covered by all the large national payers. Medicare has paid for numerous claims for medically indistinguishable beneficiaries.

With respect to the LCD, the previously submitted documents show that the LCD has not kept pace with the current peer-reviewed literature, regulatory status, consensus of experts, scientific evidence or adoption by the relevant medical community. Indeed, the LCD record shows that the DMACs have failed to update the LCD to reflect consideration of developments that have occurred over the past five years and only considered recurrent GBM. On March 6, 2019, the Carrier Advisory Committee recommended Medicare coverage of TTFT. The experts found that the peer-reviewed literature showed the treatment was safe and effective.

Finally, Medicare coverage for Ms. Prosser's TTFT device has already been decided; two prior final favorable Level III decisions were submitted with the reconsideration request. Accordingly, the Secretary is estopped from denying coverage of TTFT on the same basis for the same device for the same beneficiary.

(continued on next page)

If you have any questions, please do not hesitate to contact me at (412) 561-6250.

Yours very truly,

Debra Parrish on behalf of
Ms. Anniken Prosser

*AOR submitted below with the reconsideration request

cc:

| Anniken Prosser | Novocure, Inc., c/o Justin Kelly |
|---|---|
| W2973 Farmstead Dr. | 195 Commerce Way |
| Appleton, WI 54915 | Portsmouth, NH 03801 |
| | (603-501-4299) |

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

February 20, 2020

**_VIA PRIORITY MAIL_**

Attn: Judge Sardinas
HHS OMHA Irvine Field Office
19 Technology Dr., Suite 200
Irvine, CA 92618-2364

> **RE:** **Prehearing Brief**
> **ALJ Appeal No. 3-9079666355**
> **Appellant/Beneficiary: A. Prosser**
> **Service: E0766**
> **Dates of Services: 5/16/19 – 8/16/19**
> **Hearing Date: To Be Determined**
> **Our Ref. No.: 19-719**

Dear Judge Sardinas:

Please find attached a prehearing brief to assist in your analysis of the above-captioned case, in anticipation of its scheduling.

The QIC has not been forwarding the CD we submit at reconsideration with the administrative record. If the CD is not present in the file as forwarded to your office, please let us know and we will resubmit a copy of the CD. Alternatively, we would be happy to review an Exhibit List, once generated, to determine if the contents of the CD are present.

If you have any questions regarding the foregoing, please do not hesitate to contact me at (412) 561-6250. We appreciate your consideration.

Respectfully submitted,

Debra M. Parrish
Attorney for A. Prosser

Enclosures:
    Prehearing Brief

cc:    Ms. Prosser

**PREHEARING BRIEF - JUDGE SARDINAS**
**ALJ APPEAL NO. 3-9079666355**
**APPELLANT: A. PROSSER**
**DOS: 5/16/19 – 8/16/19**
**HEARING DATE: To Be Determined**
**February 20, 2020**

## A. Background

Ms. Anniken Prosser is a 36-year-old mother (of a six-year-old son), wife, and Medicare beneficiary. She enjoys drawing, writing and singing lyrics for two bands, and spending time with her family and friends. Unfortunately, in February 2016 she was newly diagnosed with a glioblastoma (GBM) after experiencing intractable migraines. She had surgery and chemoradiation. She completed chemoradiation in May 2016. Consistent with the standard of care, her clinician then prescribed the Optune system to treat her glioblastoma. She began using the Optune system in June 2016 with adjuvant temozolomide. She was prescribed the device as a newly diagnosed patient. Importantly, the July 17, 2019 treatment note reflects a KPS score of 80. The supplier submitted claims for the Optune system to the relevant Durable Medical Equipment Contractor (DMAC) which denied the claims.

The QIC denied the claims, arguing that the device is not reasonable and necessary per LCD L34823. As described more fully below, the denial is inconsistent with Medicare coverage criteria and the record.

The issue of Medicare coverage was already adjudicated for Ms. Prosser. Claims for the same device for the same beneficiary were the subject of two favorable ALJ decisions which are final, which found that the device was reasonable and necessary for Ms. Prosser for multiple months preceding the dates of service at issue in this case (attached to the reconsideration request). In view of the foregoing, the Secretary is estopped from denying claims on the same basis. Please see discussion below.

The DME contractors issued a revised LCD providing for coverage of TTFT for newly diagnosed glioblastoma during the pendency of an LCD challenge. They rely upon evidence that was published by 2017 at the latest, which predates the dates of service at issue. See e.g., revised LCD citing EF-14 study (Stupp), attached on CD to the reconsideration request. **By virtue of this revision, the LCD that was applied to Ms. Prosser's claim is deemed invalid under the reasonableness standard. 42 CFR § 426.420; 42 CFR § 426.460.**[1]

Moreover, in the separate administrative proceeding challenging LCD L34823, the Administrative Law Judge with jurisdiction over the case issued an interim ruling, based upon his independent assessment of the LCD record, that the LCD record is insufficient to support the

---

[1] Pursuant to 42 C.F.R. §426.420, the revision of an LCD after a challenge has been filed has the same effect as a judicial ruling that the LCD was invalid. Under 42 C.F.R. §426.420(b), "a contractor may revise an LCD under review to remove or amend the LCD provision listed in the complaint through the reconsideration process before the ALJ issues a decision regarding the LCD. Revising an LCD under review to remove the LCD provision in question has the same effect as a decision under §426.460(b)." Under §426.460(b), an ALJ finds that an LCD is not valid under the reasonableness standard. Accordingly, the claim must be adjudicated without application of the invalid LCD. See §426.460(b)(1)(i) and (iv).

PREHEARING BRIEF - JUDGE SARDINAS
ALJ APPEAL NO. 3-9079666355
APPELLANT: A. PROSSER
DOS: 5/16/19 – 8/16/19
HEARING DATE: To Be Determined
February 20, 2020

validity of the LCD (see Order on CD attached to the reconsideration request). The LCD record is devoid of any developments after 2014 in the treatment of patients diagnosed with a glioblastoma. Such a policy should not be applied against the beneficiary in this case and used to deny coverage for a treatment that is recognized as safe and effective by the published literature, consensus of experts, and widespread adoption of the treatment.

## 1. Glioblastoma Multiforme (GBM)

Glioblastoma is a very rare (~10,000 US cases annually) primary brain cancer. The National Institutes of Health (NIH) designate glioblastoma multiforme as a rare disease, with few treatment options. See e.g., https://rarediseases.info.nih.gov/diseases/2491/glioblastoma. GBM tumors are typically highly aggressive. Without treatment, life expectancy on diagnosis is 3 months. Even with aggressive chemotherapy treatment, survival at initial presentation is approximately 10 months, and upon recurrence, approximately 6 months.[2] Because it is extremely rare for glioblastoma to metastasize, it is efficient to treat the disease with regional therapy as part of the treatment strategy.

## 2. Optune (formerly NovoTTF-100A System)

Optune, previously known as the NovoTTF-100A System, is durable medical equipment that delivers alternating electric fields or "Tumor Treating Fields" to the brain. The device consists of an electric field generator which is connected to four insulated transducer arrays. The arrays are placed on the patient's scalp and deliver the Tumor Treating Fields Therapy ("TTFT") to the patient's glioblastoma. Basically, the fields interfere with/slow the replication of the cancer cells or stop their growth all together. The fields may also destroy some of the cancer cells.

Optune is FDA-approved for recurrent and newly diagnosed glioblastoma multiforme (GBM) brain tumors. Devices that are FDA approved through the PMA process as class III devices are those that "support or sustain human life or are of substantial importance in preventing impairment of human health." On January 1, 2014, CMS classified the Optune device as DME requiring frequent and substantial servicing, which is billed under HCPCS code E0766 as a monthly rental through the duration of medical necessity. Optune has been shown to extend the lives of patients suffering from glioblastoma tumors.

## B. Literature/Professional Societies

Optune is the subject of numerous peer-reviewed published studies that demonstrate the safety and efficacy of the Optune system and TTFT generally. The QIC's assertion that the literature lacks sufficient scope and breath and peer-review is belied by the evidence. More than 130 peer-reviewed publications address TTFT clinical data. More than 470 publications support

---

[2] Rulseh et al. "Long-term survival of patients suffering from glioblastoma multiforme treated with tumor-treating fields." World Journal of Surgical Oncology at 1 (2012).

PREHEARING BRIEF - JUDGE SARDINAS
ALJ APPEAL NO. 3-9079666355
APPELLANT: A. PROSSER
DOS: 5/16/19 – 8/16/19
HEARING DATE: To Be Determined
February 20, 2020

TTFT's mechanism of action – electrical field disruption of mitotic spindle formation as a means of cell death. The clinical studies are reported in some of the most prestigious journals in our country including JAMA (the Journal of the American Medical Association). See submitted studies. The studies concluded the following:

- The final analysis of the randomized phase 3 trial (695 patients) found that the addition of Optune to standard chemotherapy treatment "resulted in statistically significant improvement in progression-free survival and overall survival" over patients that were treated with chemotherapy alone. Stupp et al. at 2315 (JAMA 2017). See also, interim analysis of 315 patients from this study (adding Optune to maintenance chemotherapy "significantly prolonged progression-free and overall survival"). Stupp et al. at 2542 (JAMA 2015).

- At the same time, more than 23 randomized trials of new treatment modalities or products for glioblastoma over a ten-year period all "failed to demonstrate improved survival." JAMA 2017 at 2314-2315.

- Remarkably, adding Optune to traditional chemotherapy treatment "resulted in statistically significant longer deterioration-free survival in global health status, physical and emotional functioning, pain, and weakness of legs." Taphoorn et al. at E7 (JAMA Oncology 2018).

- As far back as 2012, researchers reported that in a study of 237 patients that received either Optune treatment or chemotherapy that the Optune treatment was at least as effective as chemotherapy alone in terms of median survival, without the toxicity risks. Stupp et al. at 8-9 (European J of Cancer 2012).

Indeed, the Data Safety Monitoring Board for the clinical trial for newly diagnosed glioblastoma (and patients that suffered recurrences during the trial) found the data so compelling, they recommended early termination and allowing patients who were not receiving TTFT to be able to cross over and receive the treatment, deeming it unethical to withhold it. The FDA agreed. Please see the submitted bibliography regarding TTFT which shows numerous peer-reviewed articles published on TTFT and its clinical application.

Optune is included in the National Comprehensive Cancer Network (NCCN) guidelines for recurrent glioblastoma and for newly diagnosed GBM in combination with temozolomide. See submitted guidelines. The NCCN guidelines are translated in multiple languages and used around the world. In particular, for cases of newly diagnosed glioblastoma, the NCCN guidelines (considered the gold standard for oncology management) give a level one recommendation for TTFT, i.e., a consensus exists among the experts based on the high level of evidence, that the treatment is recommended. Thus, a consensus exists that the published peer-reviewed literature demonstrates the effectiveness of the device for newly diagnosed glioblastomas.

PREHEARING BRIEF - JUDGE SARDINAS
ALJ APPEAL NO. 3-9079666355
APPELLANT: A. PROSSER
DOS: 5/16/19 – 8/16/19
HEARING DATE: To Be Determined
February 20, 2020

Further, a March 6, 2019 Carrier Advisory Committee meeting concluded that the peer-reviewed evidence supports Medicare coverage.[3] Thus, the very experts the DMACs assembled indicated that the literature supports coverage. As noted above, on July 18, 2019, the DMACs issued a final LCD extending coverage of TTFT for individuals who have newly diagnosed GBM.

## C.    Widespread Adoption

Based on the strength of the peer-reviewed literature and the lack of medical alternatives, the Optune system has been certified at more than 800 cancer treatment centers, and has been prescribed by over 1100 physicians in 50 states, the District of Columbia, and Puerto Rico, for over 7200 patients. It is used in 59 of the 62 NCI designated cancer centers. Virtually every major payer in the United States covers the Optune system for individuals diagnosed with a glioblastoma. These payers include, among others, Highmark, Aetna, Anthem, Humana, Kaiser, UnitedHealthcare, Cigna, Harvard Pilgrim, Geisinger, HealthPartners, and several Blue Cross plans. Approximately 250 million Americans have access to TTFT through their insurers.

TTFT is so widely accepted that it is included in medical school textbooks. See CD attached to reconsideration request.

## D.    The LCD

As noted above, on July 18, 2019, the DMACs issued a final LCD extending Medicare coverage of TTFT. Because the LCD was revised after an LCD challenge had been filed, it had the same effect as a judicial ruling the LCD was invalid. See 42 C.F.R. §§ 426.420; 426.460. Thus, the invalid LCD, made invalid by the operation of the applicable Medicare regulations, should not be applied to the claims.

In either event, the new LCD explicitly extends coverage for individuals who have newly diagnosed GBM when they start using Optune, such as this Medicare beneficiary. If the DMACs had timely completed the LCD reconsideration process as they were required to, this case likely would not have been brought.

## E.  Prior Level III Favorable Decisions

Ms. Prosser has received prior favorable Level III decisions that have not been appealed and are final. Please see the decisions attached to the reconsideration request. The Secretary is barred by the doctrine of collateral estoppel/issue preclusion from re-litigating those issues. As noted by a unanimous Supreme Court:

---

[3] Although the video of this meeting is required to be posted, the DMACs have not posted the meeting,

**PREHEARING BRIEF - JUDGE SARDINAS**
**ALJ APPEAL NO. 3-9079666355**
**APPELLANT: A. PROSSER**
**DOS: 5/16/19 – 8/16/19**
**HEARING DATE: To Be Determined**
**February 20, 2020**

> We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality. When an administrative agency is acting in a judicial capacity and resolves dispute issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution. The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity.

See *Astoria Federal Savings and Loan Assoc. v. Solimino*, 501 U.S. 104, 107-8 (1991) (internal citations and quotations omitted). The application of issue preclusion would not work as basic unfairness against the Secretary and there are no special circumstances that would make it unfair to apply the doctrine.

### F.    Reimbursement Amount

If Medicare coverage is found, payment for DME is made under a regulation, 42 C.F.R. §414.210(a), which states that:

> . . . *Medicare pays for [DME] . . .on the basis of 80 percent of the lesser of:*
>
>> *(1) the actual charge for the item; [or]*
>> *(2) the fee schedule amount for the item, as determined in accordance with §§414.220 through 414.232.*

Because no fee schedule existed on the dates of service, payment is 80% of the amount billed. See also Medicare Appeal Council Decision for ALJ 1-178898474.

### G.  Conclusion

This is the technology that clinicians treating central nervous system tumors have embraced. No basis exists to deny Medicare coverage of a device that is shown in the peer-reviewed literature to be a safe and effective treatment for glioblastoma, a life-threatening condition. The Optune system was approved as safe and effective by the FDA. The peer-reviewed literature further supports its efficacy and the improved clinical outcome of patients who use the device. It is incorporated in the NCCN guidelines (considered the gold standard for

Case 1:20-cv-00194-WCG   Filed 04/11/20   Page 10 of 11   Document 8-12
A0058

**PREHEARING BRIEF - JUDGE SARDINAS**
**ALJ APPEAL NO. 3-9079666355**
**APPELLANT: A. PROSSER**
**DOS: 5/16/19 – 8/16/19**
**HEARING DATE: To Be Determined**
**February 20, 2020**

cancer care), and it enjoys widespread adoption by clinicians and all the major payors in the United States based on the foregoing. The DMAC medical directors had indicated the prior version of the LCD did not apply to newly diagnosed glioblastomas and issued a revision that extends Medicare coverage. TTFT has already been found to be reasonable and medically necessary for this beneficiary. The Medicare beneficiary has no reasonable medical alternatives. The claims should be approved.

# EXHIBIT M



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Irvine, CA**

| | | | |
|---|---|---|---|
| Appeal of: | **A. PROSSER** | OMHA Appeal No.: | **3-9079666355** |
| Beneficiary: | **A. PROSSER** | Medicare Part: B | |
| Medicare No.: | *********1QM75** | Before: | **Adalberto Sardinas**<br>Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **FULLY FAVORABLE** decision. The Appellant is entitled to Medicare payment for the Optune Tumor Treatment Field Therapy billed as electrical stimulation device used for cancer treatment (E0766) provided to the Appellant on May 16, 2019, June 16, 2019, July 16, 2019, and August 16, 2019. The issue of liability under Section 1879 of the Social Security Act is inapplicable because the decision is fully favorable to the Appellant.

## PROCEDURAL HISTORY

Novocure, Inc. (Novocure) submitted claims for Optune Tumor Treatment Field Therapy (Optune TTFT), billed as electrical stimulation device used for cancer treatment (E0766) and provided to the Appellant on May 16, 2019, June 16, 2019, July 16, 2019, and August 16, 2019. CGS, the Medicare DME Administrative Contractor denied the claim on initial determination. The Appellant appealed the denial and CGS issued an unfavorable redetermination decision.

The Appellant filed a reconsideration before Maximus Federal Services, the Qualified Independent Contractor (QIC). On January 21, 2020, the QIC issued an unfavorable decision denying the claims at issue on the basis that the submitted documentation did not support that the technology was efficacious and medically reasonable and necessary. (File 1).

The Appellant's timely filed request for Administrative Law Judge Hearing (ALJ) was received on January 29, 2020. The Appellant's request for hearing was timely filed. The amount in controversy meets the jurisdictional requirement. Accordingly, OMHA has jurisdiction to hear this appeal. Following review of the record, the undersigned finds that a favorable decision is warranted. Thus, the undersigned is issuing this decision based upon the evidence of record, without a hearing, as allowed under 42 CFR § 405.1038(a). All files were admitted into the record.

## ISSUE(S)

The issue to be decided is whether under the provisions of Title XVIII of the Social Security Act (Act) and implementing regulations, Medicare reimbursement can be made for Optune TTFT, billed as electrical stimulation device used for cancer treatment (E0766) and provided to the Appellant on May 16, 2019, June 16, 2019, July 16, 2019, and August 16, 2019.

If it is determined that the services provided were not medically reasonable and necessary, whether payment should be made to the Provider by the Beneficiary or liability should be waived pursuant to Section 1879 of the Act.

## **APPLICABLE LAW AND POLICY**

Section 1833(e) of the Social Security Act (Act) states that no payment shall be made to any provider of services unless supported by sufficient information. *See also* 42 C.F.R. § 424.5(a) (6).

Section 1862(a)(1) of the Act excludes from Medicare coverage and payment, items and services which are not medically reasonable and necessary for the diagnosis and treatment of an illness or injury, or to improve the functioning of a malformed body member. *See also* 42 C.F.R. § 411.15(k)(1).

Section 1879 of the Act provides that when Medicare excludes payment and coverage pursuant to Section 1862(a)(1) of the Act, payment may nevertheless be made for the items or services, if neither the beneficiary nor the provider knew, and could not reasonably have been expected to know, that payment would not be made for such items or services. *See also* 42 C.F.R. § 411.406.

Section 1869 (f)(2)(A) of the Act provides that review of any local coverage determination (LCD) shall be subject to the following limitations:

(i) Upon the filing of a complaint by an aggrieved party, such a determination shall be reviewed by an administrative law judge. The administrative law judge.—

    (I) shall review the record and shall permit discovery and the taking of evidence to evaluate the reasonableness of the determination, if the administrative law judge determines that the record is incomplete or lacks adequate information to support the validity of the determination;

    (II) may, as appropriate, consult with appropriate scientific and clinical experts; and

    (III) shall defer only to the reasonable findings of fact, reasonable interpretations of law, and reasonable applications of fact to law by the Secretary.

(ii) Upon the filing of a complaint by an aggrieved party, a decision of an administrative law judge under clause (i) shall be reviewed by the Departmental Appeals Board of the Department of Health and Human Services.

(iii) The Secretary shall implement a decision of the administrative law judge or the Departmental Appeals Board within 30 days of receipt of such decision.

(iv) A decision of the Departmental Appeals Board constitutes a final agency action and is subject to judicial review.

Only an aggrieved party may initiate a review of an LCD or provisions of an LCD by filing an acceptable complaint. 42 C.F.R. § 426.320.

Under 42 C.F.R. § 426.420(b), a contractor may revise an LCD under review to remove or amend the LCD provision listed in the complaint through the reconsideration process before the ALJ issues a decision regarding the LCD. Revising an LCD under review to remove the LCD provision in question has the same effect as a decision under 42 C.F.R. § 426.460(b). If an LCD is challenged and the ALJ presiding over that challenge finds that certain provisions in that LCD are not valid under the reasonableness standard, the claim submitted by the party challenging the LCD must be adjudicated without application of the invalid provisions of the LCD. *See* 42

C.F.R. § 426.460(b)(1)(i) and (iv). Additionally, if the LCD is revised, the revised LCD is applied to services that are performed after the effective date of the revised LCD. 42 C.F.R. § 426.460(b)(1)(ii).

Section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a national coverage determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS. NCDs promulgated by the Secretary of HHS under the authority of Section 1862(a)(1) of the Act dictate the criteria under which Medicare covers specified services, procedures or supplies. NCDs are binding upon ALJs. 42 C.F.R. § 405.1060(a)(4); *see* 42 C.F.R. § 405.1060(b)(1) ("An ALJ may not disregard, set aside or otherwise review an NCD").

Although not subject to the force and effect of law, CMS and its contractors issue policies, manuals and guidelines that describe criteria for coverage of selected types of medical items and services in the form of manuals and LCDs. 42 C.F.R. § 405.1062 states that an ALJ is not bound by LCDs or CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case. If an ALJ declines to follow a policy in a particular case, the ALJ decision must explain the reasons why the policy was not followed. *Id.* An ALJ decision to disregard such policy applies only to the specific claim being considered and does not have precedential effect. *Id.*

Medicare Program Integrity Manual ("MPIM"), Pub. 100-08, Ch.13, Section 13.1.1 provides that an LCD, as defined in section 1869(f)(2)(B) of the Act, is a determination by a Medicare Administrative Contractor (MAC) respecting whether or not a particular item or service is covered on a contractor-wide basis in accordance with section 1862(a)(1)(A) of the Act. Section 1869(f)(2)(A) of the Act outlines the process for ALJ and Department of Appeals Board (DAB) review of LCDs. This process is known as the LCD Challenge Process. Procedures related to this challenge process are described in 42 C.F.R. § 426.

The LCD reconsideration process is a mechanism by which a beneficiary or stakeholder (including a medical professional society or physician) in the MAC's jurisdiction can request a revision to an LCD. MPIM, Pub. 100-08, Ch. 13, Section 13.3. The LCD reconsideration process differs from an initial request for an LCD in that it is available only for final effective LCDs. The whole LCD or any provision of the LCD may be reconsidered. In addition, MACs have the discretion to revise or retire their LCDs at any time on their own initiative.

In every proposed and final LCD, the MAC must summarize the evidence that supports coverage, limited coverage, maintenance of existing coverage in cases of LCD reconsideration or non-coverage. MPIM, Pub. 100-08, Ch. 13, Section 13.3.2. In conducting a review, MACs shall use the available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines. *Id.*

MPIM, Pub. 100-08, Ch. 13, Section 13.5.4 provides that an item or service may be covered by a contractor LCD if it is reasonable and necessary under 1862(a)(1)(A) of the Act. Under the MPIM, a service is reasonable and necessary when it is: (1) Safe and effective; (2) Not experimental or investigational (exception: routine costs of qualifying clinical trial services with dates of service on or after September 19, 2000 which meet the requirements of the Clinical Trials NCD are considered reasonable and necessary); and (3) Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether

it is: (a) Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member; (b) Furnished in a setting appropriate to the patient's medical needs and condition; (c) Ordered and furnished by qualified personnel; (d) One that meets, but does not exceed, the patient's medical need; and (e) At least as beneficial as an existing and available medically appropriate alternative. *Id.*

LCD L34823, with a revision effective date of January 1, 2017, states that tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.

Policy Article A52711 categorically places the TTFT device in the durable medical equipment category of Medicare-covered benefits. According to the Policy Article "[t]umor treatment field therapy devices are covered under the Durable Medical Equipment benefit (Social Security Act §1861(s)(6))." The Contractor provided the associated HCPCS code for the equipment and reported that the code (E0766) was in the frequent and substantial servicing payment category. *See* Policy Article A52711.

The proposed LCD L34823, with an effective date of September 1, 2019, provides as follows:

Tumor treatment field therapy (E0766) is only covered for the treatment of newly diagnosed glioblastoma multiforme (GBM) when all of the following criteria are met:

1. The beneficiary has histologically confirmed (World Health Organization (WHO) grade IV astrocytoma), newly diagnosed, supratentorial GBM; and,
2. The beneficiary has received initial treatment with maximal debulking surgery, followed by chemotherapy and radiotherapy; and,
3. Tumor treatment field therapy is initiated within 7 weeks from the last dose of concomitant chemotherapy or radiotherapy; and,
4. The beneficiary has no evidence of progression by Response Assessment in Neuro-Oncology (RANO) criteria; and,
5. The beneficiary has a Karnofsky Performance Score (KPS) of at least 70; and,
6. The beneficiary will use TTFT for at least 18 hours/day.

If all of the coverage criteria above are not met, claims for code E0766 will be denied as not reasonable and necessary.

Continued coverage of TTFT (E0766) beyond the first three months of therapy requires that no sooner than the 60th day but no later than the 91st day after initiating therapy, the treating practitioner must conduct a clinical re-evaluation and document that the beneficiary is continuing to use and is benefiting from TTFT.

Documentation of clinical benefit is demonstrated by:

1. Face-to-face clinical re-evaluation by the treating practitioner; and,
2. Objective evidence of adherence to the use of TTFT, reviewed by the treating practitioner.
3. Adherence to therapy is defined as the use of TTFT for at least 18 hours/day (see criterion 7 above).

If the above criteria are not met, continued coverage of TTFT will be denied as not reasonable and necessary.

Tumor treatment field therapy (E0766) will be denied as not reasonable and necessary for the treatment of recurrent GBM.

The use of TTFT for any indications other than newly diagnosed GBM will be denied as not reasonable and necessary.

The Medicare Appeals Council ("Council") has, in many cases, addressed the issue of ALJs' authority to apply the doctrine of equitable estoppel. In the case of M.W.J. (Docket Number M-12-1086), the Council reviewed a case arising under Medicare Part D, wherein the ALJ applied the principles of equitable estoppel to allow a tiering exception based on the Part D plan's undisputed misrepresentations that the applicable copayment for a particular drug would be $45.00, instead of $385.55. In reversing the ALJ's decision, the Council noted that there was no legal basis for allowing a tiering exception, and that federal case law prohibits the application of equitable estoppel to require a government agency to allow a benefit that is not otherwise permitted by law. In the case of Y.B. (Docket Number M-18-3806), the Council reviewed another case arising under Part D, wherein the enrollee argued, on appeal, that the Part D plan should be estopped from denying his request for a tiering exception because it had allowed tiering exceptions (or overturned tiering exception denials) in similar circumstances, in the past. The Council rejected this argument, noting that the Medicare program "does not recognize or apply principles of equity or estoppel in adjudicating claims for Medicare reimbursement."

## FINDINGS OF FACT AND ANALYSIS

At issue in this appeal is whether the TTFT (E0766) provided to the appellant on May 16, 2019, June 16, 2019, July 16, 2019, and August 16, 2019, is covered by Medicare. The QIC denied the instant claims on the basis that the submitted documentation did not support that the technology was efficacious and medically reasonable and necessary.

### The Appellant's Position

The Appellant's legal representation, Ms. Debra M. Parrish, argues that the LCD relied on to deny coverage in the instant case has since been revised to allow coverage of TTFT for the treatment of newly diagnosed glioblastoma. Ms. Parrish notes that the evidence relied on by the contractor in issuing its new LCD predates the dates of service at issue. Ms. Parrish notes that Optune, the device that delivers TTFT, is FDA approved for recurrent and newly diagnosed glioblastoma. Ms. Parrish notes that the safety and efficacy of Optune have been demonstrated by numerous peer-reviewed studies published in some of the most prestigious journals, including the Journal of the American Medical Association (JAMA). Ms. Parrish notes that Optune is included in the National Comprehensive Cancer Network (NCNN) guidelines for recurrent and newly diagnosed glioblastoma. Thus, Ms. Parrish argues, the QIC's assertion that TTFT is without peer acknowledgement, is without basis. In response to the QIC's assertion that the studies supporting TTFT are biased, because they were supported by industry, Ms. Parrish asserts that most peer-reviewed studies have some form of industry sponsorship. Ms. Parrish asserts that TTFT has widespread adoption in the industry, noting that 59 of the 62 National Cancer Institute (NCI) designated cancer centers use the technology. In regards to this issue, Ms. Parrish also notes that virtually every major payor in the United States covers the technology. Ms. Parrish further notes that the technology has been assigned a HCPCS code, which she asserts demonstrates that the technology has been deemed safe and effective by the FDA, proven by studies to result in superior outcomes, is significantly different from already-coded durable medical equipment, and has achieved sufficient adoption by the relevant medical community to

justify the administrative burden of adding a new code. Ms. Parrish also requests that I disregard LCD L34823 on the basis of the appellant's limited treatment options, as well as the compelling support for the effectiveness of the technology as demonstrated by the studies, the opinions of professional societies, the FDA's approval, and other payors' policies. Finally, Ms. Parrish argues that the collateral estoppel doctrine bars the Secretary of HHS from re-litigating this controversy against the Appellant because two favorable decisions, which became final, were issued granting coverage for the TTFT provided to the Appellant. (File 8).

## The Appellant's Medical Record

The Appellant, a 33-year old female, was diagnosed with glioblastoma multiforme in February 2016. She was status post gross resection and also chemo-radiation therapy. The Appellant's physician noted that she was a reasonable candidate for maintenance tumor-treating fields as per recent Phase III clinical trial results demonstrating overall survival benefit with following definitive surgery and chemo-radiation. The Appellant began her TTFT treatment. (File 8).

## LCD Challenge and Revised LCD L34823

Prior to the issuance of the QIC's reconsideration an LCD challenge was filed by an "aggrieved party," a Medicare beneficiary who had a TTFT claim denied by a Medicare Administrative Contractor based on LCD L34823. The outcome of the LCD challenge is that on May 28, 2019, the ALJ who presided over the LCD challenge found that the LCD's record did not support the validity of LCD L34823 under the reasonableness standard. *Id.* Then, on July 18, 2019, the Medicare contractor issued a final decision revising LCD L34823 by extending Medicare coverage to use of TTFT services to treat newly diagnosed glioblastoma multiforme, effective September 1, 2019.

The revised LCD L34823, issued with an effective date of September 1, 2019 which permits coverage of TTFT for newly diagnosed glioblastoma, removes the applicability of the previous LCD as it pertains to newly diagnosed glioblastoma. If an LCD is challenged and the ALJ presiding over that challenge finds that certain provisions in that LCD are not valid under the reasonableness standard, the claim submitted by the party challenging the LCD must be adjudicated without application of the invalid provisions of the LCD. *See* 42 C.F.R. § 426.460(b)(1)(i) and (iv). Additionally, if the LCD is revised as in the case with LCD L34823, the revised LCD is applied to services that are performed after the effective date of the revised LCD. 42 C.F.R. § 426.460(b)(1)(ii).

Thus, by operation of law, the version of LCD L34823 that existed before September 1, 2019 is invalid and cannot be applied to the claims at issue in this appeal. Moreover, the revised version of LCD L34823 that became effective September 1, 2019 also cannot be applied to claims for dates of service before September 1, 2019. Therefore, both these versions of LCD L34823 cannot be applied to the claims at issue with dates of service of April 22, 2019, May 22, 2019, June 22, 2019, and July 22, 2019. These claims must be considered using Medicare's general coverage principles that rely on published peer-reviewed medical literature, the consensus of experts, and whether the treatment at issue has been accepted by the relevant medical community. *See* MPIM, Pub. 100-08, Ch. 13, Section 13.3.2.

## The Disease and the Device

Gliobastoma is a primary malignancy of the brain, a highly aggressive brain tumor frequently striking men and women at the peak of life, and the most prevalent primary malignant brain

tumor in adults. At the end of 2015, the Journal of the American Medical Association (JAMA) reported that "[p]rognosis remains poor with no major treatment advance in more than a decade." With optimal treatment, the median survival of individuals diagnosed with glioblastoma is 15 months from diagnosis. Standard treatment options include resection, chemotherapy, and radiation therapy. Within 9 months of initial treatment, most tumors recur. Treatment options after recurrence are generally limited and include repeat resection with possible implantation of carmustine wafers, additional radiation therapy, and chemotherapy.

Optune is a portable battery or power operated device which produces alternating electrical fields (TTFT) within the human body. The TTFT disrupts the rapid cell division exhibited by cancer cells. Four adhesive patches, or transducer arrays, are applied to the scalp and connected to the device to deliver the therapy. According to the Provider's Product Dossier for Optune, the treatment is intended for adult patients who are 22 years of age or older with histologically-confirmed glioblastoma multiforme. For adult patients with newly-diagnosed, supratentorial glioblastoma, Optune coupled with temozolomide is indicated following maximal debulking surgery and completion of radiation therapy along with standard of care chemotherapy. For recurrent glioblastoma, Optune is intended to be used as a monotherapy and as an alternative to standard medical therapy for glioblastoma after surgical and radiation options have been exhausted.

Optune, previously called NovoTTF-100A System, received FDA premarket approval for use in patients with recurrent glioblastoma on April 8, 2011. On October 5, 2015, the Provider received premarket approval from the FDA for use of Optune in patients newly diagnosed with glioblastoma.

(Multiple Files).

## Published Medical Studies

On December 15, 2015, JAMA published an interim analysis of the results of this phase III clinical trial related to TTFT. (Roger Stupp, M.D., et al., *Maintenance Therapy With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone for Glioblastoma: A Randomized Clinical Trial*, 314 JAMA 2535-43 (Dec. 15, 2015) The analysis of the clinical trial concluded that adding TTFT to maintenance temozolomide chemotherapy in a population with new onset glioblastoma "significantly prolonged progression-free and overall survival." After the study concluded, the patients in the control group with ongoing maintenance therapy were offered TTFT therapy. Thirty-five of those patients chose to receive TTFT therapy. A final analysis of the randomized phase III clinical trial in December 2017 concluded that "the addition of TTFields to maintenance temozolomide chemotherapy vs maintenance temozolomide alone, resulted in statistically significant improvement in progression-free survival and overall survival." (Optune Peer-Reviewed Literature – Ruger Stupp, M.D., et al., *Effect of Tumor-Treating Fields Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma: A Randomized Clinical Trial*, 318 JAMA 2306, 2315 (Dec. 19, 2017).

The NCCN included alternating electric field therapy for glioblastoma in its NCCN Clinical Practice Guidelines in Oncology for Central Nervous System Cancers (version 1.2016). Use of alternating electric field therapy for recurrent glioblastoma was given a 2B rating, meaning that "[b]ased upon lower-level evidence, there is NCCN consensus that the intervention is appropriate." (*See* NCCN, *NCCN Categories of Evidence and Consensus* (hereinafter, NCCN Categories),

https://www.nccn.org/professionals/physician_gls/categories_of_consensus.aspx). By the time of its 2018 updates to these guidelines, the NCCN had increased its rating for alternating electric field therapy (used in conjunction with standard RT and concurrent temozolomide and adjuvant temozolomide) to category 1, the NCCN's highest rating, meaning that "[b]ased upon high-level evidence there is uniform NCCN consensus that the intervention is appropriate." https://www.nccn.org/about/news/ebulletin/ebulletindetail.aspx?ebulletinid=1370

(Multiple Files).

## **TTFT is Medically Reasonable and Necessary**

The MPIM instructs contractors to consider a service to be reasonable and necessary where that service is: (1) safe and effective; (2) not experimental or investigational; and (3) appropriate (taking into account whether the service (a) is furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition, (b) is furnished in an appropriate setting, (c) ordered and furnished by qualified personnel, (d) meets, but does not exceed, the patient's medical need, and (e) is at least as beneficial as an existing and available medically appropriate alternative. MPIM, Pub. 100-08, Ch. 13, Section 13.5.4.

### *Safe and Effective Therapy*

Medicare does not pay for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member. Social Security Act § 1862(a)(1).

The Optune device received FDA premarket approval for use in patients with recurrent glioblastoma on April 8, 2011. On October 5, 2015, the FDA gave premarket approval for use of Optune in patients (like the Appellant) with newly diagnosed glioblastoma. While FDA premarket approval does not establish that the device is medically reasonable and necessary pursuant to Medicare requirements, it does ensure that the FDA has closely examined the device and its application. In this case, the FDA determined that sufficient scientific evidence existed to provide the FDA with assurance that the device was safe and effective for its intended use in patients with both recurrent and newly diagnosed glioblastoma. This is wholly consistent with Medicare requirements. From this perspective, the use of the device meets Medicare guidance requiring that a device be proven safe and effective based on authoritative evidence. This also shows that the device is not experimental or investigational.

The FDA's conclusion has been fortified by medical investigation in the years that followed premarket approval. During that time, clinical studies evaluating the use and efficacy of the Optune device have resoundingly concluded that the device is safe and effective. The Appellant submitted various records of supporting medical literature, including articles and studies, which demonstrate the safety and efficacy of TTFT for glioblastoma. Results from a phase III clinical trial utilizing TTFT in patients with newly diagnosed glioblastoma showed that the addition of TTFT to maintenance temozolomide chemotherapy "significantly prolonged progression-free and overall survival."

(Multiple Files).

### *Not Experimental or Investigational*

The use of TTFT is generally accepted by the medical community. In the 2016 version of the NCCN Clinical Practice Guidelines in Oncology for Central Nervous System Cancers, alternating electric field therapy is an option categorized as 2B for treatment of glioblastoma. The NCCN has since upgraded its rating of alternating electric field therapy (in combination with chemotherapy and radiation) to category 1. This recognition of uniform consensus based on the highest-level evidence is the NCCN's gold standard and supports coverage using the highest level of evidence possible. Moreover, this rating is embodied in treatment guidelines from a renowned national cancer organization (as opposed to evidence based on an individual physician treating a single patient in a clinical setting) and, as such, is particularly persuasive and authoritative. It provides convincing evidence that TTFT treatment is accepted in the medical community as not experimental or investigational.

### *TTFT is Appropriate for the Appellant*

Finally, it is necessary to evaluate the extent to which the TTFT device was appropriate for the Appellant and her care. Applying the considerations mandated by the MPIM, the record in this case convincingly demonstrates that it was.

Based on the arguments and evidence presented, I decline to apply the current LCD because the policy is not applicable to the appeal at issue. I find that the Appellant has submitted ample evidence to support a favorable decision in this appeal based on the peer-reviewed literature, FDA approval, and overwhelming current acceptance in the medical community for the Optune system as a treatment option for recurrent and newly diagnosed glioblastoma. With use of TTFT, the data and medical consensus shows that the Appellant would be provided a greater quality of life as well as increased survival rate.

In this case, given the aggressive nature of the GBM tumor, it appears from all the literature that TTFT is the Appellant's most promising FDA-approved treatment option available to her and that this treatment option has been widely accepted as the standard of treatment in patients with recurrent and newly diagnosed GBM.

It should be noted that the final revised LCD now allows payment for newly diagnosed glioblastoma, effective September 1, 2019. Although the revised LCD does not apply to the services at issue because of the dates of service in this case are prior to the effective date of September 1, 2019 and applies to newly diagnosed glioblastomas, the revised LCD is indicative of the persuasiveness of the peer-reviewed literature and current acceptance for this device in the medical community for both newly diagnosed and recurrent glioblastomas.

Accordingly, coverage of TTFT treatments prior to September 1, 2019 should be based on the peer review literature and not on the prior LCD, in accordance with 42 C.F.R. 426.420. For the reasons stated, I find that TTFT through the Optune device is a covered treatment that is safe and effective based on the multiple peer-reviewed publications. TTFT was properly ordered by the Appellant's treating physician in accordance with accepted standards of medical practice for treatment of the Appellant's glioblastoma. For all of the foregoing reasons, I conclude that the TTFT device known as Optune has been shown to be safe and effective and is medically reasonable and necessary for the treatment of the Appellant's condition.

Based on the foregoing, I find that the Appellant is entitled to Medicare payment for the services at issue. As this decision is fully favorable to the Appellant, the issue of liability under Section 1879 of the Act is inapplicable.

# CONCLUSIONS OF LAW

It is my decision, based on applicable laws, regulations and CMS guidance, that the Appellant is entitled to Medicare payment for the Optune Tumor Treatment Field Therapy (Optune TTFT), billed as electrical stimulation device used for cancer treatment (E0766) and provided to the Appellant on May 16, 2019, June 16, 2019, July 16, 2019, and August 16, 2019. As this decision is fully favorable to the Appellant, the issue of liability under Section 1879 of the Act is inapplicable.

# ORDER

For the reasons discussed above, this decision is **FULLY FAVORABLE**. The Medicare Administrative Contractor is ordered to process the claim in accordance with this decision.

**SO ORDERED**

_____

Adalberto Sardinas
Administrative Law Judge

# EXHIBIT N

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

March 21, 2019

***VIA PRIORITY MAIL***
DHHS – OMHA
Centralized Docketing
**Attn: Beneficiary Mail Stop**
200 Public Square, Suite 1260
Cleveland, OH 44114-2316

# BENEFICIARY APPEAL

**RE:     Request for ALJ Hearing**
**Beneficiary:  Anniken Prosser**
                **W2973 Farmstead Dr.**
                **Appleton, WI  54915**
**Dates of Service:  1/16/2018; 2/16/2018; 3/16/18; 4/16/18**
**HICN:  4R87U71QM75**
**Medicare Appeal No:  1-8175102470**
**Date of QIC Decision:  Jan. 18, 2019**
**Device:  Tumor Treatment Field Therapy (E0766)**
**Supplier:  Novocure, Inc.**
**Our Ref: 19-51**

Dear Claims Coordinator:

As an authorized representative of the above-captioned Medicare beneficiary, Anniken Prosser, I hereby appeal to an Administrative Law Judge the above-captioned decision rendered by the Qualified Independent Contractor ("QIC") C2C Innovative Solutions, Inc. for the claims submitted for tumor treatment field therapy ("TTFT") for a glioblastoma. The QIC denied the claim asserting that there is insufficient documentation to quantify the effects of the device and the published studies do not clearly document the effectiveness of the device. The QIC generally referenced LCD L34823.

Ms. Prosser was diagnosed with a glioblastoma in July 2015. She had surgery and was treated with radiation and chemotherapy. Her clinician also prescribed TTFT. TTFT disrupts and corrupts the division of cancer cells and leads to the death of such cells. In 2011 and 2015, the FDA approved, through its more rigorous review process, a device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. During the clinical trial for newly diagnosed glioblastomas, such as that of Ms. Prosser, the TTFT results were so compelling that at the interim analysis, the Data Safety Monitoring Board recommended that those not receiving TTFT be able to cross over to receive the treatment. The FDA agreed. Thus, the peer-reviewed literature more than adequately reflects the effectiveness of the treatment.

The published, peer-reviewed literature shows the improved clinical survival and the progression-free survival of patients who receive TTFT for their glioblastoma. TTFT for glioblastoma is included in the National Comprehensive Cancer Network ("NCCN") guidelines and is considered the standard of care for newly diagnosed glioblastoma. Hundreds of treating physicians, in all 50 states, have prescribed TTFT. TTFT is covered by all the large national payers. It is used in 59 of the 62 NCD-designated cancer centers. Medicare has paid for numerous claims for medically indistinguishable beneficiaries.

Finally, the DMAC medical directors have already indicated that the LCD does not apply to newly diagnosed glioblastoma, i.e., it is inapplicable to Ms. Prosser's case. In either event, because the 21st Century Cures Act requires the Medicare contractors to list all the evidence considered in support of the LCD, the LCD does not reflect consideration of the any literature, including the most current literature, the LCD is not entitled to deference. Further, a recent production of all the evidence upon which LCD L34823 is based, shows that the LCD has not been kept current with the scientific and clinical evidence. In fact, the LCD record shows that the medical directors have failed to consider any of the peer-reviewed literature, regulatory approvals, technology assessments, indicia of widespread adoption, that evolved after 2014 – a shocking five-year failure for a fatal illness. An LCD which conflicts with the standard of care must be "based on sufficient evidence to convincingly refute evidence presented in support of coverage." No such evidence exists.

Yours very truly,

Debra Parrish on behalf of
Ms. Anniken Prosser

Enclosures:

      Attachment A:  Appointment of Representative Form
      Attachment B:  Certificate of Service
      Attachment C:  CD containing - clinical studies, NCCN guidelines 2013 & 2016 - 2018, payer
                       policies, FDA approvals, statement of adoption, article on clinical trial being
                       stopped, list of patents, prior favorable ALJ decisions *(CD v.17)*

cc:    Ms. Anniken Prosser
       Novocure, Inc., c/o Justin Kelly

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

April 29, 2019

***VIA PRIORITY MAIL***

Judge Joseph Grow
Office of Medicare Hearings and Appeals
Miami Field Office
51 SW 1st Avenue, Suite 1536
Miami, FL 33130-1608

> **RE:** **Prehearing Brief**
> **ALJ Appeal No. 1-8390277469**
> **Appellant/Beneficiary: A. Prosser**
> **Service: E0766**
> **Dates of Services: 1/16/18, 2/16/18, 3/16/18, 4/16/18**
> **Hearing Date: 5/20/2019**
> **Our Ref. No.: 19-51**

Dear Judge Grow:

In anticipation of the scheduling of the hearing for the above-captioned case, please find attached a prehearing brief to assist in your analysis.

If you have any questions regarding the foregoing, please do not hesitate to contact me at (412) 561-6250. We appreciate your consideration.

Respectfully submitted,

Debra M. Parrish
Attorney for A. Prosser

Enclosures:
Prehearing Brief

cc: Ms. Prosser

# EXHIBIT O



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, FL**

| | | | |
|---|---|---|---|
| Appeal of: | **A. Prosser** | ALJ Appeal No.: | **1-8390277469** |
| Beneficiary: | **A. Prosser** | **Medicare Part B** | |
| HICN: | **\*\*\*\*\*4857A** | Before: **J. Grow** | |
| | | U.S. Administrative Law Judge | |

## DECISION

After careful consideration of the entire record, an unfavorable decision is entered.

## PROCEDURAL HISTORY

Claims were submitted to Medicare for an electrical stimulation device used for cancer treatment, HCPCS code E0766, dates of service 1/16/18, 2/16/18, 3/16/18, and 4/16/18. *See* Exh. 1 at 3. This type of treatment is also referred to as Tumor Treatment Field Therapy (TTFT). *Id.* These claims were denied, and Appellant filed an appeal which was denied upon redetermination and reconsideration. Exh. 1 at 13-16 and 1-7. At the reconsideration level, the Qualified Independent Contractor (QIC) listed the denial rationale as Local Coverage Determination L34823 (LCD L34823) requirements had not been met. Exh. 1 at 4. The QIC found the medical provider, and not the Appellant/Beneficiary (Appellant), liable for the non-covered charges. Exh. 1 at 5.

This matter involves a claim that meets the amount in controversy requirement, and the Appellant made a timely request for an Administrative Law Judge (ALJ) hearing before the Office of Medicare Hearings and Appeals (OMHA). *See* 42 C.F.R. § 405.1014(b)(1).

I held a telephone hearing on May 20, 2019. Debra M. Parrish, Esq., appeared for Appellant. Timothy Parks, Clinical Registered Nurse for the electrical stimulation device supplier, testified on Appellant's behalf. Exhibits 1 through 5 were admitted to the record without objection.

## ISSUES

A.  Whether Medicare covers the electrical stimulation device/treatment, and

B.  If Medicare coverage is denied, then whether the waiver of liability provisions pursuant to § 1879 of the Social Security Act are applicable.

## LEGAL FRAMEWORK

### I.    ALJ Review Authority

#### *A.   Jurisdiction*

An individual or an organization that is dissatisfied with the reconsideration of an initial determination is entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner.  Social Security Act (Act) § 1869(b)(1)(A) (42 U.S.C. § 1395ff(b)(1)(A)).

In implementing this statutory directive, the Secretary has delegated the authority to administer the nationwide hearings and appeals system for the Medicare program to OMHA. *See* 70 Fed. Reg. 36386, 36387 (June 23, 2005).  The ALJs within OMHA issue the final decisions of the Secretary, except for decisions the Medicare Appeals Council further review. *Id.*

In calendar year 2019, a hearing before an ALJ is only available if the remaining amount in controversy is $160 or more for requests filed. *See* 83 Fed. Reg. 47619 (Sep. 20, 2018).  A party to a QIC reconsideration may request a hearing before an ALJ if the party files a written request for an ALJ hearing within 60 days after receipt of the notice of the QIC's reconsideration.  42 C.F.R. § 405.1002(a).

#### *B.   Scope of Review*

The issues before the ALJ include all the issues from the initial, reconsidered or revised determination that were not decided entirely in the Appellant's favor; however, if evidence presented before or during the hearing causes the ALJ to question a fully favorable decision, the Appellant will be notified and it will be considered an issue at hearing.  42 C.F.R. § 405.1032(a).

The ALJ may decide a case on the record and not conduct an oral hearing if the evidence in the hearing record supports a finding in favor of Appellant on every issue, or if the Appellant and all parties indicate in writing that they do not wish to appear before the ALJ at oral hearing.  42 C.F.R. § 405.1038.

The burden of proving each element of a Medicare claim lies with the Appellant by a preponderance of the evidence. *See* 42 C.F.R. §§ 424.5(a)(6), 405.1018, 405.1028, and 405.1030. All laws and regulations pertaining to the Medicare and Medicaid programs, including, but not limited to Titles XI, XVIII, and XIX of the Act and applicable implementing regulations, are binding on ALJ's.  42 C.F.R. § 405.1063.

An Appellant may offer new evidence for the first time at the ALJ level of appeal only upon a showing of good cause why the evidence was not submitted to the QIC or a prior decision maker. The ALJ will determine whether good cause exists for the late submission of the new evidence and may only consider the evidence in making a decision if good cause is found. *See* 42 C.F.R.

§§ 405.1018, 405.1028, and 405.1030. This new evidence restriction does not apply to unrepresented beneficiaries. *See* 42 C.F.R. § 405.1018(d).

Unless the ALJ dismisses the hearing request, the ALJ will issue a written decision that states findings of fact, conclusions of law, and the reasons for the decision. 42 C.F.R. § 405.1046(a). The decision must be based on evidence offered at the hearing or otherwise admitted into the record. *Id.*

### C. Standard of Review

The ALJ conducts a *de novo* review of each claim at issue and issues a decision based on the hearing record. 42 C.F.R. § 405.1000(d). *De novo* review requires the ALJ to review and evaluate the evidence without regard to the findings of prior determinations on the claim and make an independent assessment relying upon the evidence and controlling laws.

## II. Applicable Law

The Medicare program, Title XVIII of the Act, is administered through CMS, a component of HHS. The Secretary of HHS is authorized to enter into contracts with private entities for the administration of Part B of Title XVIII, the Supplementary Medical Insurance program, which provides coverage for a variety of medical services and supplies furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of specific health-related items and services. *See* Act § 1842(a).

Part B beneficiaries participate voluntarily in the Medicare Part B program and pay a monthly premium. Part B entitles a beneficiary to have payments made on his or her behalf for "medical and other health services." Act § 1861(s)(3).

The items and services that are "not reasonable and necessary" for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member are specifically excluded from Medicare coverage. Act § 1862(a)(1)(A). Further, payment to any provider of services is precluded unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." Act § 1833(e) of the Act; *see* 42 C.F.R. § 424.5(a)(6).

The Act limits the liability of the beneficiary and providers of services if the services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the beneficiary nor the provider knew or could reasonably have been expected to know that the services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. However, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of

medical items and services in the form of manuals and local medical review policies (LMRPs) or Local Coverage Determinations (LCDs). Act § 1871(a)(2)

The Act provides that ALJs will give substantial deference to LCDs, LMRPs or CMS program guidance when applicable, and if they do not follow the policy they must explain why in their decision. Act § Section 1869(f)(2); *see also* 42 CFR § 405.1062.

Specific to the instant case is Local Coverage Determination L34823, LCD for Tumor Treatment Field Therapy (effective 10/01/15), which was promulgated by CGS Administrators, LLC. It provides, in part: Tumor treatment field therapy (E0766) will be denied as not reasonable necessary.

The Medicare Appeals Council has cited LCD L34823 on several occasions in determining no Medicare TTFT coverage exists. *See* Medicare Appeals Council docket numbers M-19-1231 (April 23, 2019); M-19-755 (March 14, 2019); M-19-525 (March 14, 2019); and M-19-453 (March 8, 2019). Although these Council decisions are not precedential, they nonetheless represent HHS's final decision.

## **FINDINGS OF FACT AND ANALYSIS**

*1. Medicare does not cover the electrical stimulation device/treatment at issue because LCD L34823, which was in effect during the dates of service at issue, indicated there was no Medicare coverage for this device/treatment, and I must give LCDs substantial deference.*

The Appellant's attorney, Ms. Parrish, submitted a prehearing brief which discussed medical literature and professional medical societies which have determined that TTFT is safe and efficient. Exh. 4 at 6-7. Ms. Parrish's brief also discussed clinical trials which have shown TTFT to be safe and efficient. Ms. Parrish also emphasized in her brief that TTFT has been widely accepted by many major United States health coverage payors, as well as the fact that the Centers for Medicare Services previously assigned a HCPCS code with regard to TTFT devices. Exh. 4 at 8-8A. Finally, Ms. Parrish argued in her brief that LCD L34823 should not be given substantial deference due to several factors, including: "...the LCD's obvious failure to reflect the peer-reviewed literature, consensus of experts, and acceptance by the relevant medical community...." Exh. 4 at 8A.

At the hearing, Ms. Parrish emphasized that the Appellant was considered a "newly diagnosed" glioblastoma patient as of the dates of service at issue which were in 2016. She also discussed a favorable OMHA ALJ decision which had recently been issued with regard to different dates of service involving this same issue and this same Appellant. Ms. Parrish also indicated that medical contractors had proposed a new policy on May 9, 2019 which would allow Medicare TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this had been preceded by a Medicare carrier advisory meeting which took place in early March 2019, following which the participants had recommended TTFT Medicare coverage for newly diagnosed glioblastoma patients. She also discussed a new proposed LCD which would provide TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this new proposed LCD was in the public comment process as of the hearing date, May 20, 2019. Ms.

Parrish requested that I grant coverage for the Appellant here either by giving the current LCD substantial deference but refraining from applying the LCD or by taking the position that the evidence shows that the current LCD should only apply to "recurrent" glioblastoma patients and not to newly diagnosed glioblastoma patients.

Mr. Parks testified at the hearing regarding the Appellant's clinical presentation and the various treatment modalities she had undergone since being diagnosed. He also discussed the differences between "newly diagnosed" glioblastoma and "recurrent" gliobastoma.

Although I find the Appellant's arguments compelling, I also find the Appellant's arguments amount to challenges to the underlying record upon which the LCD is based. A separate adjudicative process is available for aggrieved parties to challenge whether that LCD record is complete and adequate to support the validity of the LCD. *See* 42 C.F.R. 426.25 and Part 426 generally. I cannot make those types of findings here because I do not have the record upon which the LCD is based before me.

Given that LCD L34823 was in effect during the dates of service at issue and continues to remain in effect at the present time, I must substantially defer to the LCD and find no coverage.

2.     *The provider, and not the Appellant, is responsible for the non-covered charges.*

The Act limits the liability of the Beneficiary and providers of items and services if the items and services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the Beneficiary nor the provider knew or could reasonably have been expected to know that the items and services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Medicare can reimburse for non-covered items and services if the provider or supplier of the items and services does not know, or have reason to know, that Medicare does not cover the items and services. The provider is a Medicare participant and must comply with all applicable laws and regulations. As a Medicare participant, the provider should be familiar with Medicare laws, regulations, and policies. The provider should have known the device and services that it provided to the Appellant are not covered by Medicare. The provider is therefore responsible for the non-covered charges.

The individual receiving the items and services is not liable for payment to the provider if the individual does not know, or have reason to know, that Medicare does not cover the items and services. There is no evidence in the record here indicating Appellant received advance notice, or knew, or should have known, that Medicare did not cover the item and service. Appellant is therefore not responsible for the non-covered charges.

## CONCLUSIONS OF LAW AND ORDER

Medicare does not cover the item and services the Appellant received on the dates of service at issue. The Appellant is not liable to the provider for the item and services. The provider is not

eligible for coverage under § 1879 of the Act or Medicare regulations.

The Medicare contractor will process Appellant's claim in accordance with this decision.

Dated:     . **JUN 1 9 2019**

Crow
U.S. Administrative Law Judge

# EXHIBIT P

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

July 12, 2019

## *VIA DAB E-FILE*

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building, Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

> **Re:** **ALJ Appeal No.: 1-8390277469**
> **Decision Date: June 19, 2018**
> **Appellant: A. Prosser**
> **Beneficiary: A. Prosser**
> **HICN: 4R87U71QM75**
> **Dates of Service: 1/16/18-4/16/18**
> **Service: E0766**
> **Our Ref. 19-51**

Dear Medicare Appeals Council:

Ms. Anniken Prosser hereby appeals the attached June 19, 2019 unfavorable decision by Administrative Law Judge Joseph Grow with respect to the above-identified case. See Attachment 2. Appellant appeals the unfavorable portion of the decision based on mistake of fact and mistake of law.

### I. The issues to be considered in the appeal are:

1. Did the ALJ conduct a *de novo* hearing and render a decision based on the record?

2. Did the ALJ Appellant reasonably believe that LCD L34823 did not apply to her newly diagnosed glioblastoma?

3. Was Appellant entitled to coverage based on collateral estoppel?

4. Did Appellant submit sufficient documentation to satisfy Medicare coverage criteria?

5. Was Appellant entitled to payment based on the waiver of limitation of liability?

## II.    Introduction

Ms. Prosser was prescribed an Optune system for her newly diagnosed glioblastoma (GBM). The Optune system delivers tumor treatment field therapy (TTFT). TTFT creates an electrical field that disrupts and corrupts the division of cancer cells and leads to the death of such cells. In 2011 and 2013, the FDA approved, through its more rigorous review process, the Optune device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. The initial FDA approval was for recurrent glioblastoma. The FDA then approved the Optune device for newly diagnosed glioblastomas. During the clinical trial for newly diagnosed glioblastomas, the interim TTFT results were so compelling (i.e., the treatment was able to show significant clinical benefit) that the Data Safety Monitoring Board recommended early termination of the study to enable patients not receiving the treatment to cross over and receive the treatment deeming it to be unethical to withhold TTFT from those not receiving it. The FDA agreed.

All the claims at issue were denied by the contractor citing LCD L34823 which simply states TTFT will be denied as not reasonable and necessary. The QIC denied the claims citing the LCD and finding that the "currently published studies in the medical literature do not clearly document the effectiveness of this device." Significantly, the DMAC medical directors issued a letter indicating that LCD L34823 does NOT apply to newly diagnosed glioblastoma and that they intend to undertake the LCD development process for the same. Despite this clear statement from the DMAC medical directors, the ALJ found the LCD applied.

The ALJ stated that Appellants arguments were challenges to the underlying record on which the LCD was based and asserted he did not have the LCD record before him.

## III.    Satisfaction of Medicare Coverage Criteria

All of the claims initially were denied by the Medicare contractor on the basis that TTFT was not reasonable and medically necessary generally and that the peer-reviewed literature does not document the effectiveness of the device. With respect to the second point, the evidence to the contrary is overwhelming. The data from the clinical trial for newly diagnosed glioblastomas demonstrated such remarkable effectiveness that the study was terminated early to enable those not receiving treatment during the clinical trial to receive the treatment. The FDA approved the device as effective. Because the peer-reviewed literature is so compelling, the NCCN guidelines give TTFT a level 1 recommendation for newly diagnosed glioblastomas, i.e., uniform agreement exists among the experts based on the highest level of evidence, that TTFT should be offered to those newly diagnosed with a glioblastoma. Thus, the experts agree that the peer-reviewed literature meets the highest level of evidence possible. The ALJ failed to consider the peer-reviewed literature – a primary Medicare coverage criterion.

Further, the ALJ's analysis fails to reflect consideration of the other Medicare coverage criteria, i.e., the consensus of experts (reflected in the NCCN guidelines and adoption by all the major medical centers in the United States), and acceptance by the relevant medical community (again in view of the inclusion in practice guidelines, the device has been prescribed in every state by hundreds of clinicians and is covered by all major payers). Thus, to the extent the ALJ found that the LCD was silent with respect to coverage for newly diagnosed GBM, the ALJ should have undertaken the foregoing analysis, which she did not. Further, even if the ALJ found the LCD did cover newly diagnosed GBM, notwithstanding the clear statement of the DMAC medical directors, the ALJ could have chosen not to give it deference in view of the overwhelming evidence that TTFT meets Medicare's coverage criteria.

It is difficult to follow the ALJ's statement that the CRD ruling "does include change in the treatment protocol it does not, on its own, invalidate the LCD." The Judge in the Civil Remedies Division found the LCD record did not support the validity of the LCD and invited the parties to supplement the record. The DMAC only submitted the Program Integrity Manual and indicated that it did not have witnesses to defend the LCD. Because the existing evidence did not support the LCD, and the DMACs offered no additional evidence, it is clear that the LCD will be revised or invalidated soon based on the overwhelming evidence that TTFT meets Medicare coverage criteria. It is unclear what "treatment protocol" the ALJ is referencing.

IV.    **Errors of Law and Fact - Procedural Defect**

The claims were denied below on the basis that the TTFT generally is not covered. The ALJ's decision appears to confuse the distinction between an LCD challenge and its implication for a claims appeal. A beneficiary can file an appeal of a denied claim without challenging a coverage policy. ALJs can make payment for a claim and choose not to apply an LCD in an individual case. The fact that an LCD challenge or reconsideration was filed is additional evidence that the LCD does not conform to the MPIM requirements and provides another basis for declining to follow an LCD. However, the existence of an LCD challenge or reconsideration in no way undercuts the ability of a Medicare beneficiary to argue that the LCD should not be given deference in his or her case based on the obvious deficiencies of an LCD. The ALJ appeared to think that the beneficiary was challenging the LCD in the claim appeal process when she was simply indicating that it should not be applied in her case (as opposed to all Medicare beneficiaries) based on her medical condition and need for the treatment.

In either event, the ALJ stated he did not have the LCD record before him. However, Ms. Prosser had submitted the LCD Record Exhibit List from the LCD challenge process which showed that the Medical Directors had not considered any of the evidence regarding TTFT that had evolved since 2014. Further, after the hearing, but before Judge Grow issued his decision, the Civil Remedies Division found that the LCD record did not support the validity of the LCD under the reasonableness standard. Thus, the LCD should not have been applied against a Medicare beneficiary battling a life-threatening illness. As numerous judges have found, an LCD that has not kept pace with clinical and scientific developments, and which precludes coverage of a treatment that is the standard of care, should not be applied against Medicare beneficiaries.

The ALJ failed to consider the implications of the CRD ruling when denying coverage of a treatment that is the standard of care.

Finally, Ms. Prosser received a prior favorable ALJ decision on other dates of service for the same device for the same condition. See ALJ No. 1-8416188648. Accordingly, the Secretary is estopped from denying her claims for TTFT. The Secretary is barred by the doctrine of collateral estoppel/issue preclusion from re-litigating those issues. As noted by a unanimous Supreme Court:

> We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality. When an administrative agency is acting in a judicial capacity and resolves dispute issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution. The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity.

*See Astoria Federal Savings and Loan Assoc. v. Solimino*, 501 U.S. 104, 107-8 (1991) (internal citations and quotations omitted). No basis exists for the Secretary to ignore the prior coverage rulings for this Medicare beneficiary.

### IV.    Limitation of Liability

The DMAC medical directors indicated the relevant LCD does not apply to newly diagnosed glioblastoma. Further, the Medicare beneficiary could not have reasonably known that the standard of care for newly diagnosed glioblastoma would not be covered by Medicare. In view of the overwhelming peer-reviewed literature, the consensus of medical experts and the widespread, nationwide adoption by payers and clinicians, Ms. Prosser could not have reasonably known the Optune system would not be covered by Medicare. Further, nothing distinguishes her case from the numerous claims paid by Medicare for medically similar Medicare beneficiaries. Indeed, Ms. Prosser received a favorable ALJ decision regarding Medicare coverage for TTFT for her GBM. Accordingly, she is entitled to coverage under Medicare's limitation of liability provisions.

### V. Conclusion

The Optune system was reasonable and medically necessary when it was provided to the Ms. Prosser. The ALJ committed fundamental errors of law when he denied a Medicare beneficiary coverage of a service which has extended her life. Judge Grow applied an LCD which on its face showed that it failed to consider any of the clinical and scientific developments that had occurred over the past five years and which the Civil Remedies Division found invalid under the reasonableness standard. Based on the foregoing, Judge Grows's decision should be reversed and the MAC should be ordered to cover the Optune system for Ms. Prosser.

Please contact me if you have any questions regarding this appeal.

Yours very truly,

Debra Pistorino Parrish

Enclosures:
Appointment of Representative
June 19, 2019 ALJ Decision

cc: A. Prosser
C2C Innovative Solutions, Inc.

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
Fax 412.561.6253
E-mail: info@dparrishlaw.com

January 2, 2020

*VIA E-file*
Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, DC 20201

> RE: **Request for Escalation**
> **Appellant/Medicare Beneficiary: Anniken Prosser**
> **HICN: 4R87U71QM75**
> **ALJ Decision Date: June 19, 2019**
> **ALJ Appeal Nos.: 1-8390277469**
> **Council No.: M-19-2233 (filed July 12, 2019)**
> **Our Ref: 19-51**

Dear Medicare Appeals Council:

Ms. Anniken Prosser has received two favorable ALJ decisions finding TTFT meets Medicare coverage criteria for her. See ALJ Nos. 1-8380637906 and 1-8416188648. The Secretary chose not to appeal the decisions and they have become final. The Secretary is barred by the doctrine of collateral estoppel/issue preclusion from re-litigating those issues with respect to Ms. Prosser. As noted by a unanimous Supreme Court, "We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." *See Astoria Federal Savings and Loan Assoc. v. Solimino*, 501 U.S. 104, 107-8 (1991) (internal citations and quotations omitted). The application of issue preclusion would not work as basic unfairness against the Secretary and there are no special circumstances that would make it unfair to apply the doctrine.

The above-captioned Medicare beneficiary appeal has been pending for more than 90 days. Accordingly, pursuant to 42 C.F.R. §405.1132, Ms. Prosser requests escalation of the above-captioned claims to District Court.

Sincerely,

Debra M. Parrish

Debra M. Parrish for
Medicare Beneficiary Anniken Prosser

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

DAVID CHRISTENSON and
ANNIKEN PROSSER,

        Plaintiffs,

                                    Case No. 20-cv-194

    v.

ALEX AZAR, in his capacity as Secretary
of the United States Department of Health
and Human Services,

        Defendant.

_____

DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES
_____

Defendant Alex Azar, Secretary of the United States Department of Health and Human

Services, by its undersigned counsel, hereby answers the plaintiff's complaint as follows:

## I.   <u>SUMMARY</u>

1.     *Tragically, each of the two Plaintiffs is suffering from a particularly deadly form*

*of brain cancer, glioblastoma multiforme (GMB), and they are seeking coverage for life-saving*

*treatment. In a particularly cruel twist, the Secretary is forcing Plaintiffs to prove that they are*

*entitled to the same treatment on a monthly basis, and then the Secretary's decisions differ from*

*month to month with no predictable pattern. The Secretary is playing a game of chance with the*

*Plaintiff's lives; maybe this month they will get life-saving treatment or maybe they won't.*

    **<u>ANSWER:</u>**   Admits that plaintiffs have been diagnosed with GMB. Denies the

remaining allegations of this paragraph.

1

2. *The main issue in this case is whether collateral estoppel prevents the Secretary from re-litigating issues already lost in administrative proceedings involving the same parties?*

**ANSWER:** Denies. The defendant states that under 42 U.S.C. § 405(g), the court's review is limited to whether substantial evidence supports the Secretary's final decision, as set forth in the appealed decisions (ALJ Appeal Numbers 1-8630709341 and 1-8390277469).

3. *The Secretary has asserted that his regulations preclude collateral estoppel and that month-to-month differing decisions on Plaintiff's life-saving care are not arbitrary and capricious even though the fats and/or circumstances have not changed. These positions are wholly without merit under well-established issue preclusion law. U.S. v. Stauffer Chemical Co., 464 U.S. 165 (1984); Astoria Federal Savings & Loan v. Solimino, 501 U.S. 104 (1991).*

**ANSWER:** Denies.

4. *The other issue is whether it is arbitrary and capricious under basic principles of administrative law for the Secretary to issue conflicting decisions when the facts and/or circumstances have not changed and where the Secretary has determined multiple times that coverage of a medical device to treat Plaintiff's brain cancer was appropriate.*

**ANSWER:** Denies.

## II.   **JURISDICTION**

5. *This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g) and 1395ff. Each of the Plaintiffs is filing suit after final decisions of the Medicare Appeals Council (acting on behalf of the Secretary) denying coverage of their Medicare claims (and, therefore, have exhausted their administrative remedies), the amount-in-controversy is more than $1,630 (42*

2

*U.S.C. §§ 1395ff(b)(1)(E)(i) and 1935ff(b)(1)(E)(iii), and this suit was filed within 60 days of the Secretary's final decisions, as a result of escalation. See 43 C.F.R. § 405.1016(f).*

**ANSWER:** Admits the first sentence. Denies the second sentence, except that the defendant admits plaintiffs meet the amount-in-controversy and that this action was timely filed within 60 days of escalation pursuant to 42 C.F.R. § 405.1132.

6. *Venue is proper in this district pursuant to 42 U.S.C. § 405(g) because this action is being brought in the district of Plaintiffs' residence.*

**ANSWER**: Admits.

### III.    PARTIES

7. *Plaintiff David Christenson is an individual and a resident of the State of Wisconsin. Mr. Christenson is eligible for Medicare on the basis of age or disability as previously determined by the Secretary.*

**ANSWER:** Admits.

8. *Plaintiff Anniken Prosser is an individual and a resident of the State of Wisconsin. Ms. Prosser is eligible for Medicare on the basis of age or disability as previously determined by the Secretary.*

**ANSWER:** Admits.

9. *Defendant Alex Azar is sued in his official capacity as the Secretary of Health and Human Services.*

**ANSWER:** Admits.

3

# IV.    LEGAL BACKGROUND

10.    *The doctrine of mutual collateral estoppel applies to the government and may bar the government from re-litigating facts/issues the government previously litigated and lost.   See U.S. v. Stauffer Chemical Co., 464 U.S. 165 (1984).*

**ANSWER:**    Denies.

11.    *Moreover, collateral estoppel may be based not only on litigation in federal or state courts but also on proceedings before an agency, when the agency is acting in a judicial capacity. In Astoria Federal Savings & Loan Assoc. v. Solimino, 501 U.S. 104, 107-8 (1991), the Supreme Court held that:*

> We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality.   When an administrative agency is acting in a judicial capacity and resolves dispute issues of fact property before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.   Such repose is justified on the sound and obvious principal of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one subsequently seeks to raise.   To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution.   The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity.

**ANSWER:**    Denies.

12.    *Numerous courts have applied collateral estoppel to Federal agency decision. Manitowoc Cranes LLC v. Sany America Inc., 2017 WL 6327551,*2 (E.D. Wis. 2017), citing B*

4

*&B Hardware, Inc. v. Hargis Indus., Inc.,* 135 S. Ct. 1293, 1303 (2015); *see, e.g. Brewster v. Barnhard,* 145 Fed. App'x 542 (6th Cir. 2005) (SSA ALJ bound by prior determination).

**ANSWER:**    Denies.

## V.    FACTUAL  BACKGROUND

### Tumor  Treatment  Field  Therapy  (TTFT)

13.    *Glioblastoma multiforme (GBM) is an unusually deadly type of brain cancer. Without treatment, survival is typically three months.   With traditional treatment, the survival rate at two years after treatment is ~31%, while at five years, only ~5% of patients are living.*

**ANSWER**:    As to the first sentence of this paragraph, admits that GBM is a type of brain cancer. The defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

14.    *More recently, a process for treating GBM using alternating electric fields has been developed.  This is known as tumor treatment field therapy (TTFT).  Alternating electric fields interfere with tumor cell replication and have been shown to dramatically increase the period during which the GBM does not progress, as well as overall survival rates.*

**ANSWER**:    Admits that TTFT has been prescribed as treatment in some cases of GBM. The defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

15.     *In ground-breaking papers published in the Journal of the American Medical Association (JAMA) in 2015 and 2017, TTFT was shown to increase the two-year survival rate by more than 38% and t nearly triple the five-year survival rate.[1]*

**ANSWER:**     The defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. To the extent that plaintiffs are referring to the articles that were submitted as evidence during the administrative review, the defendant refers the court to the certified administrative record at pages 267 through 288 for a complete and accurate statement of their contents.

16.     *TTFT was the first significant advance in treating GBM in more than a decade. TTFT has become the standard of care for treating GBM and essentially all private insurers cover TTFT.   It saves and/or extends GMB patients' lives, in some instances, by years.   Between January 2016 and December 2018, at least 93 scientific papers were published demonstrating the effectiveness of TTFT.   It is given a level one recommendation in the National Comprehensive Cancer Network (NCCN) guidelines, i.e., there is consensus, among the experts, based on a high level of evidence, that TTFT is a recommended intervention.*

**ANSWER:**     The defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

17.     *The sole supplier of the equipment that delivers Tumor Treatment Field Therapy Novocure, Inc. which manufactures the Optune system. The Optune TTFT system is rented on a*

---

[1] *See Stupp, et al.*, 'MAINTENANCE THERAPY WITH TUMOR-TREATING FIELDS PLUS TEMOZOLOMIDE VS. TEMOZOLOMIDE ALONE FOR GLIBOLASTOMA; A RANDOMIZED CLINICAL TRIAL", JAMA, VOL. 314, NO. 23, pgs. 2535-43 (December 15, 2015); *Stupp, et al.,* "EFFECT OF TUMOR TREATING FIELDS PLUS MAINTENANCE TEMOZOLOMIDE VS. MAINTENANCE TEMOZOLOMIDE ALONE ON SURVIVAL IN PATIENTS WITH GLIBLASTOMA", JAMA, Vol, 318, No. 23, pgs, 2306-2316 (December 19, 2017).

*monthly basis. Thus, after a patient is prescribed the Optune system, they will have separate monthly claims for Medicare coverage.*

**ANSWER:** Admits that Novocure, Inc. manufactures Optune and that Novocure rents Optune to patients on a monthly basis. The defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

18. *Sadly, there is no known cure for GBM and patients prescribed TTFT treatment must continue that treatment for the rest of their hopefully extended lives.*

**ANSWER:** Denies.

### The Medicare Appeals Process

19. *Plaintiffs are enrolled in the medical benefit commonly known as "Original Medicare." Claims submitted by beneficiaries are subject to a five (5) level appeal process, that can (and typically does) take more than a year. At the first stage, a beneficiary submits a claim. If the claim is denied, the beneficiary can request "redetermination." If the claim is still denied, the beneficiary can request "reconsideration." If the claim is still denied, the beneficiary can appeal to an Administrative Law Judge (ALJ). If the ALJ denies the claim, the beneficiary can appeal to the Medicare Appeals Council (MAC). Finally, if the claim is still denied, the beneficiary can file suit in district court.*

**ANSWER:** Admits plaintiffs are enrolled in Medicare Parts A and B. Defendant denies the remainder of this paragraph and refers the court to 42 C.F.R. § 405.904 for a complete and accurate summary of the levels of administrative review.

20. *While the statues and regulations require both ALJs and the MAC to issue decisions within 90 days, those deadlines are routinely missed. Thus, beneficiaries seeking coverage are*

*often thrown into a multi-year effort to obtain final decisions in their cases before they can seek relief in a federal court.*

**ANSWER:**    Denies.

### a.    Facts Specific to Mr. Christenson

21.    *Plaintiff David Christenson has been diagnosed with a GBM and, after receiving other treatment, has been prescribed TTFT.*

**ANSWER:** Admits.

22.    *Mr. Christenson has previously received three favorable decision from ALJs which determined that TTFT is medically reasonable and necessary for him and is a covered benefit. ALJ Appeal Nos. 1-8285652321 (April 2, 2019), 1-8416229632 (June 6, 2019) and 1-8637714249 (September 11, 2019). The Secretary did not appeal any of those decisions and they have become final.*

**ANSWER:**    Denies, except to admit that Mr. Christenson has received three favorable decisions from ALJs: ALJ Appeal 1-8285652321 (April 2, 2019) and combined ALJ Appeal 1-8416229632 and 1-8416270832 (June 6, 2019). The defendant refers the court to the certified administrative record at pages 11 and 23 for complete and accurate copies of these decisions. The defendant further states that he did not appeal these decisions and the decisions are administratively final.

23.    *Despite the prior favorable rulings, ALJ Watson issued a decision on September 12, 2019 in ALJ Appeal No. 1-8630709341 holding that TTFT is not medically reasonable and necessary for Mr. Christenson and, therefore, denying coverage.*

8

**ANSWER**: Denies. The defendant refers the court to the certified administrative record at page 84 for a complete and accurate copy of this decision.

24.     *Mr. Christenson timely appealed ALJ Watson's decision on September 18, 2019. When no decision was received within 90 days, Mr. Christenson filed a notice of escalation pursuant to 42 C.F.R. § 405.1016(f) on January 3, 2020.*

**ANSWER**: As to the first sentence of this paragraph, admits. As to the second sentence of this paragraph, denies. The defendant further states that the escalation was pursuant to 42 C.F.R. § 405.1132.

25.     *On January 22, 2020, the Medicare Appeals Council (MAC) responded indicating that they could not timely issue a decision and that judicial review was authorized within 60 days of the letter.*

**ANSWER**:     Admits. The defendant refers the court to the certified administrative record at page 57 for complete and accurate copies of the MAC's letter.

26.     *Accordingly, Mr. Christenson is entitled to a judicial review.*

**ANSWER**:     Admits.

### b.        Facts Specific to Ms. Prosser

27.     *Plaintiff Anniken Prosser has been diagnosed with a GBM and, after receiving other treatment, has been prescribed TTFT.*

**ANSWER**:     Admits.

28.     *Ms. Prosser has previously received a favorable ALJ decision determining that TTFT is medically reasonable and necessary for her and is a covered benefit.  ALJ Appeal No. 1-84161888648. The Secretary did not appeal that decision and it has become final.*

9

**ANSWER**:   Denies, except to admit that Ms. Prosser has received a favorable decision from an ALJ in ALJ Appeal Number 1-84161888648. The defendant refers the court to the certified administrative record at page 4354 for a complete and accurate copy of this decision. The defendant further states that he did not appeal this decision and it is administratively final.

29.   *Despite the prior favorable, ALJ Grow issued a decision on June 19, 2019 in ALJ Appeal No. 1-8390277469 holding that TTFT is not medically reasonable and necessary for Ms. Prosser and, therefore, denying coverage.*

**ANSWER**: Denies. The defendant refers the court to the certified administrative record at page 4380 for a complete and accurate copy of this decision.

30.   *Ms. Prosser timely appealed ALJ Grow's decision on July 12, 2019. When no decision was received within 90 days, Ms. Prosser filed a notice of escalation on January 2, 2020 pursuant to 42 C.F.R. § 405.10106(f).   No response has been received to date.*

**ANSWER**: As to the first sentence of this paragraph, admits. As to the second sentence of this paragraph, denies. The defendant further states that the escalation was pursuant to 42 C.F.R. § 405.1132. As to the third sentence of this paragraph, denies. The defendant refers the court to the certified administrative record at page 4332 for a complete and accurate copy of the Appeals Council's January 22, 2019 response.

31.   *On January 22, 2020, the Medicare Appeals Council (MAC) responded indicating that they could not timely issue a decision and that judicial review was authorized within 60 days of the letter.*

**ANSWER**:   Admits. The defendant refers the court to the certified administrative record at page 4332 for complete and accurate copy of the MAC's letter.

10

32.    *Accordingly, Ms. Prosser is entitled to judicial review.*

**ANSWER**:    Admits.

## VI.    LEGAL CAUSES OF ACTION

### COUNT I
### Violation of 42 U.S.C. §405(g)
(contrary to law)

33.    *Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as contrary to law, as arbitrary and capricious, an abuse of discretion, and unsupported by the evidence, and issue an order finding that Plaintiff's claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.*

**ANSWER**: Denies.

### COUNT II
### Violation of 5 U.S.C. § 706(1)
(unlawfully withheld or unreasonably delayed)

34.    *Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as unlawfully withheld or unreasonably delayed and unsupported by the evidence, and issue an order finding that Plaintiff's claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.*

**ANSWER**: Denies.

### COUNT III
### Violation of 5 U.S.C. § 706(2)(A)
(arbitrary and capricious, abuse of discretion, not in accordance with law)

35.    *Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance*

11

with the law, and issue an order finding that Plaintiff's claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.

**ANSWER:** Denies.

<div align="center">

**COUNT IV**
**Violation of 5 U.S.C. § 706(2)(C)**

</div>

(in excess of statutory jurisdiction, authority, or limitations or short of statutory right)

36. *Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as in excess of the Secretary's authority and limitations and short of Plaintiffs' statutory rights and issue an order finding that Plaintiff's claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.*

**ANSWER**: Denies.

<div align="center">

**COUNT V**
**Violation of 5 U.S.C. § 706(2)(D)**

</div>

(without observance of procedure required by law)

37. *Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as done without observance of the procedure required by law and issue an order finding that Plaintiff's claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.*

**ANSWER**: Denies.

<div align="center">

**COUNT VI**
**Violation of 5 U.S.C. § 706(2)(E)**

</div>

(not supported by substantial evidence)

38. *Based on the foregoing, Plaintiffs ask the Court to reverse the Secretary's Decisions as not supported by substantial evidence and issue an order finding that Plaintiff's*

*claims are covered and direct the Secretary to make appropriate payment for the claims that are the subject of this case.*

**ANSWER:** Denies.

## VII. REQUEST FOR DECLARATORY JUDGMENT

39. *It is appropriate to declare the rights and legal relations of both plaintiffs regarding payment of the past and future monthly claims for Tumor Treatment Field Therapy by the Medicare program.*

**ANSWER:** Denies.

## VIII. JURY DEMAND

40. PLAINTIFFS DEMAND A JURY TRIAL.

**ANSWER:** Plaintiffs are not entitled to a jury trial.

Defendant denies that plaintiffs are entitled to the relief sought.

The defendant denies all allegations in the Complaint not specifically admitted or denied.

## IX. AFFIRMATIVE DEFENSES

1. The complaint fails to state a claim upon which relief can be granted.

2. Collateral estoppel does not apply to non-precedential decisions issued by Administrative Law Judges.

3. ALJ Appeal Nos. 1-8630709341 and 1-8390277469 are supported by substantial evidence.

Defendant has, or may have, additional affirmative defenses that are not known at this time. Defendant specifically reserves those and other affirmative defenses.

13

For the reasons set forth above, the Court should affirm the final agency decisions, dismiss all claims against the defendant, and deny all claims for relief asserted by the plaintiffs.

Dated at Milwaukee, Wisconsin this 20th day of April, 2020.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By: /s/ Chris R. Larsen

CHRIS R. LARSEN
Assistant United States Attorney
Wisconsin State Bar Number: 1005336
Attorneys for Defendant
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-4394
Email: chris.larsen@usdoj.gov

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ANNIKEN PROSSER

        *Plaintiff,*

    v.                                   Case No. 20-cv-194

ALEX AZAR, in his capacity as Secretary
of the United States Department of Health
and Human Services,

        *Defendant.*

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that ANNIKEN PROSSER, plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the Seventh Circuit the Final Judgment issued by the United States District Court for the Eastern District of Wisconsin (the "District Court") on October 21, 2020 [Doc. 42] and, in particular, appeals, without limitation, the following four orders made final by the District Court's Final Judgment:

1.    The Decision and Order entered on July 6, 2020 [Doc. 21], which denied Plaintiff's Motion for Summary Judgment and granted Defendant's Cross-Motion for Summary Judgment;

2.    The Decision and Order entered on September 24, 2020 [Doc. 29], which denied Plaintiff's Motion for Reconsideration of the District Court's July 6, 2020 Decision and Order and Alternative Motion for §1929(b) Certification.

3.    The Decision and Order entered on October 21, 2020 [Doc. 40], which granted Defendant's Motion for Summary Judgment for Lack of Standing; and

4.    The Order entered on October 21, 2020 [Doc. 41], which denied as moot Plaintiff's Motion to Dismiss with Prejudice to Facilitate Appellate Review.

1

Respectfully submitted,

Dated: October 22, 2020

PARRISH LAW OFFICES
*Attorney for Plaintiff*
By: James C. Pistorino
788 Washington Road
Pittsburgh, PA 15228
Telephone: (412) 561-6250
james@dparrishlaw.com

DAVIS & PLEDL, SC
*Attorneys for Plaintiff*
By: Robert Theine Pledl
By: Victoria Davis Davila
1433 N. Water Street – Suite 400
Milwaukee, WI 53202
Telephone: (414) 488-1354
rtp@davisandpledl.com
vldd@davisandpledl.com

FOLEY & LARDNER LLP
*Attorneys for Plaintiff*
/s/ Michael Leffel
By: David B. Goroff
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Telephone: 312-832-4500
By: Michael Leffel
150 East Gilman Street, Suite 5000
Madison, WI 53703-1482
Telephone: 608-257-5035
dgoroff@foley.com
mleffel@foley.com

2

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this

22nd day of October, 2020 on all counsel of record by using the CM/ECF system.


By: */s/ Michael Leffel* _____
      Michael Leffel

4822-0482-4015.3

 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Reconsidered by Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services, 11th Cir.(Fla.), Aug. 12, 2011

 KeyCite Yellow Flag - Negative TreatmentProposed Legislation

---

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 7. Social Security (Refs & Annos)
         Subchapter II. Federal Old-Age, Survivors, and Disability Insurance Benefits (Refs & Annos)

---

42 U.S.C.A. § 405

# § 405. Evidence, procedure, and certification for payments
## [Statutory Text & Notes of Decisions subdivisions I to VIII]

Effective: April 13, 2019
Currentness

<Notes of Decisions for 42 USCA § 405 are displayed in multiple documents.>

**(a) Rules and regulations; procedures**

The Commissioner of Social Security shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

**(b) Administrative determination of entitlement to benefits; findings of fact; hearings; investigations; evidentiary hearings in reconsiderations of disability benefit terminations; subsequent applications**

**(1)** The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based. Upon request by any such individual or upon request by a wife, divorced wife, widow, surviving divorced wife, surviving divorced mother, surviving divorced father, husband, divorced husband, widower, surviving divorced husband, child, or parent who makes a showing in writing that his or her rights may be prejudiced by any decision the Commissioner of Social Security has rendered, the Commissioner shall give such applicant and such other individual reasonable notice and opportunity for a hearing with respect to such decision, and, if a hearing is held, shall, on the basis of evidence adduced at the hearing, affirm, modify, or reverse the Commissioner's findings of fact and such decision. Any such request with respect to such a decision must be filed within sixty days after notice of such decision is received by the individual making such request. The Commissioner of Social Security is further authorized, on the Commissioner's own motion, to hold such hearings and to conduct such investigations and other proceedings as the Commissioner may deem necessary or proper for the administration of this subchapter. In the course of any hearing, investigation, or other proceeding, the Commissioner may

administer oaths and affirmations, examine witnesses, and receive evidence. Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure.

**(2)** In any case where--

**(A)** an individual is a recipient of disability insurance benefits, or of child's, widow's, or widower's insurance benefits based on disability,

**(B)** the physical or mental impairment on the basis of which such benefits are payable is found to have ceased, not to have existed, or to no longer be disabling, and

**(C)** as a consequence of the finding described in subparagraph (B), such individual is determined by the Commissioner of Social Security not to be entitled to such benefits,

any reconsideration of the finding described in subparagraph (B), in connection with a reconsideration by the Commissioner of Social Security (before any hearing under paragraph (1) on the issue of such entitlement) of the Commissioner's determination described in subparagraph (C), shall be made only after opportunity for an evidentiary hearing, with regard to the finding described in subparagraph (B), which is reasonably accessible to such individual. Any reconsideration of a finding described in subparagraph (B) may be made either by the State agency or the Commissioner of Social Security where the finding was originally made by the State agency, and shall be made by the Commissioner of Social Security where the finding was originally made by the Commissioner of Social Security. In the case of a reconsideration by a State agency of a finding described in subparagraph (B) which was originally made by such State agency, the evidentiary hearing shall be held by an adjudicatory unit of the State agency other than the unit that made the finding described in subparagraph (B). In the case of a reconsideration by the Commissioner of Social Security of a finding described in subparagraph (B) which was originally made by the Commissioner of Social Security, the evidentiary hearing shall be held by a person other than the person or persons who made the finding described in subparagraph (B).

**(3)(A)** A failure to timely request review of an initial adverse determination with respect to an application for any benefit under this subchapter or an adverse determination on reconsideration of such an initial determination shall not serve as a basis for denial of a subsequent application for any benefit under this subchapter if the applicant demonstrates that the applicant, or any other individual referred to in paragraph (1), failed to so request such a review acting in good faith reliance upon incorrect, incomplete, or misleading information, relating to the consequences of reapplying for benefits in lieu of seeking review of an adverse determination, provided by any officer or employee of the Social Security Administration or any State agency acting under section 421 of this title.

**(B)** In any notice of an adverse determination with respect to which a review may be requested under paragraph (1), the Commissioner of Social Security shall describe in clear and specific language the effect on possible entitlement to benefits under this subchapter of choosing to reapply in lieu of requesting review of the determination.

**(c) Wage records**

**(1)** For the purposes of this subsection--

A0107

**(A)** The term "year" means a calendar year when used with respect to wages and a taxable year when used with respect to self-employment income.

**(B)** The term "time limitation" means a period of three years, three months, and fifteen days.

**(C)** The term "survivor" means an individual's spouse, surviving divorced wife, surviving divorced husband, surviving divorced mother, surviving divorced father, child, or parent, who survives such individual.

**(D)** The term "period" when used with respect to self-employment income means a taxable year and when used with respect to wages means--

**(i)** a quarter if wages were reported or should have been reported on a quarterly basis on tax returns filed with the Secretary of the Treasury or his delegate under section 6011 of the Internal Revenue Code of 1986 or regulations thereunder (or on reports filed by a State under section 418(e) of this title (as in effect prior to December 31, 1986) or regulations thereunder),

**(ii)** a year if wages were reported or should have been reported on a yearly basis on such tax returns or reports, or

**(iii)** the half year beginning January 1 or July 1 in the case of wages which were reported or should have been reported for calendar year 1937.

**(2)(A)** On the basis of information obtained by or submitted to the Commissioner of Social Security, and after such verification thereof as the Commissioner deems necessary, the Commissioner of Social Security shall establish and maintain records of the amounts of wages paid to, and the amounts of self-employment income derived by, each individual and of the periods in which such wages were paid and such income was derived and, upon request, shall inform any individual or his survivor, or the legal representative of such individual or his estate, of the amounts of wages and self-employment income of such individual and the periods during which such wages were paid and such income was derived, as shown by such records at the time of such request.

**(B)(i)** In carrying out the Commissioner's duties under subparagraph (A) and subparagraph (F), the Commissioner of Social Security shall take affirmative measures to assure that social security account numbers will, to the maximum extent practicable, be assigned to all members of appropriate groups or categories of individuals by assigning such numbers (or ascertaining that such numbers have already been assigned):

**(I)** to aliens at the time of their lawful admission to the United States either for permanent residence or under other authority of law permitting them to engage in employment in the United States and to other aliens at such time as their status is so changed as to make it lawful for them to engage in such employment;

**(II)** to any individual who is an applicant for or recipient of benefits under any program financed in whole or in part from Federal funds including any child on whose behalf such benefits are claimed by another person; and

**(III)** to any other individual when it appears that he could have been but was not assigned an account number under the provisions of subclauses (I) or (II) but only after such investigation as is necessary to establish to the satisfaction of the

Commissioner of Social Security, the identity of such individual, the fact that an account number has not already been assigned to such individual, and the fact that such individual is a citizen or a noncitizen who is not, because of his alien status, prohibited from engaging in employment;

and, in carrying out such duties, the Commissioner of Social Security is authorized to take affirmative measures to assure the issuance of social security numbers:

**(IV)** to or on behalf of children who are below school age at the request of their parents or guardians; and

**(V)** to children of school age at the time of their first enrollment in school.

**(ii)** The Commissioner of Social Security shall require of applicants for social security account numbers such evidence as may be necessary to establish the age, citizenship, or alien status, and true identity of such applicants, and to determine which (if any) social security account number has previously been assigned to such individual. With respect to an application for a social security account number for an individual who has not attained the age of 18 before such application, such evidence shall include the information described in subparagraph (C)(ii).

**(iii)** In carrying out the requirements of this subparagraph, the Commissioner of Social Security shall enter into such agreements as may be necessary with the Attorney General and other officials and with State and local welfare agencies and school authorities (including nonpublic school authorities).

**(C)(i)** It is the policy of the United States that any State (or political subdivision thereof) may, in the administration of any tax, general public assistance, driver's license, or motor vehicle registration law within its jurisdiction, utilize the social security account numbers issued by the Commissioner of Social Security for the purpose of establishing the identification of individuals affected by such law, and may require any individual who is or appears to be so affected to furnish to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved, the social security account number (or numbers, if he has more than one such number) issued to him by the Commissioner of Social Security.

**(ii)** In the administration of any law involving the issuance of a birth certificate, each State shall require each parent to furnish to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved, the social security account number (or numbers, if the parent has more than one such number) issued to the parent unless the State (in accordance with regulations prescribed by the Commissioner of Social Security) finds good cause for not requiring the furnishing of such number. The State shall make numbers furnished under this subclause available to the Commissioner of Social Security and the agency administering the State's plan under part D of subchapter IV in accordance with Federal or State law and regulation. Such numbers shall not be recorded on the birth certificate. A State shall not use any social security account number, obtained with respect to the issuance by the State of a birth certificate, for any purpose other than for the enforcement of child support orders in effect in the State, unless section 7(a) of the Privacy Act of 1974 does not prohibit the State from requiring the disclosure of such number, by reason of the State having adopted, before January 1, 1975, a statute or regulation requiring such disclosure.

**(iii)(I)** In the administration of section 9 of the Food and Nutrition Act of 2008 (7 U.S.C. 2018) involving the determination of the qualifications of applicants under such Act, the Secretary of Agriculture may require each applicant retail store or wholesale food concern to furnish to the Secretary of Agriculture the social security account number of each individual who is an officer of the store or concern and, in the case of a privately owned applicant, furnish the social security account numbers of the owners of

such applicant. No officer or employee of the Department of Agriculture shall have access to any such number for any purpose other than the establishment and maintenance of a list of the names and social security account numbers of such individuals for use in determining those applicants who have been previously sanctioned or convicted under section 12 or 15 of such Act (7 U.S.C. 2021 or 2024).

**(II)** The Secretary of Agriculture may share any information contained in any list referred to in subclause (I) with any other agency or instrumentality of the United States which otherwise has access to social security account numbers in accordance with this subsection or other applicable Federal law, except that the Secretary of Agriculture may share such information only to the extent that such Secretary determines such sharing would assist in verifying and matching such information against information maintained by such other agency or instrumentality. Any such information shared pursuant to this subclause may be used by such other agency or instrumentality only for the purpose of effective administration and enforcement of the Food and Nutrition Act of 2008 or for the purpose of investigation of violations of other Federal laws or enforcement of such laws.

**(III)** The Secretary of Agriculture, and the head of any other agency or instrumentality referred to in this subclause, shall restrict, to the satisfaction of the Commissioner of Social Security, access to social security account numbers obtained pursuant to this clause only to officers and employees of the United States whose duties or responsibilities require access for the purposes described in subclause (II).

**(IV)** The Secretary of Agriculture, and the head of any agency or instrumentality with which information is shared pursuant to clause[1] (II), shall provide such other safeguards as the Commissioner of Social Security determines to be necessary or appropriate to protect the confidentiality of the social security account numbers.

**(iv)** In the administration of section 506 of the Federal Crop Insurance Act, the Federal Crop Insurance Corporation may require each policyholder and each reinsured company to furnish to the insurer or to the Corporation the social security account number of such policyholder, subject to the requirements of this clause. No officer or employee of the Federal Crop Insurance Corporation shall have access to any such number for any purpose other than the establishment of a system of records necessary for the effective administration of such Act. The Manager of the Corporation may require each policyholder to provide to the Manager, at such times and in such manner as prescribed by the Manager, the social security account number of each individual that holds or acquires a substantial beneficial interest in the policyholder. For purposes of this clause, the term "substantial beneficial interest" means not less than 5 percent of all beneficial interest in the policyholder. The Secretary of Agriculture shall restrict, to the satisfaction of the Commissioner of Social Security, access to social security account numbers obtained pursuant to this clause only to officers and employees of the United States or authorized persons whose duties or responsibilities require access for the administration of the Federal Crop Insurance Act. The Secretary of Agriculture shall provide such other safeguards as the Commissioner of Social Security determines to be necessary or appropriate to protect the confidentiality of such social security account numbers. For purposes of this clause the term "authorized person" means an officer or employee of an insurer whom the Manager of the Corporation designates by rule, subject to appropriate safeguards including a prohibition against the release of such social security account number (other than to the Corporation) by such person.

**(v)** If and to the extent that any provision of Federal law heretofore enacted is inconsistent with the policy set forth in clause (i), such provision shall, on and after October 4, 1976, be null, void, and of no effect. If and to the extent that any such provision is inconsistent with the requirement set forth in clause (ii), such provision shall, on and after October 13, 1988, be null, void, and of no effect.

**(vi)(I)** For purposes of clause (i) of this subparagraph, an agency of a State (or political subdivision thereof) charged with the administration of any general public assistance, driver's license, or motor vehicle registration law which did not use the social

A0110

security account number for identification under a law or regulation adopted before January 1, 1975, may require an individual to disclose his or her social security number to such agency solely for the purpose of administering the laws referred to in clause (i) above and for the purpose of responding to requests for information from an agency administering a program funded under part A of subchapter IV or an agency operating pursuant to the provisions of part D of such subchapter.

**(II)** Any State or political subdivision thereof (and any person acting as an agent of such an agency or instrumentality), in the administration of any driver's license or motor vehicle registration law within its jurisdiction, may not display a social security account number issued by the Commissioner of Social Security (or any derivative of such number) on any driver's license, motor vehicle registration, or personal identification card (as defined in section 7212(a)(2) of the 9/11 Commission Implementation Act of 2004), or include, on any such license, registration, or personal identification card, a magnetic strip, bar code, or other means of communication which conveys such number (or derivative thereof).

**(vii)** For purposes of this subparagraph, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Commonwealth of the Northern Marianas, and the Trust Territory of the Pacific Islands.

**(viii)(I)** Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record.

**(II)** Paragraphs (1), (2), and (3) of section 7213(a) of the Internal Revenue Code of 1986 shall apply with respect to the unauthorized willful disclosure to any person of social security account numbers and related records obtained or maintained by an authorized person pursuant to a provision of law enacted on or after October 1, 1990, in the same manner and to the same extent as such paragraphs apply with respect to unauthorized disclosures of return and return information described in such paragraphs. Paragraph (4) of section 7213(a) of such Code shall apply with respect to the willful offer of any item of material value in exchange for any such social security account number or related record in the same manner and to the same extent as such paragraph applies with respect to offers (in exchange for any return or return information) described in such paragraph.

**(III)** For purposes of this clause, the term "authorized person" means an officer or employee of the United States, an officer or employee of any State, political subdivision of a State, or agency of a State or political subdivision of a State, and any other person (or officer or employee thereof), who has or had access to social security account numbers or related records pursuant to any provision of law enacted on or after October 1, 1990. For purposes of this subclause, the term "officer or employee" includes a former officer or employee.

**(IV)** For purposes of this clause, the term "related record" means any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained pursuant to this clause.

**(ix)** In the administration of the provisions of chapter 81 of Title 5 and the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 901 et seq.), the Secretary of Labor may require by regulation that any person filing a notice of injury or a claim for benefits under such provisions provide as part of such notice or claim such person's social security account number, subject to the requirements of this clause. No officer or employee of the Department of Labor shall have access to any such number for any purpose other than the establishment of a system of records necessary for the effective administration of such provisions. The Secretary of Labor shall restrict, to the satisfaction of the Commissioner of Social Security, access to social security account numbers obtained pursuant to this clause to officers and employees of the United States whose duties or responsibilities require

A0111

access for the administration or enforcement of such provisions. The Secretary of Labor shall provide such other safeguards as the Commissioner of Social Security determines to be necessary or appropriate to protect the confidentiality of the social security account numbers.

**(x)** The Secretary of Health and Human Services, and the Exchanges established under section 1311 of the Patient Protection and Affordable Care Act, are authorized to collect and use the names and social security account numbers of individuals as required to administer the provisions of, and the amendments made by, the[2] such Act.

**(xi)** No Federal, State, or local agency may display the Social Security account number of any individual, or any derivative of such number, on any check issued for any payment by the Federal, State, or local agency.

**(xii)** No Federal, State, or local agency may employ, or enter into a contract for the use or employment of, prisoners in any capacity that would allow such prisoners access to the Social Security account numbers of other individuals. For purposes of this clause, the term "prisoner" means an individual confined in a jail, prison, or other penal institution or correctional facility pursuant to such individual's conviction of a criminal offense.

**(xiii)** The Secretary of Health and Human Services, in consultation with the Commissioner of Social Security, shall establish cost-effective procedures to ensure that a Social Security account number (or derivative thereof) is not displayed, coded, or embedded on the Medicare card issued to an individual who is entitled to benefits under part A of subchapter XVIII or enrolled under part B of subchapter XVIII and that any other identifier displayed on such card is not identifiable as a Social Security account number (or derivative thereof).

**(D)(i)** It is the policy of the United States that--

**(I)** any State (or any political subdivision of a State) and any authorized blood donation facility may utilize the social security account numbers issued by the Commissioner of Social Security for the purpose of identifying blood donors, and

**(II)** any State (or political subdivision of a State) may require any individual who donates blood within such State (or political subdivision) to furnish to such State (or political subdivision), to any agency thereof having related administrative responsibility, or to any authorized blood donation facility the social security account number (or numbers, if the donor has more than one such number) issued to the donor by the Commissioner of Social Security.

**(ii)** If and to the extent that any provision of Federal law enacted before November 10, 1988, is inconsistent with the policy set forth in clause (i), such provision shall, on and after November 10, 1988, be null, void, and of no effect.

**(iii)** For purposes of this subparagraph--

**(I)** the term "authorized blood donation facility" means an entity described in section 1320b-11(h)(1)(B) of this title, and

**(II)** the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Commonwealth of the Northern Marianas, and the Trust Territory of the Pacific Islands.

**(E)(i)** It is the policy of the United States that--

**(I)** any State (or any political subdivision of a State) may utilize the social security account numbers issued by the Commissioner of Social Security for the additional purposes described in clause (ii) if such numbers have been collected and are otherwise utilized by such State (or political subdivision) in accordance with applicable law, and

**(II)** any district court of the United States may use, for such additional purposes, any such social security account numbers which have been so collected and are so utilized by any State.

**(ii)** The additional purposes described in this clause are the following:

**(I)** Identifying duplicate names of individuals on master lists used for jury selection purposes.

**(II)** Identifying on such master lists those individuals who are ineligible to serve on a jury by reason of their conviction of a felony.

**(iii)** To the extent that any provision of Federal law enacted before August 15, 1994, is inconsistent with the policy set forth in clause (i), such provision shall, on and after August 15, 1994, be null, void, and of no effect.

**(iv)** For purposes of this subparagraph, the term "State" has the meaning such term has in subparagraph (D).

**(F)** The Commissioner of Social Security shall require, as a condition for receipt of benefits under this subchapter, that an individual furnish satisfactory proof of a social security account number assigned to such individual by the Commissioner of Social Security or, in the case of an individual to whom no such number has been assigned, that such individual make proper application for assignment of such a number.

**(G)** The Commissioner of Social Security shall issue a social security card to each individual at the time of the issuance of a social security account number to such individual. The social security card shall be made of banknote paper, and (to the maximum extent practicable) shall be a card which cannot be counterfeited.

**(H)** The Commissioner of Social Security shall share with the Secretary of the Treasury the information obtained by the Commissioner pursuant to the second sentence of subparagraph (B)(ii) and to subparagraph (C)(ii) for the purpose of administering those sections of the Internal Revenue Code of 1986 which grant tax benefits based on support or residence of children.

**(3)** The Commissioner's records shall be evidence for the purpose of proceedings before the Commissioner of Social Security or any court of the amounts of wages paid to, and self-employment income derived by, an individual and of the periods in which such wages were paid and such income was derived. The absence of an entry in such records as to wages alleged to have been paid to, or as to self-employment income alleged to have been derived by, an individual in any period shall be evidence that no such alleged wages were paid to, or that no such alleged income was derived by, such individual during such period.

A0113

**(4)** Prior to the expiration of the time limitation following any year the Commissioner of Social Security may, if it is brought to the Commissioner's attention that any entry of wages or self-employment income in the Commissioner's records for such year is erroneous or that any item of wages or self-employment income for such year has been omitted from such records, correct such entry or include such omitted item in the Commissioner's records, as the case may be. After the expiration of the time limitation following any year--

  **(A)** the Commissioner's records (with changes, if any, made pursuant to paragraph (5) of this subsection) of the amounts of wages paid to, and self-employment income derived by, an individual during any period in such year shall be conclusive for the purposes of this subchapter;

  **(B)** the absence of an entry in the Commissioner's records as to the wages alleged to have been paid by an employer to an individual during any period in such year shall be presumptive evidence for the purposes of this subchapter that no such alleged wages were paid to such individual in such period; and

  **(C)** the absence of an entry in the Commissioner's records as to the self-employment income alleged to have been derived by an individual in such year shall be conclusive for the purposes of this subchapter that no such alleged self-employment income was derived by such individual in such year unless it is shown that he filed a tax return of his self-employment income for such year before the expiration of the time limitation following such year, in which case the Commissioner of Social Security shall include in the Commissioner's records the self-employment income of such individual for such year.

**(5)** After the expiration of the time limitation following any year in which wages were paid or alleged to have been paid to, or self-employment income was derived or alleged to have been derived by, an individual, the Commissioner of Social Security may change or delete any entry with respect to wages or self-employment income in the Commissioner's records of such year for such individual or include in the Commissioner's records of such year for such individual any omitted item of wages or self-employment income but only--

  **(A)** if an application for monthly benefits or for a lump-sum death payment was filed within the time limitation following such year; except that no such change, deletion, or inclusion may be made pursuant to this subparagraph after a final decision upon the application for monthly benefits or lump-sum death payment;

  **(B)** if within the time limitation following such year an individual or his survivor makes a request for a change or deletion, or for an inclusion of an omitted item, and alleges in writing that the Commissioner's records of the wages paid to, or the self-employment income derived by, such individual in such year are in one or more respects erroneous; except that no such change, deletion, or inclusion may be made pursuant to this subparagraph after a final decision upon such request. Written notice of the Commissioner's decision on any such request shall be given to the individual who made the request;

  **(C)** to correct errors apparent on the face of such records;

  **(D)** to transfer items to records of the Railroad Retirement Board if such items were credited under this subchapter when they should have been credited under the Railroad Retirement Act of 1937 or 1974, or to enter items transferred by the Railroad Retirement Board which have been credited under the Railroad Retirement Act of 1937 or 1974 when they should have been credited under this subchapter;

**(E)** to delete or reduce the amount of any entry which is erroneous as a result of fraud;

**(F)** to conform the Commissioner's records to--

**(i)** tax returns or portions thereof (including information returns and other written statements) filed with the Commissioner of Internal Revenue under Title VIII of the Social Security Act, under subchapter E of chapter 1 or subchapter A of chapter 9 of the Internal Revenue Code of 1939, under chapter 2 or 21 of the Internal Revenue Code of 1954 or the Internal Revenue Code of 1986, or under regulations made under authority of such title, subchapter, or chapter;

**(ii)** wage reports filed by a State pursuant to an agreement under section 418 of this title or regulations of the Commissioner of Social Security thereunder; or

**(iii)** assessments of amounts due under an agreement pursuant to section 418 of this title (as in effect prior to December 31, 1986), if such assessments are made within the period specified in subsection (q) of such section (as so in effect), or allowances of credits or refunds of overpayments by a State under an agreement pursuant to such section;

except that no amount of self-employment income of an individual for any taxable year (if such return or statement was filed after the expiration of the time limitation following the taxable year) shall be included in the Commissioner's records pursuant to this subparagraph;

**(G)** to correct errors made in the allocation, to individuals or periods, of wages or self-employment income entered in the records of the Commissioner of Social Security;

**(H)** to include wages paid during any period in such year to an individual by an employer;

**(I)** to enter items which constitute remuneration for employment under subsection (o), such entries to be in accordance with certified reports of records made by the Railroad Retirement Board pursuant to section 5(k)(3) of the Railroad Retirement Act of 1937 or section 7(b)(7) of the Railroad Retirement Act of 1974; or

**(J)** to include self-employment income for any taxable year, up to, but not in excess of, the amount of wages deleted by the Commissioner of Social Security as payments erroneously included in such records as wages paid to such individual, if such income (or net earnings from self-employment), not already included in such records as self-employment income, is included in a return or statement (referred to in subparagraph (F) of this subsection) filed before the expiration of the time limitation following the taxable year in which such deletion of wages is made.

**(6)** Written notice of any deletion or reduction under paragraph (4) or (5) of this subsection shall be given to the individual whose record is involved or to his survivor, except that (A) in the case of a deletion or reduction with respect to any entry of wages such notice shall be given to such individual only if he has previously been notified by the Commissioner of Social Security of the amount of his wages for the period involved, and (B) such notice shall be given to such survivor only if he or the individual whose record is involved has previously been notified by the Commissioner of Social Security of the amount of such individual's wages and self-employment income for the period involved.

**(7)** Upon request in writing (within such period, after any change or refusal of a request for a change of the Commissioner's records pursuant to this subsection, as the Commissioner of Social Security may prescribe), opportunity for hearing with respect to such change or refusal shall be afforded to any individual or his survivor. If a hearing is held pursuant to this paragraph the Commissioner of Social Security shall make findings of fact and a decision based upon the evidence adduced at such hearing and shall include any omitted items, or change or delete any entry, in the Commissioner's records as may be required by such findings and decision.

**(8)** A translation into English by a third party of a statement made in a foreign language by an applicant for or beneficiary of monthly insurance benefits under this subchapter shall not be regarded as reliable for any purpose under this subchapter unless the third party, under penalty of perjury--

**(A)** certifies that the translation is accurate; and

**(B)** discloses the nature and scope of the relationship between the third party and the applicant or recipient, as the case may be.

**(9)** Decisions of the Commissioner of Social Security under this subsection shall be reviewable by commencing a civil action in the United States district court as provided in subsection (g).

**(d) Issuance of subpenas in administrative proceedings**

For the purpose of any hearing, investigation, or other proceeding authorized or directed under this subchapter, or relative to any other matter within the Commissioner's jurisdiction hereunder, the Commissioner of Social Security shall have power to issue subpenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation or in question before the Commissioner of Social Security. Such attendance of witnesses and production of evidence at the designated place of such hearing, investigation, or other proceeding may be required from any place in the United States or in any Territory or possession thereof. Subpenas of the Commissioner of Social Security shall be served by anyone authorized by the Commissioner (1) by delivering a copy thereof to the individual named therein, or (2) by registered mail or by certified mail addressed to such individual at his last dwelling place or principal place of business. A verified return by the individual so serving the subpena setting forth the manner of service, or, in the case of service by registered mail or by certified mail, the return post-office receipt therefor signed by the individual so served, shall be proof of service. Witnesses so subpenaed shall be paid the same fees and mileage as are paid witnesses in the district courts of the United States.

**(e) Judicial enforcement of subpenas; contempt**

In case of contumacy by, or refusal to obey a subpena duly served upon, any person, any district court of the United States for the judicial district in which said person charged with contumacy or refusal to obey is found or resides or transacts business, upon application by the Commissioner of Social Security, shall have jurisdiction to issue an order requiring such person to appear and give testimony, or to appear and produce evidence, or both; any failure to obey such order of the court may be punished by said court as contempt thereof.

**(f) Repealed. Pub.L. 91-452, Title II, § 236,** Oct. 15, 1970, 84 Stat. 930

A0116

**(g) Judicial review**

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia. As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations. The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based. Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision. The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions. Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.

**(h) Finality of Commissioner's decision**

The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

**(i) Certification for payment**

Upon final decision of the Commissioner of Social Security, or upon final judgment of any court of competent jurisdiction, that any person is entitled to any payment or payments under this subchapter, the Commissioner of Social Security shall certify to the Managing Trustee the name and address of the person so entitled to receive such payment or payments, the amount of such payment or payments, and the time at which such payment or payments should be made, and the Managing Trustee, through the Fiscal Service of the Department of the Treasury, and prior to any action thereon by the Government Accountability Office, shall make payment in accordance with the certification of the Commissioner of Social Security (except that in the case of (A) an individual who will have completed ten years of service (or five or more years of service, all of which accrues after

A0117

December 31, 1995) creditable under the Railroad Retirement Act of 1937 or the Railroad Retirement Act of 1974, (B) the wife or husband or divorced wife or divorced husband of such an individual, (C) any survivor of such an individual if such survivor is entitled, or could upon application become entitled, to an annuity under section 2 of the Railroad Retirement Act of 1974, and (D) any other person entitled to benefits under section 402 of this title on the basis of the wages and self-employment income of such an individual (except a survivor of such an individual where such individual did not have a current connection with the railroad industry, as defined in the Railroad Retirement Act of 1974, at the time of his death), such certification shall be made to the Railroad Retirement Board which shall provide for such payment or payments to such person on behalf of the Managing Trustee in accordance with the provisions of the Railroad Retirement Act of 1974): *Provided,* That where a review of the Commissioner's decision is or may be sought under subsection (g) the Commissioner of Social Security may withhold certification of payment pending such review. The Managing Trustee shall not be held personally liable for any payment or payments made in accordance with a certification by the Commissioner of Social Security.

**(j) Representative payees**

**(1)(A)** If the Commissioner of Social Security determines that the interest of any individual under this subchapter would be served thereby, certification of payment of such individual's benefit under this subchapter may be made, regardless of the legal competency or incompetency of the individual, either for direct payment to the individual, or for his or her use and benefit, to another individual, or an organization, with respect to whom the requirements of paragraph (2) have been met (hereinafter in this subsection referred to as the individual's "representative payee"). If the Commissioner of Social Security or a court of competent jurisdiction determines that a representative payee has misused any individual's benefit paid to such representative payee pursuant to this subsection or section 1007 or 1383(a)(2) of this title, the Commissioner of Social Security shall promptly revoke certification for payment of benefits to such representative payee pursuant to this subsection and certify payment to an alternative representative payee or, if the interest of the individual under this subchapter would be served thereby, to the individual.

**(B)** In the case of an individual entitled to benefits based on disability, the payment of such benefits shall be made to a representative payee if the Commissioner of Social Security determines that such payment would serve the interest of the individual because the individual also has an alcoholism or drug addiction condition (as determined by the Commissioner) and the individual is incapable of managing such benefits.

**(C)(i)** An individual who is entitled to or is an applicant for a benefit under this subchapter, subchapter VIII, or subchapter XVI, who has attained 18 years of age or is an emancipated minor, may, at any time, designate one or more other individuals to serve as a representative payee for such individual in the event that the Commissioner of Social Security determines under subparagraph (A) that the interest of such individual would be served by certification for payment of such benefits to which the individual is entitled to a representative payee. If the Commissioner of Social Security makes such a determination with respect to such individual at any time after such designation has been made, the Commissioner shall--

**(I)** certify payment of such benefits to the designated individual, subject to the requirements of paragraph (2); or

**(II)** if the Commissioner determines that certification for payment of such benefits to the designated individual would not satisfy the requirements of paragraph (2), that the designated individual is unwilling or unable to serve as representative payee, or that other good cause exists, certify payment of such benefits to another individual or organization, in accordance with paragraph (1).

A0118

**(ii)** An organization may not be designated to serve as a representative payee under this subparagraph.

**(2)(A)** Any certification made under paragraph (1) for payment of benefits to an individual's representative payee shall be made on the basis of--

**(i)** an investigation by the Commissioner of Social Security of the person to serve as representative payee, which shall be conducted in advance of such certification and shall, to the extent practicable, include a face-to-face interview with such person, and

**(ii)** adequate evidence that such certification is in the interest of such individual (as determined by the Commissioner of Social Security in regulations).

**(B)(i)** As part of the investigation referred to in subparagraph (A)(i), the Commissioner of Social Security shall--

**(I)** require the person being investigated to submit documented proof of the identity of such person, unless information establishing such identity has been submitted with an application for benefits under this subchapter, subchapter VIII, or subchapter XVI,

**(II)** verify such person's social security account number (or employer identification number),

**(III)** determine whether such person has been convicted of a violation of section 408, 1011, or 1383a of this title,

**(IV)** obtain information concerning whether such person has been convicted of any other offense under Federal or State law which resulted in imprisonment for more than 1 year,

**(V)** obtain information concerning whether such person is a person described in section 402(x)(1)(A)(iv) of this title,

**(VI)** determine whether certification of payment of benefits to such person has been revoked pursuant to this subsection, the designation of such person as a representative payee has been revoked pursuant to section 1007(a) of this title, or payment of benefits to such person has been terminated pursuant to section 1383(a)(2)(A)(iii) of this title by reason of misuse of funds paid as benefits under this subchapter, subchapter VIII, or subchapter XVI, and

**(VII)** determine whether such person has been convicted (and not subsequently exonerated), under Federal or State law, of a felony provided under clause (iv), or of an attempt or a conspiracy to commit such a felony.

**(ii)** The Commissioner of Social Security shall establish and maintain a centralized file, which shall be updated periodically and which shall be in a form which renders it readily retrievable by each servicing office of the Social Security Administration. Such file shall consist of--

A0119

**(I)** a list of the names and social security account numbers (or employer identification numbers) of all persons with respect to whom certification of payment of benefits has been revoked on or after January 1, 1991, pursuant to this subsection, whose designation as a representative payee has been revoked pursuant to section 1007(a) of this title, or with respect to whom payment of benefits has been terminated on or after such date pursuant to section 1383(a)(2)(A)(iii) of this title, by reason of misuse of funds paid as benefits under this subchapter, subchapter VIII, or subchapter XVI, and

**(II)** a list of the names and social security account numbers (or employer identification numbers) of all persons who have been convicted of a violation of section 408, 1011, or 1383a of this title.

**(iii)** Notwithstanding the provisions of section 552a of Title 5 or any other provision of Federal or State law (other than section 6103 of the Internal Revenue Code of 1986 and section 1306(c) of this title), the Commissioner shall furnish any Federal, State, or local law enforcement officer, upon the written request of the officer, with the current address, social security account number, and photograph (if applicable) of any person investigated under this paragraph, if the officer furnishes the Commissioner with the name of such person and such other identifying information as may reasonably be required by the Commissioner to establish the unique identity of such person, and notifies the Commissioner that--

**(I)** such person is described in section 402(x)(1)(A)(iv) of this title,

**(II)** such person has information that is necessary for the officer to conduct the officer's official duties, and

**(III)** the location or apprehension of such person is within the officer's official duties.

**(iv)** The felony crimes provided under this clause, whether an offense under State or Federal law, are the following:

**(I)** Human trafficking, including as prohibited under sections 1590 and 1591 of Title 18.

**(II)** False imprisonment, including as prohibited under section 1201 of Title 18.

**(III)** Kidnapping, including as prohibited under section 1201 of Title 18.

**(IV)** Rape and sexual assault, including as prohibited under sections 2241, 2242, 2243, and 2244 of Title 18.

**(V)** First-degree homicide, including as prohibited under section 1111 of Title 18.

**(VI)** Robbery, including as prohibited under section 2111 of Title 18.

**(VII)** Fraud to obtain access to government assistance, including as prohibited under sections 287, 1001, and 1343 of Title 18.

A0120

**(VIII)** Fraud by scheme, including as prohibited under section 1343 of Title 18.

**(IX)** Theft of government funds or property, including as prohibited under section 641 of Title 18.

**(X)** Abuse or neglect, including as prohibited under sections 111, 113, 114, 115, 116, or 117 of Title 18.

**(XI)** Forgery, including as prohibited under section 642 and chapter 25 (except section 512) of Title 18.

**(XII)** Identity theft or identity fraud, including as prohibited under sections 1028 and 1028A of Title 18.

The Commissioner of Social Security may promulgate regulations to provide for additional felony crimes under this clause.

**(v)(I)** For the purpose of carrying out the activities required under subparagraph (B)(i) as part of the investigation under subparagraph (A)(i), the Commissioner may conduct a background check of any individual seeking to serve as a representative payee under this subsection and may disqualify from service as a representative payee any such individual who fails to grant permission for the Commissioner to conduct such a background check.

**(II)** The Commissioner may revoke certification of payment of benefits under this subsection to any individual serving as a representative payee on or after January 1, 2019 who fails to grant permission for the Commissioner to conduct such a background check.

**(C)(i)** Benefits of an individual may not be certified for payment to any other person pursuant to this subsection if--

**(I)** such person has previously been convicted as described in subparagraph (B)(i)(III),

**(II)** except as provided in clause (ii), certification of payment of benefits to such person under this subsection has previously been revoked as described in subparagraph (B)(i)(VI)[3] the designation of such person as a representative payee has been revoked pursuant to section 1007(a) of this title, or payment of benefits to such person pursuant to section 1383(a)(2)(A)(ii) of this title has previously been terminated as described in section 1383(a)(2)(B)(ii)(VI) of this title,

**(III)** except as provided in clause (iii), such person is a creditor of such individual who provides such individual with goods or services for consideration,

**(IV)** such person has previously been convicted as described in subparagraph (B)(i)(IV), unless the Commissioner determines that such certification would be appropriate notwithstanding such conviction,

**(V)** such person is a person described in section 402(x)(1)(A)(iv) of this title,

A0121

**(VI)** except as provided in clause (vi), such person has previously been convicted (and not subsequently exonerated) as described in subparagraph (B)(i)(VII), or

**(VII)** such person's benefits under this subchapter, subchapter VIII, or subchapter XVI are certified for payment to a representative payee during the period for which the individual's benefits would be certified for payment to another person.

**(ii)** The Commissioner of Social Security shall prescribe regulations under which the Commissioner of Social Security may grant exemptions to any person from the provisions of clause (i)(II) on a case-by-case basis if such exemption is in the best interest of the individual whose benefits would be paid to such person pursuant to this subsection.

**(iii)** Clause (i)(III) shall not apply with respect to any person who is a creditor referred to therein if such creditor is--

**(I)** a relative of such individual if such relative resides in the same household as such individual,

**(II)** a legal guardian or legal representative of such individual,

**(III)** a facility that is licensed or certified as a care facility under the law of a State or a political subdivision of a State,

**(IV)** a person who is an administrator, owner, or employee of a facility referred to in subclause (III) if such individual resides in such facility, and the certification of payment to such facility or such person is made only after good faith efforts have been made by the local servicing office of the Social Security Administration to locate an alternative representative payee to whom such certification of payment would serve the best interests of such individual, or

**(V)** an individual who is determined by the Commissioner of Social Security, on the basis of written findings and under procedures which the Commissioner of Social Security shall prescribe by regulation, to be acceptable to serve as a representative payee.

**(iv)** The procedures referred to in clause (iii)(V) shall require the individual who will serve as representative payee to establish, to the satisfaction of the Commissioner of Social Security, that--

**(I)** such individual poses no risk to the beneficiary,

**(II)** the financial relationship of such individual to the beneficiary poses no substantial conflict of interest, and

**(III)** no other more suitable representative payee can be found.

**(v)** In the case of an individual described in paragraph (1)(B), when selecting such individual's representative payee, preference shall be given to--

A0122

**(I)** a certified community-based nonprofit social service agency (as defined in paragraph (10)),

**(II)** a Federal, State, or local government agency whose mission is to carry out income maintenance, social service, or health care-related activities,

**(III)** a State or local government agency with fiduciary responsibilities, or

**(IV)** a designee of an agency (other than of a Federal agency) referred to in the preceding subclauses of this clause, if the Commissioner of Social Security deems it appropriate,

unless the Commissioner of Social Security determines that selection of a family member would be appropriate.

**(vi)(I)** With respect to any person described in subclause (II)--

**(aa)** subparagraph (B)(i)(VII) shall not apply; and

**(bb)** the Commissioner may grant an exemption from the provisions of clause (i)(VI) if the Commissioner determines that such exemption is in the best interest of the individual entitled to benefits.

**(II)** A person is described in this subclause if the person--

**(aa)** is the custodial parent of a minor child for whom the person applies to serve;

**(bb)** is the custodial spouse of the beneficiary for whom the person applies to serve;

**(cc)** is the custodial parent of a beneficiary who is under a disability (as defined in section 423(d) of this title) which began before the beneficiary attained the age of 22, for whom the person applies to serve;

**(dd)** is the custodial court appointed guardian of the beneficiary for whom the person applies to serve;

**(ee)** is the custodial grandparent of a minor grandchild for whom the person applies to serve;

**(ff)** is the parent who was previously representative payee for his or her minor child who has since turned 18 and continues to be eligible for such benefit; or

**(gg)** received a presidential or gubernatorial pardon for the relevant conviction.

A0123

**(D)(i)** Subject to clause (ii), if the Commissioner of Social Security makes a determination described in the first sentence of paragraph (1) with respect to any individual's benefit and determines that direct payment of the benefit to the individual would cause substantial harm to the individual, the Commissioner of Social Security may defer (in the case of initial entitlement) or suspend (in the case of existing entitlement) direct payment of such benefit to the individual, until such time as the selection of a representative payee is made pursuant to this subsection.

**(ii)(I)** Except as provided in subclause (II), any deferral or suspension of direct payment of a benefit pursuant to clause (i) shall be for a period of not more than 1 month.

**(II)** Subclause (I) shall not apply in any case in which the individual is, as of the date of the Commissioner's determination, legally incompetent, under the age of 15 years, or described in paragraph (1)(B).

**(iii)** Payment pursuant to this subsection of any benefits which are deferred or suspended pending the selection of a representative payee shall be made to the individual or the representative payee as a single sum or over such period of time as the Commissioner of Social Security determines is in the best interest of the individual entitled to such benefits.

**(E)(i)** Any individual who is dissatisfied with a determination by the Commissioner of Social Security to certify payment of such individual's benefit to a representative payee under paragraph (1) or with the designation of a particular person to serve as representative payee shall be entitled to a hearing by the Commissioner of Social Security to the same extent as is provided in subsection (b), and to judicial review of the Commissioner's final decision as is provided in subsection (g).

**(ii)** In advance of the certification of payment of an individual's benefit to a representative payee under paragraph (1), the Commissioner of Social Security shall provide written notice of the Commissioner's initial determination to certify such payment. Such notice shall be provided to such individual, except that, if such individual--

**(I)** is under the age of 15,

**(II)** is an unemancipated minor under the age of 18, or

**(III)** is legally incompetent,

then such notice shall be provided solely to the legal guardian or legal representative of such individual.

**(iii)** Any notice described in clause (ii) shall be clearly written in language that is easily understandable to the reader, shall identify the person to be designated as such individual's representative payee, and shall explain to the reader the right under clause (i) of such individual or of such individual's legal guardian or legal representative--

**(I)** to appeal a determination that a representative payee is necessary for such individual,

**(II)** to appeal the designation of a particular person to serve as the representative payee of such individual, and

A0124

**(III)** to review the evidence upon which such designation is based and submit additional evidence.

**(3)(A)** In any case where payment under this subchapter is made to a person other than the individual entitled to such payment, the Commissioner of Social Security shall establish a system of accountability monitoring whereby such person shall report not less often than annually with respect to the use of such payments. The Commissioner of Social Security shall establish and implement statistically valid procedures for reviewing such reports in order to identify instances in which such persons are not properly using such payments.

**(B)** Subparagraph (A) shall not apply in any case where the other person to whom such payment is made is a State institution. In such cases, the Commissioner of Social Security shall establish a system of accountability monitoring for institutions in each State.

**(C)** Subparagraph (A) shall not apply in any case where the individual entitled to such payment is a resident of a Federal institution and the other person to whom such payment is made is the institution.

**(D)(i)** Subparagraph (A) shall not apply in any case where the other person to whom such payment is made is--

**(I)** a parent, or other individual who is a legal guardian of, a minor child entitled to such payment who primarily resides in the same household;

**(II)** a parent of an individual entitled to such payment who is under a disability (as defined in section 423(d) of this title) who primarily resides in the same household; or

**(III)** the spouse of the individual entitled to such payment.

**(ii)** The Commissioner of Social Security shall establish and implement procedures as necessary for the Commissioner to determine the eligibility of such parties for the exemption provided in clause (i). The Commissioner shall prescribe such regulations as may be necessary to determine eligibility for such exemption.

**(E)** Notwithstanding subparagraphs (A), (B), (C), and (D), the Commissioner of Social Security may require a report at any time from any person receiving payments on behalf of another, if the Commissioner of Social Security has reason to believe that the person receiving such payments is misusing such payments.

**(F)** In any case in which the person described in subparagraph (A) or (E) receiving payments on behalf of another fails to submit a report required by the Commissioner of Social Security under subparagraph (A) or (E), the Commissioner may, after furnishing notice to such person and the individual entitled to such payment, require that such person appear in person at a field office of the Social Security Administration serving the area in which the individual resides in order to receive such payments.

**(G)** The Commissioner of Social Security shall maintain a centralized file, which shall be updated periodically and which shall be in a form which will be readily retrievable by each servicing office of the Social Security Administration, of--

A0125

**(i)** the address and the social security account number (or employer identification number) of each representative payee who is receiving benefit payments pursuant to this subsection, section 1007 of this title, or section 1383(a)(2) of this title, and

**(ii)** the address and social security account number of each individual for whom each representative payee is reported to be providing services as representative payee pursuant to this subsection, section 1007 of this title, or section 1383(a)(2) of this title.

**(H)** Each servicing office of the Administration shall maintain a list, which shall be updated periodically, of public agencies and certified community-based nonprofit social service agencies (as defined in paragraph (10)) which are qualified to serve as representative payees pursuant to this subsection or section 1007 or 1383(a)(2) of this title and which are located in the area served by such servicing office.

**(4)(A)(i)** Except as provided in the next sentence, a qualified organization may collect from an individual a monthly fee for expenses (including overhead) incurred by such organization in providing services performed as such individual's representative payee pursuant to this subsection if such fee does not exceed the lesser of--

**(I)** 10 percent of the monthly benefit involved, or

**(II)** $25.00 per month ($50.00 per month in any case in which the individual is described in paragraph (1)(B)).

A qualified organization may not collect a fee from an individual for any month with respect to which the Commissioner of Social Security or a court of competent jurisdiction has determined that the organization misused all or part of the individual's benefit, and any amount so collected by the qualified organization for such month shall be treated as a misused part of the individual's benefit for purposes of paragraphs (5) and (6). The Commissioner shall adjust annually (after 1995) each dollar amount set forth in subclause (II) under procedures providing for adjustments in the same manner and to the same extent as adjustments are provided for under the procedures used to adjust benefit amounts under section 415(i)(2)(A) of this title, except that any amount so adjusted that is not a multiple of $1.00 shall be rounded to the nearest multiple of $1.00. Any agreement providing for a fee in excess of the amount permitted under this subparagraph shall be void and shall be treated as misuse by such organization of such individual's benefits.

**(ii)** In the case of an individual who is no longer currently entitled to monthly insurance benefits under this subchapter but to whom all past-due benefits have not been paid, for purposes of clause (i), any amount of such past-due benefits payable in any month shall be treated as a monthly benefit referred to in clause (i)(I).

**(B)** For purposes of this paragraph, the term "qualified organization" means any State or local government agency whose mission is to carry out income maintenance, social service, or health care-related activities, any State or local government agency with fiduciary responsibilities, or any certified community-based nonprofit social service agency (as defined in paragraph (10)), if such agency, in accordance with any applicable regulations of the Commissioner of Social Security--

**(i)** regularly provides services as the representative payee, pursuant to this subsection or section 1007 or 1383(a)(2) of this title, concurrently to 5 or more individuals,[4]

**(ii)** demonstrates to the satisfaction of the Commissioner of Social Security that such agency is not otherwise a creditor of any such individual.

The Commissioner of Social Security shall prescribe regulations under which the Commissioner of Social Security may grant an exception from clause (ii) for any individual on a case-by-case basis if such exception is in the best interests of such individual.

**(C)** Any qualified organization which knowingly charges or collects, directly or indirectly, any fee in excess of the maximum fee prescribed under subparagraph (A) or makes any agreement, directly or indirectly, to charge or collect any fee in excess of such maximum fee, shall be fined in accordance with Title 18, or imprisoned not more than 6 months, or both.

**(5)** In cases where the negligent failure of the Commissioner of Social Security to investigate or monitor a representative payee results in misuse of benefits by the representative payee, the Commissioner of Social Security shall certify for payment to the beneficiary or the beneficiary's alternative representative payee an amount equal to such misused benefits. In any case in which a representative payee that--

**(A)** is not an individual (regardless of whether it is a "qualified organization" within the meaning of paragraph (4)(B)); or

**(B)** is an individual who, for any month during a period when misuse occurs, serves 15 or more individuals who are beneficiaries under this subchapter, subchapter VIII, subchapter XVI, or any combination of such subchapters;

misuses all or part of an individual's benefit paid to such representative payee, the Commissioner of Social Security shall certify for payment to the beneficiary or the beneficiary's alternative representative payee an amount equal to the amount of such benefit so misused. The provisions of this paragraph are subject to the limitations of paragraph (7)(B). The Commissioner of Social Security shall make a good faith effort to obtain restitution from the terminated representative payee.

**(6)** In addition to such other reviews of representative payees as the Commissioner of Social Security may otherwise conduct, the Commissioner shall provide for the periodic onsite review of any person or agency located in the United States that receives the benefits payable under this subchapter (alone or in combination with benefits payable under subchapter VIII or subchapter XVI) to another individual pursuant to the appointment of such person or agency as a representative payee under this subsection, section 1007 of this title, or section 1383(a)(2) of this title in any case in which--

**(i)** the representative payee is a person who serves in that capacity with respect to 15 or more such individuals;

**(ii)** the representative payee is a certified community-based nonprofit social service agency (as defined in paragraph (10) of this subsection or section 1383(a)(2)(I) of this title);

**(iii)** the representative payee is an agency (other than an agency described in clause (ii)) that serves in that capacity with respect to 50 or more such individuals; or

**(iv)** the representative payee collects a fee for its services.

A0127

The Commissioner shall also conduct periodic onsite reviews of individual and organizational payees, including payees who are related to the beneficiary and primarily reside in the same household, selected on the basis of risk-factors for potential misuse or unsuitability associated with such payees or beneficiaries.

**(C)(i)**[5] The Commissioner of Social Security shall make annual grants directly to the protection and advocacy system serving each of the States and the American Indian consortium for the purpose of conducting reviews of representative payees in accordance with this subparagraph. The total amount used by the Commissioner for such grants each year--

**(I)** shall be an amount sufficient, as determined by the Commissioner in consultation with each of the protection and advocacy systems, to carry out all of the activities described in clause (ii); and

**(II)** shall not be less than $25,000,000.

**(ii)** A protection and advocacy system awarded a grant under this subparagraph shall use the grant funds to--

**(I)** conduct all periodic onsite reviews pursuant to this paragraph and such other reviews of representative payees as the Commissioner may request, including reviews conducted in response to allegations or concerns about the performance or suitability of the payee;

**(II)** conduct additional reviews that the protection and advocacy system has reason to believe are warranted;

**(III)** develop corrective action plans to assist representative payees in conforming to requirements specified by the Commissioner;

**(IV)** submit a report to the Commissioner on each completed review containing such information as the Commissioner shall require; and

**(V)** conduct an initial onsite assessment of any organization that begins collecting a fee for its services as a representative payee to ensure that such organization is established as such a representative payee in accordance with requirements specified by the Commissioner.

A protection and advocacy system may refer beneficiaries to other programs or services as the protection and advocacy system considers appropriate.

**(iii)** To be eligible to receive grants under this section, a protection and advocacy system shall submit an initial application to the Commissioner at such time, in such form and manner, and accompanied by such information and assurances as the Commissioner may require.

**(iv)(I)** Subject to subclause (II), the Commissioner shall ensure that any funds used for grants under clause (i) shall be allocated to the protection and advocacy systems serving each of the States and the American Indian consortium in a manner such that the amount provided to each protection and advocacy system bears the same ratio to the total of such funds as the number of

A0128

represented beneficiaries in the State or American Indian consortium in which such protection and advocacy system is located bears to the total number of represented beneficiaries.

**(II)** The amount of an annual grant to a protection and advocacy system under clause (i) shall--

    **(aa)** in the case of a protection and advocacy system serving American Samoa, Guam, the United States Virgin Islands, or the Commonwealth of the Northern Mariana Islands, or the American Indian consortium, not be less than $30,000; and

    **(bb)** in the case of a protection and advocacy system serving any other State, not be less than $60,000.

**(III)** Funds provided to a protection and advocacy system through a grant under clause (i) for a 1-year period shall remain available through the end of the following 1-year period.

**(IV)** For purposes of this clause, the term "represented beneficiary" means an individual--

    **(aa)** who is entitled to benefits under this subchapter, subchapter VIII, or subchapter XVI; and

    **(bb)** whose benefits have been certified for payment to a representative payee.

**(v)(I)** The Commissioner shall make annual grants, in an amount equal to 4 percent of the total amount of grants awarded each year under clause (i), to an eligible national association for the provision of training and technical assistance, administrative support, and data collection services to protection and advocacy systems in connection with grants awarded under clause (i).

**(II)** In this clause, the term "eligible national association" means a national disability association with extensive knowledge and demonstrated experience in providing training, technical assistance, and administrative oversight to protection and advocacy systems that monitor representative payees.

**(vi)** In conducting reviews under this section, a protection and advocacy system shall have the same authorities, including access to records, facilities, and persons, as such system would have for purposes of providing services under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15041 et seq.).

**(vii)** Whenever benefit amounts under this subchapter are increased by any percentage effective with any month after November 2018 as a result of a determination made under section 415(i) of this title, each of the dollar amounts specified in clauses (i)(II) and (iv)(II) shall be increased by the same percentage.

**(viii)** No additional funds are authorized to be appropriated to carry out the requirements of this subparagraph. Such requirements shall be carried out using amounts otherwise authorized.

**(ix)** In this subparagraph:

A0129

**(I)** The term "American Indian consortium" means a consortium established under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15041 et seq.).

**(II)** The term "protection and advocacy system" means a protection and advocacy system established under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15041 et seq.).

**(III)** The term "State" means the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

**(7)(A)** If the Commissioner of Social Security or a court of competent jurisdiction determines that a representative payee that is not a Federal, State, or local government agency has misused all or part of an individual's benefit that was paid to such representative payee under this subsection, the representative payee shall be liable for the amount misused, and such amount (to the extent not repaid by the representative payee) shall be treated as an overpayment of benefits under this subchapter to the representative payee for all purposes of this chapter and related laws pertaining to the recovery of such overpayments. Subject to subparagraph (B), upon recovering all or any part of such amount, the Commissioner shall certify an amount equal to the recovered amount for payment to such individual or such individual's alternative representative payee.

**(B)** The total of the amount certified for payment to such individual or such individual's alternative representative payee under subparagraph (A) and the amount certified for payment under paragraph (5) may not exceed the total benefit amount misused by the representative payee with respect to such individual.

**(8)** For purposes of this subsection, the term "benefit based on disability" of an individual means a disability insurance benefit of such individual under section 423 of this title or a child's, widow's, or widower's insurance benefit of such individual under section 402 of this title based on such individual's disability.

**(9)** For purposes of this subsection, misuse of benefits by a representative payee occurs in any case in which the representative payee receives payment under this subchapter for the use and benefit of another person and converts such payment, or any part thereof, to a use other than for the use and benefit of such other person. The Commissioner of Social Security may prescribe by regulation the meaning of the term "use and benefit" for purposes of this paragraph.

**(10)** For purposes of this subsection, the term "certified community-based nonprofit social service agency" means a community-based nonprofit social service agency which is in compliance with requirements, under regulations which shall be prescribed by the Commissioner, for annual certification to the Commissioner that it is bonded in accordance with requirements specified by the Commissioner and that it is licensed in each State in which it serves as a representative payee (if licensing is available in the State) in accordance with requirements specified by the Commissioner. Any such annual certification shall include a copy of any independent audit on the agency which may have been performed since the previous certification.

**(11)(A)** The Commissioner of Social Security shall--

**(i)** enter into agreements with each State with a plan approved under part E of subchapter IV for the purpose of sharing and matching data, on an automated monthly basis, in the system of records of the Social Security Administration with each

A0130

Statewide and Tribal Automated Child Welfare Information System to identify represented minor beneficiaries who are in foster care under the responsibility of the State for such month; and

**(ii)** in any case in which a represented minor beneficiary has entered or exited foster care or changed foster care placement in such month, redetermine the appropriate representative payee for such individual.

**(B)** For purposes of this paragraph--

**(i)** the term "State" has the meaning given such term for purposes of part E of subchapter IV;

**(ii)** the term "Statewide and Tribal Automated Child Welfare Information System" means a statewide mechanized data collection and information retrieval system described in section 674(a)(3)(C) of this title; and

**(iii)** the term "represented minor beneficiary", with respect to an individual for a month, means a child (as defined for purposes of section 675(8) of this title) entitled to benefits under this subchapter for such month whose benefits are certified for payment to a representative payee.

**(12)(A)** Not later than January 31 of each fiscal year, the Commissioner shall submit to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate a report on the total number of individuals entitled to benefits under subchapters II, VIII, and XVI, respectively, (and the number of individuals concurrently entitled to benefits under more than one such subchapter) who have a representative payee, the total number of such representative payees, and the results of all reviews of representative payees conducted during the previous fiscal year in connection with benefits under this subchapter, subchapter VIII, or subchapter XVI. Such report shall summarize problems identified in such reviews and corrective actions taken or planned to be taken to correct such problems, and shall include--

**(i)** the number of such reviews;

**(ii)** the results of such reviews;

**(iii)** the number of cases in which the representative payee was changed and why;

**(iv)** the number of reviews conducted in response to allegations or concerns about the performance or suitability of the payee;

**(v)** the number of cases discovered in which there was a misuse of funds, and the total dollar amount of benefits determined by the Commissioner during such fiscal year to have been misused by a representative payee (regardless of the fiscal year in which such misuse occurred);

**(vi)** the number of cases discovered in which such misuse of funds resulted from the negligent failure of the Commissioner to investigate or monitor a representative payee;

**(vii)** the final disposition of such cases of misuse of funds, including--

**(I)** any criminal, civil, and administrative penalties imposed;

**(II)** the total dollar amount of misused benefits repaid to beneficiaries and alternative representative payees under each of--

**(aa)** paragraph (5) (on the basis of a negligent failure of the Commissioner described in such paragraph);

**(bb)** paragraph (5) (on any other basis); and

**(cc)** paragraph (7);

**(III)** the total dollar amount of misused benefits recovered under each of--

**(aa)** paragraph (5); and

**(bb)** paragraph (7);

**(viii)** any updates to prior year reports necessary to reflect subsequent recoveries and repayments pertaining to misuse determinations made in prior years; and

**(ix)** such other information as the Commissioner deems appropriate.

**(B)** Each report required under this paragraph for a fiscal year shall include the information described in clauses (i) through (ix) of subparagraph (A) with respect to--

**(i)** all representative payees reviewed during such fiscal year;

**(ii)** all such representative payees that are organizations, separated by whether such organization collects a fee for its services as a representative payee;

**(iii)** all such representative payees that are individuals serving 15 or more individuals; and

**(iv)** all such representative payees that are individuals serving less than 15 individuals, separated by whether such representative payee is a family member.

**(k) Payments to incompetents**

Any payment made after December 31, 1939, under conditions set forth in subsection (j), any payment made before January 1, 1940, to, or on behalf of, a legally incompetent individual, and any payment made after December 31, 1939, to a legally incompetent individual without knowledge by the Commissioner of Social Security of incompetency prior to certification of payment, if otherwise valid under this subchapter, shall be a complete settlement and satisfaction of any claim, right, or interest in and to such payment.

**(l) Delegation of powers and duties by Commissioner**

The Commissioner of Social Security is authorized to delegate to any member, officer, or employee of the Social Security Administration designated by the Commissioner any of the powers conferred upon the Commissioner by this section, and is authorized to be represented by the Commissioner's own attorneys in any court in any case or proceeding arising under the provisions of subsection (e).

**(m) Repealed. Aug. 28, 1950, c. 809, Title I, § 101(b)(2), 64 Stat. 488**

**(n) Joint payments**

The Commissioner of Social Security may, in the Commissioner's discretion, certify to the Managing Trustee any two or more individuals of the same family for joint payment of the total benefits payable to such individuals for any month, and if one of such individuals dies before a check representing such joint payment is negotiated, payment of the amount of such unnegotiated check to the surviving individual or individuals may be authorized in accordance with regulations of the Secretary of the Treasury; except that appropriate adjustment or recovery shall be made under section 404(a) of this title with respect to so much of the amount of such check as exceeds the amount to which such surviving individual or individuals are entitled under this subchapter for such month.

**(o) Crediting of compensation under Railroad Retirement Act**

If there is no person who would be entitled, upon application therefor, to an annuity under section 2 of the Railroad Retirement Act of 1974, or to a lump-sum payment under section 6(b) of such Act, with respect to the death of an employee (as defined in such Act), then, notwithstanding section 410(a)(9) of this title, compensation (as defined in such Railroad Retirement Act, but excluding compensation attributable as having been paid during any month on account of military service creditable under section 3(i) of such Act if wages are deemed to have been paid to such employee during such month under subsection (a) or (e) of section 417 of this title) of such employee shall constitute remuneration for employment for purposes of determining (A) entitlement to and the amount of any lump-sum death payment under this subchapter on the basis of such employee's wages and self-employment income and (B) entitlement to and the amount of any monthly benefit under this subchapter, for the month in which such employee died or for any month thereafter, on the basis of such wages and self-employment income. For such purposes, compensation (as so defined) paid in a calendar year before 1978 shall, in the absence of evidence to the contrary, be presumed to have been paid in equal proportions with respect to all months in the year in which the employee rendered services for such compensation.

**(p) Special rules in case of Federal service**

**(1)** With respect to service included as employment under section 410 of this title which is performed in the employ of the United States or in the employ of any instrumentality which is wholly owned by the United States, including service, performed

A0133

as a member of a uniformed service, to which the provisions of subsection (l)(1) of such section are applicable, and including service, performed as a volunteer or volunteer leader within the meaning of the Peace Corps Act, to which the provisions of section 410(o) of this title are applicable, the Commissioner of Social Security shall not make determinations as to the amounts of remuneration for such service, or the periods in which or for which such remuneration was paid, but shall accept the determinations with respect thereto of the head of the appropriate Federal agency or instrumentality, and of such agents as such head may designate, as evidenced by returns filed in accordance with the provisions of section 3122 of the Internal Revenue Code of 1954 and certifications made pursuant to this subsection. Such determinations shall be final and conclusive. Nothing in this paragraph shall be construed to affect the Commissioner's authority to determine under sections 409 and 410 of this title whether any such service constitutes employment, the periods of such employment, and whether remuneration paid for any such service constitutes wages.

**(2)** The head of any such agency or instrumentality is authorized and directed, upon written request of the Commissioner of Social Security, to make certification to the Commissioner with respect to any matter determinable for the Commissioner of Social Security by such head or his agents under this subsection, which the Commissioner of Social Security finds necessary in administering this subchapter.

**(3)** The provisions of paragraphs (1) and (2) of this subsection shall be applicable in the case of service performed by a civilian employee, not compensated from funds appropriated by the Congress, in the Army and Air Force Exchange Service, Army and Air Force Motion Picture Service, Navy Exchanges, Marine Corps Exchanges, or other activities, conducted by an instrumentality of the United States subject to the jurisdiction of the Secretary of Defense, at installations of the Department of Defense for the comfort, pleasure, contentment, and mental and physical improvement of personnel of such Department; and for purposes of paragraphs (1) and (2) of this subsection the Secretary of Defense shall be deemed to be the head of such instrumentality. The provisions of paragraphs (1) and (2) shall be applicable also in the case of service performed by a civilian employee, not compensated from funds appropriated by the Congress, in the Coast Guard Exchanges or other activities, conducted by an instrumentality of the United States subject to the jurisdiction of the Secretary of Homeland Security, at installations of the Coast Guard for the comfort, pleasure, contentment, and mental and physical improvement of personnel of the Coast Guard; and for purposes of paragraphs (1) and (2) the Secretary of Homeland Security shall be deemed to be the head of such instrumentality.

**(q) Expedited benefit payments**

**(1)** The Commissioner of Social Security shall establish and put into effect procedures under which expedited payment of monthly insurance benefits under this subchapter will, subject to paragraph (4) of this subsection, be made as set forth in paragraphs (2) and (3) of this subsection.

**(2)** In any case in which--

**(A)** an individual makes an allegation that a monthly benefit under this subchapter was due him in a particular month but was not paid to him, and

**(B)** such individual submits a written request for the payment of such benefit--

A0134

**(i)** in the case of an individual who received a regular monthly benefit in the month preceding the month with respect to which such allegation is made, not less than 30 days after the 15th day of the month with respect to which such allegation is made (and in the event that such request is submitted prior to the expiration of such 30-day period, it shall be deemed to have been submitted upon the expiration of such period), and

**(ii)** in any other case, not less than 90 days after the later of (I) the date on which such benefit is alleged to have been due, or (II) the date on which such individual furnished the last information requested by the Commissioner of Social Security (and such written request will be deemed to be filed on the day on which it was filed, or the ninetieth day after the first day on which the Commissioner of Social Security has evidence that such allegation is true, whichever is later),

the Commissioner of Social Security shall, if the Commissioner finds that benefits are due, certify such benefits for payment, and payment shall be made within 15 days immediately following the date on which the written request is deemed to have been filed.

**(3)** In any case in which the Commissioner of Social Security determines that there is evidence, although additional evidence might be required for a final decision, that an allegation described in paragraph (2)(A) is true, the Commissioner may make a preliminary certification of such benefit for payment even though the 30-day or 90-day periods described in paragraph (2) (B)(i) and (B)(ii) have not elapsed.

**(4)** Any payment made pursuant to a certification under paragraph (3) of this subsection shall not be considered an incorrect payment for purposes of determining the liability of the certifying or disbursing officer.

**(5)** For purposes of this subsection, benefits payable under section 428 of this title shall be treated as monthly insurance benefits payable under this subchapter. However, this subsection shall not apply with respect to any benefit for which a check has been negotiated, or with respect to any benefit alleged to be due under either section 423 of this title, or section 402 of this title to a wife, husband, or child of an individual entitled to or applying for benefits under section 423 of this title, or to a child who has attained age 18 and is under a disability, or to a widow or widower on the basis of being under a disability.

**(r) Use of death certificates to correct program information**

**(1)** The Commissioner of Social Security shall undertake to establish a program under which--

**(A)** States (or political subdivisions thereof) voluntarily contract with the Commissioner of Social Security to furnish the Commissioner of Social Security periodically with information (in a form established by the Commissioner of Social Security in consultation with the States) concerning individuals with respect to whom death certificates (or equivalent documents maintained by the States or subdivisions) have been officially filed with them; and

**(B)** there will be (i) a comparison of such information on such individuals with information on such individuals in the records being used in the administration of this chapter, (ii) validation of the results of such comparisons, and (iii) corrections in such records to accurately reflect the status of such individuals.

**(2)** Each State (or political subdivision thereof) which furnishes the Commissioner of Social Security with information on records of deaths in the State or subdivision under this subsection may be paid by the Commissioner of Social Security from

A0135

amounts available for administration of this chapter the reasonable costs (established by the Commissioner of Social Security in consultations with the States) for transcribing and transmitting such information to the Commissioner of Social Security.

**(3)** In the case of individuals with respect to whom federally funded benefits are provided by (or through) a Federal or State agency other than under this chapter, the Commissioner of Social Security shall to the extent feasible provide such information through a cooperative arrangement with such agency, for ensuring proper payment of those benefits with respect to such individuals if--

**(A)** under such arrangement the agency provides reimbursement to the Commissioner of Social Security for the reasonable cost of carrying out such arrangement, and

**(B)** such arrangement does not conflict with the duties of the Commissioner of Social Security under paragraph (1).

**(4)** The Commissioner of Social Security may enter into similar agreements with States to provide information for their use in programs wholly funded by the States if the requirements of subparagraphs (A) and (B) of paragraph (3) are met.

**(5)** The Commissioner of Social Security may use or provide for the use of such records as may be corrected under this section, subject to such safeguards as the Commissioner of Social Security determines are necessary or appropriate to protect the information from unauthorized use or disclosure, for statistical and research activities conducted by Federal and State agencies.

**(6)** Information furnished to the Commissioner of Social Security under this subsection may not be used for any purpose other than the purpose described in this subsection and is exempt from disclosure under section 552 of Title 5, and from the requirements of section 552a of such title.

**(7)** The Commissioner of Social Security shall include information on the status of the program established under this section and impediments to the effective implementation of the program in the 1984 report required under section 904 of this title.

**(8)(A)** The Commissioner of Social Security shall, upon the request of the official responsible for a State driver's license agency pursuant to the Help America Vote Act of 2002--

**(i)** enter into an agreement with such official for the purpose of verifying applicable information, so long as the requirements of subparagraphs (A) and (B) of paragraph (3) are met; and

**(ii)** include in such agreement safeguards to assure the maintenance of the confidentiality of any applicable information disclosed and procedures to permit such agency to use the applicable information for the purpose of maintaining its records.

**(B)** Information provided pursuant to an agreement under this paragraph shall be provided at such time, in such place, and in such manner as the Commissioner determines appropriate.

A0136

**(C)** The Commissioner shall develop methods to verify the accuracy of information provided by the agency with respect to applications for voter registration, for whom the last 4 digits of a social security number are provided instead of a driver's license number.

**(D)** For purposes of this paragraph--

**(i)** the term "applicable information" means information regarding whether--

**(I)** the name (including the first name and any family forename or surname), the date of birth (including the month, day, and year), and social security number of an individual provided to the Commissioner match the information contained in the Commissioner's records, and

**(II)** such individual is shown on the records of the Commissioner as being deceased; and

**(ii)** the term "State driver's license agency" means the State agency which issues driver's licenses to individuals within the State and maintains records relating to such licensure.

**(E)** Nothing in this paragraph may be construed to require the provision of applicable information with regard to a request for a record of an individual if the Commissioner determines there are exceptional circumstances warranting an exception (such as safety of the individual or interference with an investigation).

**(F)** Applicable information provided by the Commission pursuant to an agreement under this paragraph or by an individual to any agency that has entered into an agreement under this paragraph shall be considered as strictly confidential and shall be used only for the purposes described in this paragraph and for carrying out an agreement under this paragraph. Any officer or employee or former officer or employee of a State, or any officer or employee or former officer or employee of a contractor of a State who, without the written authority of the Commissioner, publishes or communicates any applicable information in such individual's possession by reason of such employment or position as such an officer, shall be guilty of a felony and upon conviction thereof shall be fined or imprisoned, or both, as described in section 408 of this title.

**(9)(A)** The Commissioner of Social Security shall, upon the request of the Secretary or the Inspector General of the Department of Health and Human Services--

**(i)** enter into an agreement with the Secretary or such Inspector General for the purpose of matching data in the system of records of the Social Security Administration and the system of records of the Department of Health and Human Services; and

**(ii)** include in such agreement safeguards to assure the maintenance of the confidentiality of any information disclosed.

**(B)** For purposes of this paragraph, the term "system of records" has the meaning given such term in section 552a(a)(5) of Title 5.

**(s) Notice requirements**

A0137

The Commissioner of Social Security shall take such actions as are necessary to ensure that any notice to one or more individuals issued pursuant to this subchapter by the Commissioner of Social Security or by a State agency--

**(1)** is written in simple and clear language, and

**(2)** includes the address and telephone number of the local office of the Social Security Administration which serves the recipient.

In the case of any such notice which is not generated by a local servicing office, the requirements of paragraph (2) shall be treated as satisfied if such notice includes the address of the local office of the Social Security Administration which services the recipient of the notice and a telephone number through which such office can be reached.

**(t) Same-day personal interviews at field offices in cases where time is of essence**

In any case in which an individual visits a field office of the Social Security Administration and represents during the visit to an officer or employee of the Social Security Administration in the office that the individual's visit is occasioned by--

**(1)** the receipt of a notice from the Social Security Administration indicating a time limit for response by the individual, or

**(2)** the theft, loss, or nonreceipt of a benefit payment under this subchapter,

the Commissioner of Social Security shall ensure that the individual is granted a face-to-face interview at the office with an officer or employee of the Social Security Administration before the close of business on the day of the visit.

**(u) Redetermination of entitlement**

**(1)(A)** The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits, unless a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud.

**(B)** When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence.

**(2)** For purposes of paragraph (1), similar fault is involved with respect to a determination if--

**(A)** an incorrect or incomplete statement that is material to the determination is knowingly made; or

A0138

**(B)** information that is material to the determination is knowingly concealed.

**(3)** If, after redetermining pursuant to this subsection the entitlement of an individual to monthly insurance benefits, the Commissioner of Social Security determines that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments.

## CREDIT(S)

(Aug. 14, 1935, c. 531, Title II, § 205, 49 Stat. 624; Aug. 10, 1939, c. 666, Title II, § 201, 53 Stat. 1362, 1368; June 25, 1948, c. 646, § 32(b), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Aug. 28, 1950, c. 809, Title I, §§ 101(b)(2), 108(a) to (c), 109(b), 64 Stat. 488, 518, 523; July 18, 1952, c. 945, § 5(b), 66 Stat. 775; Sept. 1, 1954, c. 1206, Title I, § 101(a)(5), (c) (3), 68 Stat. 1052, 1054; Aug. 1, 1956, c. 836, Title I, §§ 107(b), 111(a), 117, 70 Stat. 829, 831, 834; Aug. 1, 1956, c. 837, Title IV, § 402(b), 70 Stat. 871; Pub.L. 86-507, § 1(35), June 11, 1960, 74 Stat. 202; Pub.L. 86-778, Title I, §§ 102(f)(2), 103(j)(2) (E), Title VII, § 702(a), Sept. 13, 1960, 74 Stat. 933, 938, 993; Pub.L. 87-293, Title II, § 202(b)(3), Sept. 22, 1961, 75 Stat. 626; Pub.L. 89-97, Title III, §§ 308(d)(9), (10), 330, July 30, 1965, 79 Stat. 379, 401; Pub.L. 90-248, Title I, § 171(a), Jan. 2, 1968, 81 Stat. 876; Pub.L. 91-452, Title II, § 236, Oct. 15, 1970, 84 Stat. 930; Pub.L. 92-603, Title I, § 137, Oct. 30, 1972, 86 Stat. 1364; Pub.L. 93-445, Title III, §§ 302(a), 303, Oct. 16, 1974, 88 Stat. 1358; Pub.L. 94-202, § 4, Jan. 2, 1976, 89 Stat. 1136; Pub.L. 94-455, Title XII, § 1211(b), Oct. 4, 1976, 90 Stat. 1711; Pub.L. 95-216, Title III, § 353(f)(2), Dec. 20, 1977, 91 Stat. 1554; Pub.L. 95-600, Title VII, § 703(j)(14)(B), Nov. 6, 1978, 92 Stat. 2942; Pub.L. 96-265, Title III, §§ 305(a), 307, June 9, 1980, 94 Stat. 457, 458; Pub.L. 97-455, § 4(a), Jan. 12, 1983, 96 Stat. 2499; Pub.L. 98-21, Title III, §§ 301(d), 309(i), 336, 345(a), Apr. 20, 1983, 97 Stat. 111, 117, 130, 137; Pub.L. 98-369, Div. B, Title VI, §§ 2661(h), 2663(a)(4), (j)(4), July 18, 1984, 98 Stat. 1157, 1162, 1171; Pub.L. 98-460, § 16(a), Oct. 9, 1984, 98 Stat. 1809; Pub.L. 99-509, Title IX, § 9002(c)(2) (A), (B), Oct. 21, 1986, 100 Stat. 1971; Pub.L. 100-485, Title I, § 125(a), Oct. 13, 1988, 102 Stat. 2353; Pub.L. 100-647, Title VIII, §§ 8008(a), 8009(a), 8015(a)(1), 8016(a)(1), Nov. 10, 1988, 102 Stat. 3783, 3787, 3790, 3792; Pub.L. 101-239, Title X, §§ 10303(a), 10304, Dec. 19, 1989, 103 Stat. 2482, 2483; Pub.L. 101-508, Title V, §§ 5105(a)(1)(A), (2)(A)(i), (3)(A)(i), (b) (1)(A), (c)(1), (d)(1)(A), 5107(a)(1), 5109(a)(1), Nov. 5, 1990, 104 Stat. 1388-254, 1388-255, 1388-260, 1388-263, 1388-265, 1388-269, 1388-271; Pub.L. 101-624, Title XVII, § 1735(a), (b), Title XXII, § 2201(b), (c), Nov. 28, 1990, 104 Stat. 3791, 3792, 3951, 3952; Pub.L. 103-296, Title I, § 107(a)(1), (2), (4), Title II, §§ 201(a)(1)(A), (B), (2)(A) to (C), 206(a)(1), (d)(1), Title III, §§ 304(a), 316(a), 318, 321(a)(7) to (11), (c)(3), (6)(B), (f)(2)(A), Aug. 15, 1994, 108 Stat. 1477, 1478, 1490, 1492, 1509, 1514, 1520, 1531, 1533, 1536, 1538, 1541; Pub.L. 104-121, Title I, § 105(a)(2), Mar. 29, 1996, 110 Stat. 852; Pub.L. 104-193, Title I, § 108(a)(1), Aug. 22, 1996, 110 Stat. 2164; Pub.L. 105-34, Title X, § 1090(b)(1), Aug. 5, 1997, 111 Stat. 962; Pub.L. 106-169, Title II, § 251(b)(2), Dec. 14, 1999, 113 Stat. 1854; Pub.L. 107-90, Title I, § 4002(b)(1)(B), (2)(V), Dec. 21, 2001, 115 Stat. 882; Pub.L. 107-252, Title III, § 303(a)(5)(C), Oct. 29, 2002, 116 Stat. 1711; Pub.L. 108-203, Title I, §§ 101(a), 102(a)(1), (b)(1), 103(a), 104(a), 105(a), 106(a), Title IV, § 411(a), Mar. 2, 2004, 118 Stat. 495, 497, 498, 500, 503 to 505, 527; Pub.L. 108-271, § 8(b), July 7, 2004, 118 Stat. 814; Pub.L. 108-458, Title VII, § 7214(a), Dec. 17, 2004, 118 Stat. 3832; Pub.L. 109-241, Title IX, § 902(n), July 11, 2006, 120 Stat. 568; Pub.L. 110-234, Title IV, § 4002(b)(1)(B), (2)(V), May 22, 2008, 122 Stat. 1096, 1097; Pub.L. 110-246, § 4(a), Title IV, § 4002(b)(1)(B), (2)(V), June 18, 2008, 122 Stat. 1664, 1857, 1858; Pub.L. 111-148, Title I, § 1414(a)(2), Title VI, § 6402(b)(3), Mar. 23, 2010, 124 Stat. 237, 756; Pub.L. 111-318, § 2(a)(1), (b)(1), Dec. 18, 2010, 124 Stat. 3455; Pub.L. 114-10, Title V, § 501(a), Apr. 16, 2015, 129 Stat. 163; Pub.L. 114-74, Title VIII, § 843, Nov. 2, 2015, 129 Stat. 617; Pub.L. 115-165, Title I, §§ 101(a), (b), 102(a), 103(a)(1), 105(a), Title II, §§ 201(a), 202(a), 203(a), Apr. 13, 2018, 132 Stat. 1257, 1259, 1260, 1261, 1264, 1266, 1267, 1272.)

Notes of Decisions (1502)

Footnotes

1      So in original. Probably should be "subclause".

2      So in original. The word "the" probably should not appear.

3      So in original. Probably should be followed by a comma.

4      So in original. Probably should be followed by "and".

5      So in original. There are no subpars. (A) or (B).

42 U.S.C.A. § 405, 42 USCA § 405

Current through P.L. 116-182.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                35

A0140

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 7. Social Security (Refs & Annos)
      Subchapter XVIII. Health Insurance for Aged and Disabled (Refs & Annos)
        Part B. Supplementary Medical Insurance Benefits for Aged and Disabled (Refs & Annos)

42 U.S.C.A. § 1395k

§ 1395k. Scope of benefits; definitions

Effective: October 21, 2011

Currentness

**(a) Scope of benefits**

The benefits provided to an individual by the insurance program established by this part shall consist of--

**(1)** entitlement to have payment made to him or on his behalf (subject to the provisions of this part) for medical and other health services, except those described in subparagraphs (B) and (D) of paragraph (2) and subparagraphs (E) and (F) of section 1395u(b)(6) of this title; and

**(2)** entitlement to have payment made on his behalf (subject to the provisions of this part) for--

**(A)** home health services (other than items described in subparagraph (G) or subparagraph (I));

**(B)** medical and other health services (other than items described in subparagraph (G) or subparagraph (I)) furnished by a provider of services or by others under arrangement with them made by a provider of services, excluding--

**(i)** physician services except where furnished by--

**(I)** a resident or intern of a hospital, or

**(II)** a physician to a patient in a hospital which has a teaching program approved as specified in paragraph (6) of section 1395x(b) of this title (including services in conjunction with the teaching programs of such hospital whether or not such patient is an inpatient of such hospital) where the conditions specified in paragraph (7) of such section are met,

**(ii)** services for which payment may be made pursuant to section 1395n(b)(2) of this title,

A0141

**(iii)** services described by section 1395x(s)(2)(K)(i) of this title, certified nurse-midwife services, qualified psychologist services, and services of a certified registered nurse anesthetist;[1]

**(iv)** services of a nurse practitioner or clinical nurse specialist but only if no facility or other provider charges or is paid any amounts with respect to the furnishing of such services; and[2]

**(C)** outpatient physical therapy services (other than services to which the second sentence of section 1395x(p) of this title applies), outpatient occupational therapy services (other than services to which such sentence applies through the operation of section 1395x(g) of this title), and outpatient speech-language pathology services (other than services to which the second sentence of section 1395x(p) of this title applies through the application of section 1395x(*ll*)(2) of this title);

**(D)** (i) rural health clinic services and (ii) Federally qualified health center services;

**(E)** comprehensive outpatient rehabilitation facility services;

**(F)** facility services furnished in connection with surgical procedures specified by the Secretary--

**(i)** pursuant to section 1395*l*(i)(1)(A) of this title and performed in an ambulatory surgical center (which meets health, safety, and other standards specified by the Secretary in regulations) if the center has an agreement in effect with the Secretary by which the center agrees to accept the standard overhead amount determined under section 1395*l*(i)(2)(A) of this title as full payment for such services (including intraocular lens in cases described in section 1395*l*(i)(2)(A)(iii) of this title) and to accept an assignment described in section 1395u(b)(3)(B)(ii) of this title with respect to payment for all such services (including intraocular lens in cases described in section 1395*l*(i)(2)(A)(iii) of this title) furnished by the center to individuals enrolled under this part, or

**(ii)** pursuant to section 1395*l*(i)(1)(B) of this title and performed by a physician, described in paragraph (1), (2), or (3) of section 1395x(r) of this title, in his office, if the Secretary has determined that--

**(I)** a quality improvement organization (having a contract with the Secretary under part B of subchapter XI of this chapter) is willing, able, and has agreed to carry out a review (on a sample or other reasonable basis) of the physician's performing such procedures in the physician's office,

**(II)** the particular physician involved has agreed to make available to such organization such records as the Secretary determines to be necessary to carry out the review, and

**(III)** the physician is authorized to perform the procedure in a hospital located in the area in which the office is located,

and if the physician agrees to accept the standard overhead amount determined under section 1395*l*(i)(2)(B) of this title as full payment for such services and to accept payment on an assignment-related basis with respect to payment for all services (including all pre- and post-operative services) described in paragraphs (1) and (2)(A)

A0142

of section 1395x(s) of this title and furnished in connection with such surgical procedure to individuals enrolled under this part;

**(G)** covered items (described in section 1395m(a)(13) of this title) furnished by a provider of services or by others under arrangements with them made by a provider of services;

**(H)** outpatient critical access hospital services (as defined in section 1395x(mm)(3) of this title);

**(I)** prosthetic devices and orthotics and prosthetics (described in section 1395m(h)(4) of this title) furnished by a provider of services or by others under arrangements with them made by a provider of services; and

**(J)** partial hospitalization services provided by a community mental health center (as described in section 1395x(ff)(2)(B) of this title).

## (b) Definitions

For definitions of "spell of illness", "medical and other health services", and other terms used in this part, see section 1395x of this title.

## CREDIT(S)

(Aug. 14, 1935, c. 531, Title XVIII, § 1832, as added Pub.L. 89-97, Title I, § 102(a), July 30, 1965, 79 Stat. 302; amended Pub.L. 90-248, Title I, §§ 129(c)(6)(B), 133(d), Jan. 2, 1968, 81 Stat. 848, 851; Pub.L. 92-603, Title II, §§ 227(e)(1), 251(a)(4), Oct. 30, 1972, 86 Stat. 1406, 1445; Pub.L. 95-210, § 1(a), Dec. 13, 1977, 91 Stat. 1485; Pub.L. 96-499, Title IX, §§ 930(g), 933(a), 934(a), 948(a)(2), Dec. 5, 1980, 94 Stat. 2631, 2635, 2637, 2643; Pub.L. 97-248, Title I, § 148(c), Sept. 3, 1982, 96 Stat. 394; Pub.L. 98-369, Div. B, Title III, §§ 2341(b), 2354(b)(6), July 18, 1984, 98 Stat. 1094, 1100; Pub.L. 99-509, Title IX, §§ 9320(d), 9337(a), 9343(e)(1), Oct. 21, 1986, 100 Stat. 2013, 2033, 2041; Pub.L. 100-203, Title IV, §§ 4062(d)(2), 4063(e)(2), 4073(b)(1), 4077(b)(2), 4085(i)(22)(A), Dec. 22, 1987, 101 Stat. 1330-108, 1330-118, 1330-120; Pub.L. 100-360, Title I, § 104(d)(3), Title II, §§ 203(a), 205(a), Title IV, § 411(g)(2)(E), (h)(4)(A), (7)(B), (i)(4)(C)(vi), July 1, 1988, 102 Stat. 689, 721, 729, 783, 786, 787, 789; Pub.L. 101-234, Title I, § 101(a)(1), Title II, § 201(a)(1), Dec. 13, 1989, 103 Stat. 1979, 1981; Pub.L. 101-239, Title VI, § 6116(a)(2), Dec. 19, 1989, 103 Stat. 2219; Pub.L. 101-508, Title IV, §§ 4153(a)(2)(A), 4155(b)(1), 4157(b), 4161(a)(3)(A), 4162(b)(1), Nov. 5, 1990, 104 Stat. 1388-83, 1388-86, 1388-89, 1388-93, 1388-96; Pub.L. 105-33, Title IV, §§ 4201(c)(1), 4432(b)(5)(B), 4511(c), 4603(c)(2)(B)(ii), Aug. 5, 1997, 111 Stat. 373, 421, 443, 471; Pub.L. 106-113, Div. B, § 1000(a)(6) [Title II, § 227(b)], Nov. 29, 1999, 113 Stat. 1536, 1501A-354; Pub.L. 106-554, § 1(a)(6) [Title I, § 113(b)(1)], Dec. 21, 2000, 114 Stat. 2763, 2763A-473; Pub.L. 110-275, Title I, § 143(b)(1), July 15, 2008, 122 Stat. 2542; Pub.L. 112-40, Title II, § 261(a)(3)(B), Oct. 21, 2011, 125 Stat. 423.)

Notes of Decisions (8)

Footnotes

| 1 | So in original. The semicolon probably should be a comma. |
| 2 | So in original. The word "and" probably should not appear. |

42 U.S.C.A. § 1395k, 42 USCA § 1395k

Current through P.L. 116-182.

**End of Document**                                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

A0144

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 7. Social Security (Refs & Annos)
            Subchapter XVIII. Health Insurance for Aged and Disabled (Refs & Annos)
                Part E. Miscellaneous Provisions (Refs & Annos)

42 U.S.C.A. § 1395ff

# § 1395ff. Determinations; appeals

Effective: April 1, 2014

Currentness

**(a) Initial determinations**

**(1) Promulgations of regulations**

The Secretary shall promulgate regulations and make initial determinations with respect to benefits under part A or part B in accordance with those regulations for the following:

**(A)** The initial determination of whether an individual is entitled to benefits under such parts.

**(B)** The initial determination of the amount of benefits available to the individual under such parts.

**(C)** Any other initial determination with respect to a claim for benefits under such parts, including an initial determination by the Secretary that payment may not be made, or may no longer be made, for an item or service under such parts, an initial determination made by a quality improvement organization under section 1320c-3(a)(2) of this title, and an initial determination made by an entity pursuant to a contract (other than a contract under section 1395w-22 of this title) with the Secretary to administer provisions of this subchapter or subchapter XI.

**(2) Deadlines for making initial determinations**

**(A) In general**

Subject to subparagraph (B), in promulgating regulations under paragraph (1), initial determinations shall be concluded by not later than the 45-day period beginning on the date the fiscal intermediary or the carrier, as the case may be, receives a claim for benefits from an individual as described in paragraph (1). Notice of such determination shall be mailed to the individual filing the claim before the conclusion of such 45-day period.

A0145

**(B) Clean claims**

Subparagraph (A) shall not apply with respect to any claim that is subject to the requirements of section 1395h(c)(2) or 1395u(c)(2) of this title.

**(3) Redeterminations**

**(A) In general**

In promulgating regulations under paragraph (1) with respect to initial determinations, such regulations shall provide for a fiscal intermediary or a carrier to make a redetermination with respect to a claim for benefits that is denied in whole or in part.

**(B) Limitations**

**(i) Appeal rights**

No initial determination may be reconsidered or appealed under subsection (b) unless the fiscal intermediary or carrier has made a redetermination of that initial determination under this paragraph.

**(ii) Decisionmaker**

No redetermination may be made by any individual involved in the initial determination.

**(C) Deadlines**

**(i) Filing for redetermination**

A redetermination under subparagraph (A) shall be available only if notice is filed with the Secretary to request the redetermination by not later than the end of the 120-day period beginning on the date the individual receives notice of the initial determination under paragraph (2).

**(ii) Concluding redeterminations**

Redeterminations shall be concluded by not later than the 60-day period beginning on the date the fiscal intermediary or the carrier, as the case may be, receives a request for a redetermination. Notice of such determination shall be mailed to the individual filing the claim before the conclusion of such 60-day period.

**(D) Construction**

For purposes of the succeeding provisions of this section a redetermination under this paragraph shall be considered to be part of the initial determination.

A0146

**(4) Requirements of notice of determinations**

With respect to an initial determination insofar as it results in a denial of a claim for benefits--

**(A)** the written notice on the determination shall include--

**(i)** the reasons for the determination, including whether a local medical review policy or a local coverage determination was used;

**(ii)** the procedures for obtaining additional information concerning the determination, including the information described in subparagraph (B); and

**(iii)** notification of the right to seek a redetermination or otherwise appeal the determination and instructions on how to initiate such a redetermination under this section;

**(B)** such written notice shall be provided in printed form and written in a manner calculated to be understood by the individual entitled to benefits under part A or enrolled under part B, or both; and

**(C)** the individual provided such written notice may obtain, upon request, information on the specific provision of the policy, manual, or regulation used in making the redetermination.

**(5) Requirements of notice of redeterminations**

With respect to a redetermination insofar as it results in a denial of a claim for benefits--

**(A)** the written notice on the redetermination shall include--

**(i)** the specific reasons for the redetermination;

**(ii)** as appropriate, a summary of the clinical or scientific evidence used in making the redetermination;

**(iii)** a description of the procedures for obtaining additional information concerning the redetermination; and

**(iv)** notification of the right to appeal the redetermination and instructions on how to initiate such an appeal under this section;

**(B)** such written notice shall be provided in printed form and written in a manner calculated to be understood by the individual entitled to benefits under part A or enrolled under part B, or both; and

**(C)** the individual provided such written notice may obtain, upon request, information on the specific provision of the policy, manual, or regulation used in making the redetermination.

**(b) Appeal rights**

**(1) In general**

**(A) Reconsideration of initial determination**

Subject to subparagraph (D), any individual dissatisfied with any initial determination under subsection (a)(1) shall be entitled to reconsideration of the determination, and, subject to subparagraphs (D) and (E), a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and, subject to paragraph (2), to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title. For purposes of the preceding sentence, any reference to the "Commissioner of Social Security" or the "Social Security Administration" in subsection (g) or (l) of section 405 of this title shall be considered a reference to the "Secretary" or the "Department of Health and Human Services", respectively.

**(B) Representation by provider or supplier**

**(i) In general**

Sections 406(a), 1302, and 1395hh of this title shall not be construed as authorizing the Secretary to prohibit an individual from being represented under this section by a person that furnishes or supplies the individual, directly or indirectly, with services or items, solely on the basis that the person furnishes or supplies the individual with such a service or item.

**(ii) Mandatory waiver of right to payment from beneficiary**

Any person that furnishes services or items to an individual may not represent an individual under this section with respect to the issue described in section 1395pp(a)(2) of this title unless the person has waived any rights for payment from the beneficiary with respect to the services or items involved in the appeal.

**(iii) Prohibition on payment for representation**

If a person furnishes services or items to an individual and represents the individual under this section, the person may not impose any financial liability on such individual in connection with such representation.

**(iv) Requirements for representatives of a beneficiary**

The provisions of section 405(j) of this title and of section 406 of this title (other than subsection (a)(4) of such section) regarding representation of claimants shall apply to representation of an individual with respect to appeals under this section in the same manner as they apply to representation of an individual under those sections.

A0148

**(C) Succession of rights in cases of assignment**

The right of an individual to an appeal under this section with respect to an item or service may be assigned to the provider of services or supplier of the item or service upon the written consent of such individual using a standard form established by the Secretary for such an assignment.

**(D) Time limits for filing appeals**

**(i) Reconsiderations**

Reconsideration under subparagraph (A) shall be available only if the individual described in subparagraph (A) files notice with the Secretary to request reconsideration by not later than the end of the 180-day period beginning on the date the individual receives notice of the redetermination under subsection (a)(3), or within such additional time as the Secretary may allow.

**(ii) Hearings conducted by the Secretary**

The Secretary shall establish in regulations time limits for the filing of a request for a hearing by the Secretary in accordance with provisions in sections 405 and 406 of this title.

**(E) Amounts in controversy**

**(i) In general**

A hearing (by the Secretary) shall not be available to an individual under this section if the amount in controversy is less than $100, and judicial review shall not be available to the individual if the amount in controversy is less than $1,000.

**(ii) Aggregation of claims**

In determining the amount in controversy, the Secretary, under regulations, shall allow two or more appeals to be aggregated if the appeals involve--

**(I)** the delivery of similar or related services to the same individual by one or more providers of services or suppliers, or

**(II)** common issues of law and fact arising from services furnished to two or more individuals by one or more providers of services or suppliers.

**(iii) Adjustment of dollar amounts**

For requests for hearings or judicial review made in a year after 2004, the dollar amounts specified in clause (i) shall be equal to such dollar amounts increased by the percentage increase in the medical care component of the consumer price

A0149

index for all urban consumers (U.S. city average) for July 2003 to the July preceding the year involved. Any amount determined under the previous sentence that is not a multiple of $10 shall be rounded to the nearest multiple of $10.

**(F) Expedited proceedings**

**(i) Expedited determination**

In the case of an individual who has received notice from a provider of services that such provider plans--

**(I)** to terminate services provided to an individual and a physician certifies that failure to continue the provision of such services is likely to place the individual's health at significant risk, or

**(II)** to discharge the individual from the provider of services,

the individual may request, in writing or orally, an expedited determination or an expedited reconsideration of an initial determination made under subsection (a)(1), as the case may be, and the Secretary shall provide such expedited determination or expedited reconsideration.

**(ii) Reference to expedited access to judicial review**

For the provision relating to expedited access to judicial review, see paragraph (2).

**(G) Reopening and revision of determinations**

The Secretary may reopen or revise any initial determination or reconsidered determination described in this subsection under guidelines established by the Secretary in regulations.

**(2) Expedited access to judicial review**

**(A) In general**

The Secretary shall establish a process under which a provider of services or supplier that furnishes an item or service or an individual entitled to benefits under part A or enrolled under part B, or both, who has filed an appeal under paragraph (1) (other than an appeal filed under paragraph (1)(F)(i)) may obtain access to judicial review when a review entity (described in subparagraph (D)), on its own motion or at the request of the appellant, determines that the Departmental Appeals Board does not have the authority to decide the question of law or regulation relevant to the matters in controversy and that there is no material issue of fact in dispute. The appellant may make such request only once with respect to a question of law or regulation for a specific matter in dispute in a case of an appeal.

**(B) Prompt determinations**

If, after or coincident with appropriately filing a request for an administrative hearing, the appellant requests a determination by the appropriate review entity that the Departmental Appeals Board does not have the authority to decide the question

A0150

of law or regulations relevant to the matters in controversy and that there is no material issue of fact in dispute, and if such request is accompanied by the documents and materials as the appropriate review entity shall require for purposes of making such determination, such review entity shall make a determination on the request in writing within 60 days after the date such review entity receives the request and such accompanying documents and materials. Such a determination by such review entity shall be considered a final decision and not subject to review by the Secretary.

**(C) Access to judicial review**

**(i) In general**

If the appropriate review entity--

**(I)** determines that there are no material issues of fact in dispute and that the only issues to be adjudicated are ones of law or regulation that the Departmental Appeals Board does not have authority to decide; or

**(II)** fails to make such determination within the period provided under subparagraph (B),

then the appellant may bring a civil action as described in this subparagraph.

**(ii) Deadline for filing**

Such action shall be filed, in the case described in--

**(I)** clause (i)(I), within 60 days of the date of the determination described in such clause; or

**(II)** clause (i)(II), within 60 days of the end of the period provided under subparagraph (B) for the determination.

**(iii) Venue**

Such action shall be brought in the district court of the United States for the judicial district in which the appellant is located (or, in the case of an action brought jointly by more than one applicant, the judicial district in which the greatest number of applicants are located) or in the District Court for the District of Columbia.

**(iv) Interest on any amounts in controversy**

Where a provider of services or supplier is granted judicial review pursuant to this paragraph, the amount in controversy (if any) shall be subject to annual interest beginning on the first day of the first month beginning after the 60-day period as determined pursuant to clause (ii) and equal to the rate of interest on obligations issued for purchase by the Federal Supplementary Medical Insurance Trust Fund for the month in which the civil action authorized under this paragraph is commenced, to be awarded by the reviewing court in favor of the prevailing party. No interest awarded pursuant to the preceding sentence shall be deemed income or cost for the purposes of determining reimbursement due providers of services or suppliers under this subchapter.

A0151

**(D) Review entity defined**

For purposes of this subsection, the term "review entity" means an entity of up to three reviewers who are administrative law judges or members of the Departmental Appeals Board selected for purposes of making determinations under this paragraph.

**(3) Requiring full and early presentation of evidence by providers**

A provider of services or supplier may not introduce evidence in any appeal under this section that was not presented at the reconsideration conducted by the qualified independent contractor under subsection (c), unless there is good cause which precluded the introduction of such evidence at or before that reconsideration.

**(c) Conduct of reconsiderations by independent contractors**

**(1) In general**

The Secretary shall enter into contracts with qualified independent contractors to conduct reconsiderations of initial determinations made under subparagraphs (B) and (C) of subsection (a)(1). Contracts shall be for an initial term of three years and shall be renewable on a triennial basis thereafter.

**(2) Qualified independent contractor**

For purposes of this subsection, the term "qualified independent contractor" means an entity or organization that is independent of any organization under contract with the Secretary that makes initial determinations under subsection (a)(1), and that meets the requirements established by the Secretary consistent with paragraph (3).

**(3) Requirements**

Any qualified independent contractor entering into a contract with the Secretary under this subsection shall meet all of the following requirements:

**(A) In general**

The qualified independent contractor shall perform such duties and functions and assume such responsibilities as may be required by the Secretary to carry out the provisions of this subsection, and shall have sufficient medical, legal, and other expertise (including knowledge of the program under this subchapter) and sufficient staffing to make reconsiderations under this subsection.

**(B) Reconsiderations**

**(i) In general**

The qualified independent contractor shall review initial determinations. Where an initial determination is made with respect to whether an item or service is reasonable and necessary for the diagnosis or treatment of illness or injury (under section 1395y(a)(1)(A) of this title), such review shall include consideration of the facts and circumstances of the initial determination by a panel of physicians or other appropriate health care professionals and any decisions with respect to the reconsideration shall be based on applicable information, including clinical experience (including the medical records of the individual involved) and medical, technical, and scientific evidence.

### (ii) Effect of national and local coverage determinations

#### (I) National coverage determinations

If the Secretary has made a national coverage determination pursuant to the requirements established under the third sentence of section 1395y(a) of this title, such determination shall be binding on the qualified independent contractor in making a decision with respect to a reconsideration under this section.

#### (II) Local coverage determinations

If the Secretary has made a local coverage determination, such determination shall not be binding on the qualified independent contractor in making a decision with respect to a reconsideration under this section. Notwithstanding the previous sentence, the qualified independent contractor shall consider the local coverage determination in making such decision.

#### (III) Absence of national or local coverage determination

In the absence of such a national coverage determination or local coverage determination, the qualified independent contractor shall make a decision with respect to the reconsideration based on applicable information, including clinical experience and medical, technical, and scientific evidence.

## (C) Deadlines for decisions

### (i) Reconsiderations

Except as provided in clauses (iii) and (iv), the qualified independent contractor shall conduct and conclude a reconsideration under subparagraph (B), and mail the notice of the decision with respect to the reconsideration by not later than the end of the 60-day period beginning on the date a request for reconsideration has been timely filed.

### (ii) Consequences of failure to meet deadline

In the case of a failure by the qualified independent contractor to mail the notice of the decision by the end of the period described in clause (i) or to provide notice by the end of the period described in clause (iii), as the case may be, the party requesting the reconsideration or appeal may request a hearing before the Secretary, notwithstanding any requirements for a reconsidered determination for purposes of the party's right to such hearing.

A0153

### (iii) Expedited reconsiderations

The qualified independent contractor shall perform an expedited reconsideration under subsection (b)(1)(F) as follows:

#### (I) Deadline for decision

Notwithstanding section 416(j) of this title and subject to clause (iv), not later than the end of the 72-hour period beginning on the date the qualified independent contractor has received a request for such reconsideration and has received such medical or other records needed for such reconsideration, the qualified independent contractor shall provide notice (by telephone and in writing) to the individual and the provider of services and attending physician of the individual of the results of the reconsideration. Such reconsideration shall be conducted regardless of whether the provider of services or supplier will charge the individual for continued services or whether the individual will be liable for payment for such continued services.

#### (II) Consultation with beneficiary

In such reconsideration, the qualified independent contractor shall solicit the views of the individual involved.

#### (III) Special rule for hospital discharges

A reconsideration of a discharge from a hospital shall be conducted under this clause in accordance with the provisions of paragraphs (2), (3), and (4) of section 1320c-3(e) of this title as in effect on the date that precedes December 21, 2000.

### (iv) Extension

An individual requesting a reconsideration under this subparagraph may be granted such additional time as the individual specifies (not to exceed 14 days) for the qualified independent contractor to conclude the reconsideration. The individual may request such additional time orally or in writing.

## (D) Qualifications for reviewers

The requirements of subsection (g) shall be met (relating to qualifications of reviewing professionals).

## (E) Explanation of decision

Any decision with respect to a reconsideration of a qualified independent contractor shall be in writing, be written in a manner calculated to be understood by the individual entitled to benefits under part A or enrolled under part B, or both, and shall include (to the extent appropriate) and shall include[1] a detailed explanation of the decision as well as a discussion of the pertinent facts and applicable regulations applied in making such decision, and[2] a notification of the right to appeal such determination and instructions on how to initiate such appeal under this section[3] and[3] in the case of a determination of whether an item or service is reasonable and necessary for the diagnosis or treatment of illness or injury (under section 1395y(a)(1)(A) of this title)[3] an explanation of the medical and scientific rationale for the decision.

**(F) Notice requirements**

Whenever a qualified independent contractor makes a decision with respect to a reconsideration under this subsection, the qualified independent contractor shall promptly notify the entity responsible for the payment of claims under part A or part B of such decision.

**(G) Dissemination of decisions on reconsiderations**

Each qualified independent contractor shall make available all decisions with respect to reconsiderations of such qualified independent contractors to fiscal intermediaries (under section 1395h of this title), carriers (under section 1395u of this title), quality improvement organizations (under part B of subchapter XI), Medicare+Choice organizations offering Medicare+Choice plans under part C, other entities under contract with the Secretary to make initial determinations under part A or part B or subchapter XI, and to the public. The Secretary shall establish a methodology under which qualified independent contractors shall carry out this subparagraph.

**(H) Ensuring consistency in decisions**

Each qualified independent contractor shall monitor its decisions with respect to reconsiderations to ensure the consistency of such decisions with respect to requests for reconsideration of similar or related matters.

**(I) Data collection**

**(i) In general**

Consistent with the requirements of clause (ii), a qualified independent contractor shall collect such information relevant to its functions, and keep and maintain such records in such form and manner as the Secretary may require to carry out the purposes of this section and shall permit access to and use of any such information and records as the Secretary may require for such purposes.

**(ii) Type of data collected**

Each qualified independent contractor shall keep accurate records of each decision made, consistent with standards established by the Secretary for such purpose. Such records shall be maintained in an electronic database in a manner that provides for identification of the following:

**(I)** Specific claims that give rise to appeals.

**(II)** Situations suggesting the need for increased education for providers of services, physicians, or suppliers.

**(III)** Situations suggesting the need for changes in national or local coverage determination.

**(IV)** Situations suggesting the need for changes in local coverage determinations.

### (iii) Annual reporting

Each qualified independent contractor shall submit annually to the Secretary (or otherwise as the Secretary may request) records maintained under this paragraph for the previous year.

## (J) Hearings by the Secretary

The qualified independent contractor shall (i) submit such information as is required for an appeal of a decision of the contractor, and (ii) participate in such hearings as required by the Secretary.

## (K) Independence requirements

### (i) In general

Subject to clause (ii), a qualified independent contractor shall not conduct any activities in a case unless the entity--

**(I)** is not a related party (as defined in subsection (g)(5));

**(II)** does not have a material familial, financial, or professional relationship with such a party in relation to such case; and

**(III)** does not otherwise have a conflict of interest with such a party.

### (ii) Exception for reasonable compensation

Nothing in clause (i) shall be construed to prohibit receipt by a qualified independent contractor of compensation from the Secretary for the conduct of activities under this section if the compensation is provided consistent with clause (iii).

### (iii) Limitations on entity compensation

Compensation provided by the Secretary to a qualified independent contractor in connection with reviews under this section shall not be contingent on any decision rendered by the contractor or by any reviewing professional.

## (4) Number of qualified independent contractors

The Secretary shall enter into contracts with a sufficient number of qualified independent contractors (but not fewer than 4 such contractors) to conduct reconsiderations consistent with the timeframes applicable under this subsection.

## (5) Limitation on qualified independent contractor liability

A0156

No qualified independent contractor having a contract with the Secretary under this subsection and no person who is employed by, or who has a fiduciary relationship with, any such qualified independent contractor or who furnishes professional services to such qualified independent contractor, shall be held by reason of the performance of any duty, function, or activity required or authorized pursuant to this subsection or to a valid contract entered into under this subsection, to have violated any criminal law, or to be civilly liable under any law of the United States or of any State (or political subdivision thereof) provided due care was exercised in the performance of such duty, function, or activity.

**(d) Deadlines for hearings by the Secretary; notice**

**(1) Hearing by administrative law judge**

**(A) In general**

Except as provided in subparagraph (B), an administrative law judge shall conduct and conclude a hearing on a decision of a qualified independent contractor under subsection (c) and render a decision on such hearing by not later than the end of the 90-day period beginning on the date a request for hearing has been timely filed.

**(B) Waiver of deadline by party seeking hearing**

The 90-day period under subparagraph (A) shall not apply in the case of a motion or stipulation by the party requesting the hearing to waive such period.

**(2) Departmental Appeals Board review**

**(A) In general**

The Departmental Appeals Board of the Department of Health and Human Services shall conduct and conclude a review of the decision on a hearing described in paragraph (1) and make a decision or remand the case to the administrative law judge for reconsideration by not later than the end of the 90-day period beginning on the date a request for review has been timely filed.

**(B) DAB hearing procedure**

In reviewing a decision on a hearing under this paragraph, the Departmental Appeals Board shall review the case de novo.

**(3) Consequences of failure to meet deadlines**

**(A) Hearing by administrative law judge**

In the case of a failure by an administrative law judge to render a decision by the end of the period described in paragraph (1), the party requesting the hearing may request a review by the Departmental Appeals Board of the Department of Health and Human Services, notwithstanding any requirements for a hearing for purposes of the party's right to such a review.

**(B) Departmental Appeals Board review**

In the case of a failure by the Departmental Appeals Board to render a decision by the end of the period described in paragraph (2), the party requesting the hearing may seek judicial review, notwithstanding any requirements for a hearing for purposes of the party's right to such judicial review.

**(4) Notice**

Notice of the decision of an administrative law judge shall be in writing in a manner calculated to be understood by the individual entitled to benefits under part A or enrolled under part B, or both, and shall include--

**(A)** the specific reasons for the determination (including, to the extent appropriate, a summary of the clinical or scientific evidence used in making the determination);

**(B)** the procedures for obtaining additional information concerning the decision; and

**(C)** notification of the right to appeal the decision and instructions on how to initiate such an appeal under this section.

**(e) Administrative provisions**

**(1) Limitation on review of certain regulations**

A regulation or instruction that relates to a method for determining the amount of payment under part B and that was initially issued before January 1, 1981, shall not be subject to judicial review.

**(2) Outreach**

The Secretary shall perform such outreach activities as are necessary to inform individuals entitled to benefits under this subchapter and providers of services and suppliers with respect to their rights of, and the process for, appeals made under this section. The Secretary shall use the toll-free telephone number maintained by the Secretary under section 1395b-2(b) of this title to provide information regarding appeal rights and respond to inquiries regarding the status of appeals.

**(3) Continuing education requirement for qualified independent contractors and administrative law judges**

The Secretary shall provide to each qualified independent contractor, and, in consultation with the Commissioner of Social Security, to administrative law judges that decide appeals of reconsiderations of initial determinations or other decisions or determinations under this section, such continuing education with respect to coverage of items and services under this subchapter or policies of the Secretary with respect to part B of subchapter XI as is necessary for such qualified independent contractors and administrative law judges to make informed decisions with respect to appeals.

**(4) Reports**

A0158

**(A) Annual report to Congress**

The Secretary shall submit to Congress an annual report describing the number of appeals for the previous year, identifying issues that require administrative or legislative actions, and including any recommendations of the Secretary with respect to such actions. The Secretary shall include in such report an analysis of determinations by qualified independent contractors with respect to inconsistent decisions and an analysis of the causes of any such inconsistencies.

**(B) Survey**

Not less frequently than every 5 years, the Secretary shall conduct a survey of a valid sample of individuals entitled to benefits under this subchapter who have filed appeals of determinations under this section, providers of services, and suppliers to determine the satisfaction of such individuals or entities with the process for appeals of determinations provided for under this section and education and training provided by the Secretary with respect to that process. The Secretary shall submit to Congress a report describing the results of the survey, and shall include any recommendations for administrative or legislative actions that the Secretary determines appropriate.

**(f) Review of coverage determinations**

**(1) National coverage determinations**

**(A) In general**

Review of any national coverage determination shall be subject to the following limitations:

**(i)** Such a determination shall not be reviewed by any administrative law judge.

**(ii)** Such a determination shall not be held unlawful or set aside on the ground that a requirement of section 553 of Title 5 or section 1395hh(b) of this title, relating to publication in the Federal Register or opportunity for public comment, was not satisfied.

**(iii)** Upon the filing of a complaint by an aggrieved party, such a determination shall be reviewed by the Departmental Appeals Board of the Department of Health and Human Services. In conducting such a review, the Departmental Appeals Board--

**(I)** shall review the record and shall permit discovery and the taking of evidence to evaluate the reasonableness of the determination, if the Board determines that the record is incomplete or lacks adequate information to support the validity of the determination;

**(II)** may, as appropriate, consult with appropriate scientific and clinical experts; and

A0159

**(III)** shall defer only to the reasonable findings of fact, reasonable interpretations of law, and reasonable applications of fact to law by the Secretary.

**(iv)** The Secretary shall implement a decision of the Departmental Appeals Board within 30 days of receipt of such decision.

**(v)** A decision of the Departmental Appeals Board constitutes a final agency action and is subject to judicial review.

**(B) Definition of national coverage determination**

For purposes of this section, the term "national coverage determination" means a determination by the Secretary with respect to whether or not a particular item or service is covered nationally under this subchapter, but does not include a determination of what code, if any, is assigned to a particular item or service covered under this subchapter or a determination with respect to the amount of payment made for a particular item or service so covered.

**(2) Local coverage determination**

**(A) In general**

Review of any local coverage determination shall be subject to the following limitations:

**(i)** Upon the filing of a complaint by an aggrieved party, such a determination shall be reviewed by an administrative law judge. The administrative law judge--

**(I)** shall review the record and shall permit discovery and the taking of evidence to evaluate the reasonableness of the determination, if the administrative law judge determines that the record is incomplete or lacks adequate information to support the validity of the determination;

**(II)** may, as appropriate, consult with appropriate scientific and clinical experts; and

**(III)** shall defer only to the reasonable findings of fact, reasonable interpretations of law, and reasonable applications of fact to law by the Secretary.

**(ii)** Upon the filing of a complaint by an aggrieved party, a decision of an administrative law judge under clause (i) shall be reviewed by the Departmental Appeals Board of the Department of Health and Human Services.

**(iii)** The Secretary shall implement a decision of the administrative law judge or the Departmental Appeals Board within 30 days of receipt of such decision.

**(iv)** A decision of the Departmental Appeals Board constitutes a final agency action and is subject to judicial review.

A0160

**(B) Definition of local coverage determination**

For purposes of this section, the term "local coverage determination" means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1395y(a)(1)(A) of this title.

**(C) Local coverage determinations for clinical diagnostic laboratory tests**

For provisions relating to local coverage determinations for clinical diagnostic laboratory tests, see section 1395m-1(g) of this title.

**(3) No material issues of fact in dispute**

In the case of a determination that may otherwise be subject to review under paragraph (1)(A)(iii) or paragraph (2)(A)(i), where the moving party alleges that--

**(A)** there are no material issues of fact in dispute, and

**(B)** the only issue of law is the constitutionality of a provision of this subchapter, or that a regulation, determination, or ruling by the Secretary is invalid,

the moving party may seek review by a court of competent jurisdiction without filing a complaint under such paragraph and without otherwise exhausting other administrative remedies.

**(4) Pending national coverage determinations**

**(A) In general**

In the event the Secretary has not issued a national coverage or noncoverage determination with respect to a particular type or class of items or services, an aggrieved person (as described in paragraph (5)) may submit to the Secretary a request to make such a determination with respect to such items or services. By not later than the end of the 90-day period beginning on the date the Secretary receives such a request (notwithstanding the receipt by the Secretary of new evidence (if any) during such 90-day period), the Secretary shall take one of the following actions:

**(i)** Issue a national coverage determination, with or without limitations.

**(ii)** Issue a national noncoverage determination.

**(iii)** Issue a determination that no national coverage or noncoverage determination is appropriate as of the end of such 90-day period with respect to national coverage of such items or services.

A0161

(iv) Issue a notice that states that the Secretary has not completed a review of the request for a national coverage determination and that includes an identification of the remaining steps in the Secretary's review process and a deadline by which the Secretary will complete the review and take an action described in clause (i), (ii), or (iii).

**(B) Deemed action by the Secretary**

In the case of an action described in subparagraph (A)(iv), if the Secretary fails to take an action referred to in such clause by the deadline specified by the Secretary under such clause, then the Secretary is deemed to have taken an action described in subparagraph (A)(iii) as of the deadline.

**(C) Explanation of determination**

When issuing a determination under subparagraph (A), the Secretary shall include an explanation of the basis for the determination. An action taken under subparagraph (A) (other than clause (iv)) is deemed to be a national coverage determination for purposes of review under paragraph (1)(A).

**(5) Standing**

An action under this subsection seeking review of a national coverage determination or local coverage determination may be initiated only by individuals entitled to benefits under part A, or enrolled under part B, or both, who are in need of the items or services that are the subject of the coverage determination.

**(6) Publication on the Internet of decisions of hearings of the Secretary**

Each decision of a hearing by the Secretary with respect to a national coverage determination shall be made public, and the Secretary shall publish each decision on the Medicare[4] Internet site of the Department of Health and Human Services. The Secretary shall remove from such decision any information that would identify any individual, provider of services, or supplier.

**(7) Annual report on national coverage determinations**

**(A) In general**

Not later than December 1 of each year, beginning in 2001, the Secretary shall submit to Congress a report that sets forth a detailed compilation of the actual time periods that were necessary to complete and fully implement national coverage determinations that were made in the previous fiscal year for items, services, or medical devices not previously covered as a benefit under this subchapter, including, with respect to each new item, service, or medical device, a statement of the time taken by the Secretary to make and implement the necessary coverage, coding, and payment determinations, including the time taken to complete each significant step in the process of making and implementing such determinations.

**(B) Publication of reports on the Internet**

The Secretary shall publish each report submitted under clause (i) on the medicare Internet site of the Department of Health and Human Services.

**(8) Construction**

Nothing in this subsection shall be construed as permitting administrative or judicial review pursuant to this section insofar as such review is explicitly prohibited or restricted under another provision of law.

**(g) Qualifications of reviewers**

**(1) In general**

In reviewing determinations under this section, a qualified independent contractor shall assure that--

**(A)** each individual conducting a review shall meet the qualifications of paragraph (2);

**(B)** compensation provided by the contractor to each such reviewer is consistent with paragraph (3); and

**(C)** in the case of a review by a panel described in subsection (c)(3)(B) composed of physicians or other health care professionals (each in this subsection referred to as a "reviewing professional"), a reviewing professional meets the qualifications described in paragraph (4) and, where a claim is regarding the furnishing of treatment by a physician (allopathic or osteopathic) or the provision of items or services by a physician (allopathic or osteopathic), a reviewing professional shall be a physician (allopathic or osteopathic).

**(2) Independence**

**(A) In general**

Subject to subparagraph (B), each individual conducting a review in a case shall--

**(i)** not be a related party (as defined in paragraph (5));

**(ii)** not have a material familial, financial, or professional relationship with such a party in the case under review; and

**(iii)** not otherwise have a conflict of interest with such a party.

**(B) Exception**

Nothing in subparagraph (A) shall be construed to--

A0163

**(i)** prohibit an individual, solely on the basis of a participation agreement with a fiscal intermediary, carrier, or other contractor, from serving as a reviewing professional if--

**(I)** the individual is not involved in the provision of items or services in the case under review;

**(II)** the fact of such an agreement is disclosed to the Secretary and the individual entitled to benefits under part A or enrolled under part B, or both, or such individual's authorized representative, and neither party objects; and

**(III)** the individual is not an employee of the intermediary, carrier, or contractor and does not provide services exclusively or primarily to or on behalf of such intermediary, carrier, or contractor;

**(ii)** prohibit an individual who has staff privileges at the institution where the treatment involved takes place from serving as a reviewer merely on the basis of having such staff privileges if the existence of such privileges is disclosed to the Secretary and such individual (or authorized representative), and neither party objects; or

**(iii)** prohibit receipt of compensation by a reviewing professional from a contractor if the compensation is provided consistent with paragraph (3).

For purposes of this paragraph, the term "participation agreement" means an agreement relating to the provision of health care services by the individual and does not include the provision of services as a reviewer under this subsection.

**(3) Limitations on reviewer compensation**

Compensation provided by a qualified independent contractor to a reviewer in connection with a review under this section shall not be contingent on the decision rendered by the reviewer.

**(4) Licensure and expertise**

Each reviewing professional shall be--

**(A)** a physician (allopathic or osteopathic) who is appropriately credentialed or licensed in one or more States to deliver health care services and has medical expertise in the field of practice that is appropriate for the items or services at issue; or

**(B)** a health care professional who is legally authorized in one or more States (in accordance with State law or the State regulatory mechanism provided by State law) to furnish the health care items or services at issue and has medical expertise in the field of practice that is appropriate for such items or services.

**(5) Related party defined**

For purposes of this section, the term "related party" means, with respect to a case under this subchapter involving a specific individual entitled to benefits under part A or enrolled under part B, or both, any of the following:

**(A)** The Secretary, the medicare administrative contractor involved, or any fiduciary, officer, director, or employee of the Department of Health and Human Services, or of such contractor.

**(B)** The individual (or authorized representative).

**(C)** The health care professional that provides the items or services involved in the case.

**(D)** The institution at which the items or services (or treatment) involved in the case are provided.

**(E)** The manufacturer of any drug or other item that is included in the items or services involved in the case.

**(F)** Any other party determined under any regulations to have a substantial interest in the case involved.

**(h) Prior determination process for certain items and services**

**(1) Establishment of process**

**(A) In general**

With respect to a medicare administrative contractor that has a contract under section 1395kk-1 of this title that provides for making payments under this subchapter with respect to physicians' services (as defined in section 1395w-4(j)(3) of this title), the Secretary shall establish a prior determination process that meets the requirements of this subsection and that shall be applied by such contractor in the case of eligible requesters.

**(B) Eligible requester**

For purposes of this subsection, each of the following shall be an eligible requester:

**(i)** A participating physician, but only with respect to physicians' services to be furnished to an individual who is entitled to benefits under this subchapter and who has consented to the physician making the request under this subsection for those physicians' services.

**(ii)** An individual entitled to benefits under this subchapter, but only with respect to a physicians' service for which the individual receives, from a physician, an advance beneficiary notice under section 1395pp(a) of this title.

**(2) Secretarial flexibility**

The Secretary shall establish by regulation reasonable limits on the physicians' services for which a prior determination of coverage may be requested under this subsection. In establishing such limits, the Secretary may consider the dollar amount involved with respect to the physicians' service, administrative costs and burdens, and other relevant factors.

**(3) Request for prior determination**

**(A) In general**

Subject to paragraph (2), under the process established under this subsection an eligible requester may submit to the contractor a request for a determination, before the furnishing of a physicians' service, as to whether the physicians' service is covered under this subchapter consistent with the applicable requirements of section 1395y(a)(1)(A) of this title (relating to medical necessity).

**(B) Accompanying documentation**

The Secretary may require that the request be accompanied by a description of the physicians' service, supporting documentation relating to the medical necessity for the physicians' service, and any other appropriate documentation. In the case of a request submitted by an eligible requester who is described in paragraph (1)(B)(ii), the Secretary may require that the request also be accompanied by a copy of the advance beneficiary notice involved.

**(4) Response to request**

**(A) In general**

Under such process, the contractor shall provide the eligible requester with written notice of a determination as to whether--

**(i)** the physicians' service is so covered;

**(ii)** the physicians' service is not so covered; or

**(iii)** the contractor lacks sufficient information to make a coverage determination with respect to the physicians' service.

**(B) Contents of notice for certain determinations**

**(i) Noncoverage**

If the contractor makes the determination described in subparagraph (A)(ii), the contractor shall include in the notice a brief explanation of the basis for the determination, including on what national or local coverage or noncoverage determination (if any) the determination is based, and a description of any applicable rights under subsection (a).

**(ii) Insufficient information**

A0166

If the contractor makes the determination described in subparagraph (A)(iii), the contractor shall include in the notice a description of the additional information required to make the coverage determination.

**(C) Deadline to respond**

Such notice shall be provided within the same time period as the time period applicable to the contractor providing notice of initial determinations on a claim for benefits under subsection (a)(2)(A).

**(D) Informing beneficiary in case of physician request**

In the case of a request by a participating physician under paragraph (1)(B)(i), the process shall provide that the individual to whom the physicians' service is proposed to be furnished shall be informed of any determination described in subparagraph (A)(ii) (relating to a determination of non-coverage) and the right (referred to in paragraph (6)(B)) to obtain the physicians' service and have a claim submitted for the physicians' service.

**(5) Binding nature of positive determination**

If the contractor makes the determination described in paragraph (4)(A)(i), such determination shall be binding on the contractor in the absence of fraud or evidence of misrepresentation of facts presented to the contractor.

**(6) Limitation on further review**

**(A) In general**

Contractor determinations described in paragraph (4)(A)(ii) or (4)(A)(iii) (relating to pre-service claims) are not subject to further administrative appeal or judicial review under this section or otherwise.

**(B) Decision not to seek prior determination or negative determination does not impact right to obtain services, seek reimbursement, or appeal rights**

Nothing in this subsection shall be construed as affecting the right of an individual who--

**(i)** decides not to seek a prior determination under this subsection with respect to physicians' services; or

**(ii)** seeks such a determination and has received a determination described in paragraph (4)(A)(ii),

from receiving (and submitting a claim for) such physicians' services and from obtaining administrative or judicial review respecting such claim under the other applicable provisions of this section. Failure to seek a prior determination under this subsection with respect to physicians' service shall not be taken into account in such administrative or judicial review.

**(C) No prior determination after receipt of services**

A0167

Once an individual is provided physicians' services, there shall be no prior determination under this subsection with respect to such physicians' services.

**(i) Mediation process for local coverage determinations**

**(1) Establishment of process**

The Secretary shall establish a mediation process under this subsection through the use of a physician trained in mediation and employed by the Centers for Medicare & Medicaid Services.

**(2) Responsibility of mediator**

Under the process established in paragraph (1), such a mediator shall mediate in disputes between groups representing providers of services, suppliers (as defined in section 1395x(d) of this title), and the medical director for a medicare administrative contractor whenever the regional administrator (as defined by the Secretary) involved determines that there was a systematic pattern and a large volume of complaints from such groups regarding decisions of such director or there is a complaint from the co-chair of the advisory committee for that contractor to such regional administrator regarding such dispute.

<div align="center">

**CREDIT(S)**

</div>

(Aug. 14, 1935, c. 531, Title XVIII, § 1869, as added Pub.L. 89-97, Title I, § 102(a), July 30, 1965, 79 Stat. 330; amended Pub.L. 92-603, Title II, § 299O(a), Oct. 30, 1972, 86 Stat. 1464; Pub.L. 98-369, Div. B, Title III, § 2354(b)(35), July 18, 1984, 98 Stat. 1102; Pub.L. 99-509, Title IX, §§ 9313(a)(1), (b)(1), 9341(a)(1), Oct. 21, 1986, 100 Stat. 2002, 2037; Pub.L. 100-93, § 8(e), Aug. 18, 1987, 101 Stat. 694; Pub.L. 100-203, Title IV, §§ 4082(a), (b), 4085(i)(18), (19), Dec. 22, 1987, 101 Stat. 1330-128, 1330-133; Pub.L. 103-296, Title I, § 108(c)(5), Aug. 15, 1994, 108 Stat. 1485; Pub.L. 105-33, Title IV, § 4611(c), Aug. 5, 1997, 111 Stat. 473; Pub.L. 106-554, § 1(a)(6) [Title V, §§ 521(a), 522(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-534, 2763A-543; Pub.L. 108-173, Title IX, §§ 931(d), 932(a), 933(a)(1), (b), (c), (d)(1) to (3), 938(a), 940(a), (b)(1), 940A(a), 948(b)(1), (c), Dec. 8, 2003, 117 Stat. 2399, 2402 to 2406, 2413, 2416, 2417, 2426; Pub.L. 112-40, Title II, § 261(a)(3)(A), (F), Oct. 21, 2011, 125 Stat. 423; Pub.L. 113-93, Title II, § 216(b)(2), Apr. 1, 2014, 128 Stat. 1060.)

Notes of Decisions (184)

Footnotes

1       So in original.

2       So in original. The word "and" probably should not appear.

3       So in original. Probably should be followed by a comma.

4       So in original. Probably should not be capitalized.

42 U.S.C.A. § 1395ff, 42 USCA § 1395ff

Current through P.L. 116-182.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    24

A0168

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
 Title 42. The Public Health and Welfare
  Chapter 7. Social Security (Refs & Annos)
   Subchapter XVIII. Health Insurance for Aged and Disabled (Refs & Annos)
    Part E. Miscellaneous Provisions (Refs & Annos)

42 U.S.C.A. § 1395hh

## § 1395hh. Regulations

Effective: December 8, 2003
Currentness

**(a) Authority to prescribe regulations; ineffectiveness of substantive rules not promulgated by regulation**

**(1)** The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. When used in this subchapter, the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary.

**(2)** No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

**(3)(A)** The Secretary, in consultation with the Director of the Office of Management and Budget, shall establish and publish a regular timeline for the publication of final regulations based on the previous publication of a proposed regulation or an interim final regulation.

**(B)** Such timeline may vary among different regulations based on differences in the complexity of the regulation, the number and scope of comments received, and other relevant factors, but shall not be longer than 3 years except under exceptional circumstances. If the Secretary intends to vary such timeline with respect to the publication of a final regulation, the Secretary shall cause to have published in the Federal Register notice of the different timeline by not later than the timeline previously established with respect to such regulation. Such notice shall include a brief explanation of the justification for such variation.

**(C)** In the case of interim final regulations, upon the expiration of the regular timeline established under this paragraph for the publication of a final regulation after opportunity for public comment, the interim final regulation shall not continue in effect unless the Secretary publishes (at the end of the regular timeline and, if applicable, at the end of each succeeding 1-year period) a notice of continuation of the regulation that includes an explanation of why the regular timeline (and any subsequent 1-year extension) was not complied with. If such a notice is published, the regular timeline (or such timeline as previously extended under this paragraph) for publication of the final regulation shall be treated as having been extended for 1 additional year.

**(D)** The Secretary shall annually submit to Congress a report that describes the instances in which the Secretary failed to publish a final regulation within the applicable regular timeline under this paragraph and that provides an explanation for such failures.

**(4)** If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation.

**(b) Notice of proposed regulations; public comment**

**(1)** Except as provided in paragraph (2), before issuing in final form any regulation under subsection (a), the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon.

**(2)** Paragraph (1) shall not apply where--

**(A)** a statute specifically permits a regulation to be issued in interim final form or otherwise with a shorter period for public comment,

**(B)** a statute establishes a specific deadline for the implementation of a provision and the deadline is less than 150 days after the date of the enactment of the statute in which the deadline is contained, or

**(C)** subsection (b) of section 553 of Title 5 does not apply pursuant to subparagraph (B) of such subsection.

**(c) Publication of certain rules; public inspection; changes in data collection and retrieval**

**(1)** The Secretary shall publish in the Federal Register, not less frequently than every 3 months, a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability which--

**(A)** are promulgated to carry out this subchapter, but

**(B)** are not published pursuant to subsection (a)(1) and have not been previously published in a list under this subsection.

**(2)** Effective June 1, 1988, each fiscal intermediary and carrier administering claims for extended care, post-hospital extended care, home health care, and durable medical equipment benefits under this subchapter shall make available to the public all interpretative materials, guidelines, and clarifications of policies which relate to payments for such benefits.

**(3)** The Secretary shall to the extent feasible make such changes in automated data collection and retrieval by the Secretary and fiscal intermediaries with agreements under section 1395h of this title as are necessary to make easily accessible for the Secretary and other appropriate parties a data base which fairly and accurately reflects the provision of extended care, post-

A0170

hospital extended care and home health care benefits pursuant to this subchapter, including such categories as benefit denials, results of appeals, and other relevant factors, and selectable by such categories and by fiscal intermediary, service provider, and region.

**(e)**[1] **Retroactivity of substantive changes; reliance upon written guidance**

**(1)(A)** A substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability under this subchapter shall not be applied (by extrapolation or otherwise) retroactively to items and services furnished before the effective date of the change, unless the Secretary determines that--

   **(i)** such retroactive application is necessary to comply with statutory requirements; or

   **(ii)** failure to apply the change retroactively would be contrary to the public interest.

**(B)(i)** Except as provided in clause (ii), a substantive change referred to in subparagraph (A) shall not become effective before the end of the 30-day period that begins on the date that the Secretary has issued or published, as the case may be, the substantive change.

**(ii)** The Secretary may provide for such a substantive change to take effect on a date that precedes the end of the 30-day period under clause (i) if the Secretary finds that waiver of such 30-day period is necessary to comply with statutory requirements or that the application of such 30-day period is contrary to the public interest. If the Secretary provides for an earlier effective date pursuant to this clause, the Secretary shall include in the issuance or publication of the substantive change a finding described in the first sentence, and a brief statement of the reasons for such finding.

**(C)** No action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change.

**(2)(A)** If--

   **(i)** a provider of services or supplier follows the written guidance (which may be transmitted electronically) provided by the Secretary or by a medicare contractor (as defined in section 1395zz(g) of this title) acting within the scope of the contractor's contract authority, with respect to the furnishing of items or services and submission of a claim for benefits for such items or services with respect to such provider or supplier;

   **(ii)** the Secretary determines that the provider of services or supplier has accurately presented the circumstances relating to such items, services, and claim to the contractor in writing; and

   **(iii)** the guidance was in error;

the provider of services or supplier shall not be subject to any penalty or interest under this subchapter or the provisions of subchapter XI insofar as they relate to this subchapter (including interest under a repayment plan under section 1395ddd of

A0171

this title or otherwise) relating to the provision of such items or service or such claim if the provider of services or supplier reasonably relied on such guidance.

**(B)** Subparagraph (A) shall not be construed as preventing the recoupment or repayment (without any additional penalty) relating to an overpayment insofar as the overpayment was solely the result of a clerical or technical operational error.

**(f) Report on areas of inconsistency or conflict**

**(1)** Not later than 2 years after December 8, 2003, and every 3 years thereafter, the Secretary shall submit to Congress a report with respect to the administration of this subchapter and areas of inconsistency or conflict among the various provisions under law and regulation.

**(2)** In preparing a report under paragraph (1), the Secretary shall collect--

**(A)** information from individuals entitled to benefits under part A or enrolled under part B, or both, providers of services, and suppliers and from the Medicare Beneficiary Ombudsman with respect to such areas of inconsistency and conflict; and

**(B)** information from medicare contractors that tracks the nature of written and telephone inquiries.

**(3)** A report under paragraph (1) shall include a description of efforts by the Secretary to reduce such inconsistency or conflicts, and recommendations for legislation or administrative action that the Secretary determines appropriate to further reduce such inconsistency or conflicts.

## CREDIT(S)

(Aug. 14, 1935, c. 531, Title XVIII, § 1871, as added Pub.L. 89-97, Title I, § 102(a), July 30, 1965, 79 Stat. 331; amended Pub.L. 99-509, Title IX, § 9321(e)(1), Oct. 21, 1986, 100 Stat. 2017; Pub.L. 100-203, Title IV, § 4035(b), (c), Dec. 22, 1987, 101 Stat. 1330-78; Pub.L. 108-173, Title IX, §§ 902(a)(1), (b)(1), 903(a)(1), (b)(1), (c)(1), 904(b), Dec. 8, 2003, 117 Stat. 2375, 2376, 2377.)

Notes of Decisions (44)

Footnotes

1        So in original. No subsec. (d) has been enacted.

42 U.S.C.A. § 1395hh, 42 USCA § 1395hh

Current through P.L. 116-182.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          4

A0172

---

<div style="border:1px solid">

United States Code Annotated
　　Title 42. The Public Health and Welfare
　　　　Chapter 7. Social Security (Refs & Annos)
　　　　　　Subchapter XVIII. Health Insurance for Aged and Disabled (Refs & Annos)
　　　　　　　　Part E. Miscellaneous Provisions (Refs & Annos)

</div>

42 U.S.C.A. § 1395pp

### § 1395pp. Limitation on liability where claims are disallowed

Effective: October 6, 2014
Currentness

**(a) Conditions prerequisite to payment for items and services notwithstanding determination of disallowance**

Where--

**(1)** a determination is made that, by reason of section 1395y(a)(1) or (9) of this title or by reason of a coverage denial described in subsection (g), payment may not be made under part A or part B of this subchapter for any expenses incurred for items or services furnished an individual by a provider of services or by another person pursuant to an assignment under section 1395u(b)(3)(B)(ii) of this title, and

**(2)** both such individual and such provider of services or such other person, as the case may be, did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services under such part A or part B,

then to the extent permitted by this subchapter, payment shall, notwithstanding such determination, be made for such items or services (and for such period of time as the Secretary finds will carry out the objectives of this subchapter), as though section 1395y(a)(1) and section 1395y(a)(9) of this title did not apply and as though the coverage denial described in subsection (g) had not occurred. In each such case the Secretary shall notify both such individual and such provider of services or such other person, as the case may be, of the conditions under which payment for such items or services was made and in the case of comparable situations arising thereafter with respect to such individual or such provider or such other person, each shall, by reason of such notice (or similar notices provided before the enactment of this section), be deemed to have knowledge that payment cannot be made for such items or services or reasonably comparable items or services. Any provider or other person furnishing items or services for which payment may not be made by reason of section 1395y(a)(1) or (9) of this title or by reason of a coverage denial described in subsection (g) shall be deemed to have knowledge that payment cannot be made for such items or services if the claim relating to such items or services involves a case, provider or other person furnishing services, procedure, or test, with respect to which such provider or other person has been notified by the Secretary (including notification by a quality improvement organization) that a pattern of inappropriate utilization has occurred in the past, and such provider or other person has been allowed a reasonable time to correct such inappropriate utilization.

**(b) Knowledge of person or provider that payment could not be made; indemnification of individual**

In any case in which the provisions of paragraphs (1) and (2) of subsection (a) are met, except that such provider or such other person, as the case may be, knew, or could be expected to know, that payment for such services or items could not be made under

such part A or part B, then the Secretary shall, upon proper application filed within such time as may be prescribed in regulations, indemnify the individual (referred to in such paragraphs) for any payments received from such individual by such provider or such other person, as the case may be, for such items or services. Any payments made by the Secretary as indemnification shall be deemed to have been made to such provider or such other person, as the case may be, and shall be treated as overpayments, recoverable from such provider or such other person, as the case may be, under applicable provisions of law. In each such case the Secretary shall notify such individual of the conditions under which indemnification is made and in the case of comparable situations arising thereafter with respect to such individual, he shall, by reason of such notice (or similar notices provided before the enactment of this section), be deemed to have knowledge that payment cannot be made for such items or services. No item or service for which an individual is indemnified under this subsection shall be taken into account in applying any limitation on the amount of items and services for which payment may be made to or on behalf of the individual under this subchapter.

### (c) Knowledge of both provider and individual to whom items or services were furnished that payment could not be made

No payments shall be made under this subchapter in any cases in which the provisions of paragraph (1) of subsection (a) are met, but both the individual to whom the items or services were furnished and the provider of service or other person, as the case may be, who furnished the items or services knew, or could reasonably have been expected to know, that payment could not be made for items or services under part A or part B by reason of section 1395y(a)(1) or (a)(9) of this title or by reason of a coverage denial described in subsection (g).

### (d) Exercise of rights

In any case arising under subsection (b) (but without regard to whether payments have been made by the individual to the provider or other person) or subsection (c), the provider or other person shall have the same rights that an individual has under sections 1395ff(b) and 1395u(b)(3)(C) of this title (as may be applicable) when the amount of benefit or payments is in controversy, except that such rights may, under prescribed regulations, be exercised by such provider or other person only after the Secretary determines that the individual will not exercise such rights under such sections.

### (e) Payment where beneficiary not at fault

Where payment for inpatient hospital services or extended care services may not be made under part A of this subchapter on behalf of an individual entitled to benefits under such part solely because of an unintentional, inadvertent, or erroneous action with respect to the transfer of such individual from a hospital or skilled nursing facility that meets the requirements of section 1395x(e) or (j) of this title by such a provider of services acting in good faith in accordance with the advice of a utilization review committee, quality improvement organization, or fiscal intermediary, or on the basis of a clearly erroneous administrative decision by a provider of services, the Secretary shall take such action with respect to the payment of such benefits as he determines may be necessary to correct the effects of such unintentional, inadvertent, or erroneous action.

### (f) Presumption with respect to coverage denial; rebuttal; requirements; "fiscal intermediary" defined

**(1)** A home health agency which meets the applicable requirements of paragraphs (3) and (4) shall be presumed to meet the requirement of subsection (a)(2).

**(2)** The presumption of paragraph (1) with respect to specific services may be rebutted by actual or imputed knowledge of the facts described in subsection (a)(2), including any of the following:

A0174

**(A)** Notice by the fiscal intermediary of the fact that payment may not be made under this subchapter with respect to the services.

**(B)** It is clear and obvious that the provider should have known at the time the services were furnished that they were excluded from coverage.

**(3)** The requirements of this paragraph are as follows:

**(A)** The agency complies with requirements of the Secretary under this subchapter respecting timely submittal of bills for payment and medical documentation.

**(B)** The agency program has reasonable procedures to notify promptly each patient (and the patient's physician) where it is determined that a patient is being or will be furnished items or services which are excluded from coverage under this subchapter.

**(4)(A)** The requirement of this paragraph is that, on the basis of bills submitted by a home health agency during the previous quarter, the rate of denial of bills for the agency by reason of a coverage denial described in subsection (g) does not exceed 2.5 percent, computed based on visits for home health services billed.

**(B)** For purposes of determining the rate of denial of bills for a home health agency under subparagraph (A), a bill shall not be considered to be denied until the expiration of the 60-day period that begins on the date such bill is denied by the fiscal intermediary, or, with respect to such a denial for which the agency requests reconsideration, until the fiscal intermediary issues a decision denying payment for such bill.

**(5)** In this subsection, the term "fiscal intermediary" means, with respect to a home health agency, an agency or organization with an agreement under section 1395h of this title with respect to the agency.

**(6)** The Secretary shall monitor the proportion of denied bills submitted by home health agencies for which reconsideration is requested, and shall notify Congress if the proportion of denials reversed upon reconsideration increases significantly.

**(g) Coverage denial defined**

The coverage denial described in this subsection is--

**(1)** with respect to the provision of home health services to an individual, a failure to meet the requirements of section 1395f(a)(2)(C) of this title or section 1395n(a)(2)(A) of this title in that the individual--

**(A)** is or was not confined to his home, or

**(B)** does or did not need skilled nursing care on an intermittent basis; and

A0175

**(2)** with respect to the provision of hospice care to an individual, a determination that the individual is not terminally ill.

## (h) Supplier responsibility for items furnished on assignment basis

If a supplier of medical equipment and supplies (as defined in section 1395m(j)(5) of this title)--

**(1)** furnishes an item or service to a beneficiary for which no payment may be made by reason of section 1395m(j)(1) of this title;

**(2)** furnishes an item or service to a beneficiary for which payment is denied in advance under section 1395m(a)(15) of this title; or

**(3)** furnishes an item or service to a beneficiary for which no payment may be made by reason of section 1395m(a)(17)(B) of this title,

any expenses incurred for items and services furnished to an individual by such a supplier on an assignment-related basis shall be the responsibility of such supplier. The individual shall have no financial responsibility for such expenses and the supplier shall refund on a timely basis to the individual (and shall be liable to the individual for) any amounts collected from the individual for such items or services. The provisions of section 1395m(a)(18) of this title shall apply to refunds required under the previous sentence in the same manner as such provisions apply to refunds under such section.

## (i) Hospice program eligibility recertification

The provisions of this section shall apply with respect to a denial of a payment under this subchapter by reason of section 1395f(a)(7)(E) of this title in the same manner as such provisions apply with respect to a denial of a payment under this subchapter by reason of section 1395y(a)(1) of this title.

## CREDIT(S)

(Aug. 14, 1935, c. 531, Title XVIII, § 1879, as added Pub.L. 92-603, Title II, § 213(a), Oct. 30, 1972, 86 Stat. 1384; amended Pub.L. 96-499, Title IX, § 956(a), Dec. 5, 1980, 94 Stat. 2648; Pub.L. 97-248, Title I, §§ 145, 148(e), Sept. 3, 1982, 96 Stat. 393, 394; Pub.L. 99-509, Title IX, §§ 9305(g)(1), 9341(a)(3), Oct. 21, 1986, 100 Stat. 1991, 2038; Pub.L. 100-203, Title IV, § 4096(b), Dec. 22, 1987, 101 Stat. 1330-139; Pub.L. 101-239, Title VI, § 6214(a), (b), Dec. 19, 1989, 103 Stat. 2252; Pub.L. 103-432, Title I, § 133(b), Oct. 31, 1994, 108 Stat. 4421; Pub.L. 105-33, Title IV, § 4447, Aug. 5, 1997, 111 Stat. 424; Pub.L. 112-40, Title II, § 261(a)(3)(A), (B), Oct. 21, 2011, 125 Stat. 423; Pub.L. 113-185, § 3(b), Oct. 6, 2014, 128 Stat. 1969.)

Notes of Decisions (9)

42 U.S.C.A. § 1395pp, 42 USCA § 1395pp
Current through P.L. 116-182.

A0176

Code of Federal Regulations
    Title 42. Public Health
        Chapter IV. Centers for Medicare & Medicaid Services, Department of Health and Human Services (Refs & Annos)
            Subchapter A. General Provisions
                Part 401. General Administrative Requirements (Refs & Annos)
                    Subpart B. Confidentiality and Disclosure

42 C.F.R. § 401.109

## § 401.109 Precedential Final Decisions of the Secretary.

Effective: March 20, 2017
Currency

(a) The Chair of the Department of Health and Human Services Departmental Appeals Board (DAB Chair) may designate a final decision of the Secretary issued by the Medicare Appeals Council in accordance with part 405, subpart I; part 422, subpart M; part 423, subpart U; or part 478, subpart B, of this chapter as precedential. In determining which decisions should be designated as precedential, the DAB Chair may take into consideration decisions that address, resolve, or clarify recurring legal issues, rules or policies, or that may have broad application or impact, or involve issues of public interest.

(b) Precedential decisions are made available to the public, with personally identifiable information of the beneficiary removed, and have precedential effect from the date they are made available to the public. Notice of precedential decisions is published in the Federal Register.

(c) Medicare Appeals Council decisions designated in accordance with paragraph (a) of this section have precedential effect and are binding on all CMS components, on all HHS components that adjudicate matters under the jurisdiction of CMS, and on the Social Security Administration to the extent that components of the Social Security Administration adjudicate matters under the jurisdiction of CMS.

(d) Precedential effect, as used in this section, means that the Medicare Appeals Council's—

(1) Legal analysis and interpretation of a Medicare authority or provision is binding and must be followed in future determinations and appeals in which the same authority or provision applies and is still in effect; and

(2) Factual findings are binding and must be applied to future determinations and appeals involving the same parties if the relevant facts are the same and evidence is presented that the underlying factual circumstances have not changed since the issuance of the precedential final decision.

**Credits**

[82 FR 5105, Jan. 17, 2017]

A0177

SOURCE: 46 FR 55696, Nov. 12, 1981; 58 FR 61837, Nov. 23, 1993; 59 FR 56232, Nov. 10, 1994; 60 FR 50441, Sept. 29, 1995; 61 FR 63748, Dec. 2, 1996; 73 FR 36447, June 27, 2008; 76 FR 76567, Dec. 7, 2011; 77 FR 29028, May 16, 2012; 81 FR 44479, July 7, 2016, unless otherwise noted.

AUTHORITY: Secs. 1102, 1871, and 1874(e) of the Social Security Act (42 U.S.C. 1302, 1395hh, and 1395w–5) and sec. 105, Pub.L. 114–10, 129 Stat. 87.

Current through October 29, 2020; 85 FR 68703.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

A0178

Code of Federal Regulations
    Title 42. Public Health
        Chapter IV. Centers for Medicare & Medicaid Services, Department of Health and Human Services (Refs & Annos)
            Subchapter B. Medicare Program
                Part 405. Federal Health Insurance for the Aged and Disabled (Refs & Annos)
                    Subpart I. Determinations, Redeterminations, Reconsiderations, and Appeals Under Original Medicare (Part A and Part B) (Refs & Annos)
                        ALJ Hearings

42 C.F.R. § 405.1012

§ 405.1012 When CMS or its contractors may be a party to a hearing.

Effective: July 8, 2019

Currentness

(a) When CMS or a contractor can elect to be a party to a hearing.

(1) Unless the request for hearing is filed by an unrepresented beneficiary, and unless otherwise provided in this section, CMS or one of its contractors may elect to be a party to the hearing upon filing a notice of intent to be a party to the hearing in accordance with paragraph (b) of this section no later than 10 calendar days after receipt of the notice of hearing by the QIC or another contractor designated by CMS to receive the notice of hearing.

(2) Unless the request for hearing is filed by an unrepresented beneficiary, an ALJ may request, but may not require, CMS and/or one or more of its contractors to be a party to the hearing. The ALJ cannot draw any adverse inferences if CMS or the contractor decides not to be a party to the hearing.

(b) How an election is made. If CMS or a contractor elects to be a party to the hearing, it must send written notice to the ALJ and the parties who were sent a copy of the notice of hearing of its intent to be a party to the hearing.

(c) Roles and responsibilities of CMS or a contractor as a party.

(1) As a party, CMS or a contractor may file position papers, submit evidence, provide testimony to clarify factual or policy issues, call witnesses or cross-examine the witnesses of other parties.

(2) CMS or contractor position papers, written testimony, and evidentiary submissions are subject to the following:

(i) Any position paper, written testimony, and/or evidence must be submitted no later than 5 calendar days prior to the hearing unless the ALJ grants additional time to submit the position paper, written testimony, and/or evidence.

(ii) A copy of any position paper, written testimony, and/or evidence it submits to OMHA must be sent within the same time frame specified in paragraph (c)(2)(i) of this section to the parties who were sent a copy of the notice of hearing.

(iii) If CMS or a contractor fails to send a copy of its position paper, written testimony, and/or evidence to the parties or fails to submit its position paper, written testimony, and/or evidence within the time frames described in this section, the position paper, written testimony, and/or evidence will not be considered in deciding the appeal.

(d) Limitation on participating in a hearing.

(1) If CMS and one or more contractors, or multiple contractors, file an election to be a party to the hearing, the first entity to file its election after the notice of hearing is issued is made a party to the hearing and the other entities are made participants in the proceedings under § 405.1010, subject to § 405.1010(d)(1) and (3), unless the ALJ grants leave to an entity to also be a party to the hearing in accordance with paragraph (d)(2) of this section.

(2) If CMS or a contractor filed an election to be a party in accordance with this section but is precluded from being made a party under paragraph (d)(1) of this section, the ALJ may grant leave to be a party to the hearing if the ALJ determines that the entity's participation as a party is necessary for a full examination of the matters at issue.

(e) Invalid election.

(1) An ALJ may determine that a CMS or contractor election is invalid under this section if the request for hearing was filed by an unrepresented beneficiary, the election was not timely, the election was not sent to the correct parties, or CMS or a contractor had already filed an election to be a party to the hearing and the ALJ did not determine that the entity's participation as a party is necessary for a full examination of the matters at issue.

(2) If an election is determined to be invalid, a written notice must be sent to the entity that submitted the election and the parties who were sent the notice of hearing.

(i) If the election was submitted after the hearing occurred, the written notice of invalid election must be sent no later than the date the decision, dismissal, or remand notice is mailed.

(ii) If the election was submitted before the hearing occurs, the written notice of invalid election must be sent prior to the hearing. If the notice would be sent fewer than 5 calendar days before the hearing is scheduled to occur, oral notice must be provided to the entity that submitted the election, and the written notice to the entity and the parties who were sent the notice of hearing must be sent as soon as possible after the oral notice is provided.

**Credits**

[74 FR 65335, Dec. 9, 2009; 82 FR 5111, Jan. 17, 2017; 84 FR 19870, May 7, 2019]

SOURCE: 63 FR 41002, July 31, 1998; 70 FR 11472, March 8, 2005; 73 FR 11043, Feb. 29, 2008; 74 FR 65333, Dec. 9, 2009; 77 FR 29028, May 16, 2012; 82 FR 38509, Aug. 14, 2017; 83 FR 60072, Nov. 23, 2018; 84 FR 19869, May 7, 2019; 84 FR 47851, Sept. 10, 2019, unless otherwise noted.

AUTHORITY: 42 U.S.C. 263a, 405(a), 1302, 1320b–12, 1395x, 1395y(a), 1395ff, 1395hh, 1395kk, 1395rr, and 1395ww(k).

Current through October 29, 2020; 85 FR 68703.

**End of Document**　　　　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

A0181

| | |
|---|---|
| **JOHN THUMANN** | Case No. 1:20-cv-00125 |
| *Plaintiff,* | |
| v. | Judge Timothy S. Black |
| **ALEX AZAR**, in his capacity as Secretary of the United States Department of Health and Human Services, | Magistrate Judge Stephen K. Bowman |
| *Defendant.* | |

## RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Alex Azar, Secretary of Health and Human Services, hereby serves the following Response to Plaintiff's First Set of Interrogatories.

## GENERAL OBJECTIONS

These general objections apply as though restated in full in Defendant's Response to Plaintiff's First Set of Interrogatories Directed to Defendant.

1. Defendant objects to the Interrogatories to the extent that they seeks information protected from disclosure by the attorney/client, attorney work product deliberative process.

2.	Defendant objects to any and all of the Interrogatories to the extent that they seek disclosure of the mental impressions, conclusions, opinions, legal research and legal theories of counsel.

3.	Defendant objects to any and all of the Interrogatories to the extent that they seek to discover the manner or method of proof at trial.

4.	Defendant objects to any and all of the Interrogatories to the extent that they seek information that is irrelevant, overbroad, unduly burdensome to produce, or not reasonably calculated to lead to the discovery of admissible evidence.

5.	Defendant objects to any and all of the Interrogatories to the extent that they seek information that is protected by the provisions of the Privacy Act, 5 U.S.C. § 552a.

## CONDITIONS

1.	These answers are made without in any way waiving or intending to waive, but on the contrary, intending to preserve:

a)	All objections as to competency, relevancy, materiality, privilege and admissibility as evidence for any purpose in subsequent proceedings or the trial of this or any other actions;

b)	The right to object to the use of any information which may be provided, or the subject matter thereof, in any subsequent proceedings or the trial of this or any other action on any other grounds;

c)	The right to object on any ground at any time to further discovery proceedings involving or relating to the subject matter of the Interrogatories; and

d)	The right at any time to revise, correct, supplement, clarify or amend these responses in accordance with the Federal Rules of Civil Procedure.

A0183

2.     All answers to the Interrogatories are based on Defendant's best understanding of the Interrogatories and/or the terms used therein. Such responses cannot properly be used as evidence except in the context in which the Defendant understood the Interrogatories and/or the terms used therein.

3.     These answers are not a representation or concession as to the relevance and/or relationship of the information to this action.

## ANSWERS AND SPECIFIC OBJECTIONS TO INTERROGATORIES

1.     Identify each Person who provided information or otherwise participated in the preparation of Your answers or responses to these Interrogatories.

**RESPONSE:**

Margaret Castro
Assistant United States Attorney

Jon Dorman
Director, Appeals Policy and Operations Division
Office of Medicare Hearings and Appeals

Brian J. Haring
Deputy Chief Administrative Law Judge
Office of Medicare Hearings and Appeals

Brian Pflaum
Assistant Regional Counsel
Office of the General Counsel
U.S. Department of Health & Human Services

2.     Identify the number of ALJ appeals for fiscal year 2019, including:

   a) The total number of ALJ appeals;
   b) The total number of beneficiary ALJ appeals;
   c) The total number of beneficiary ALJ appeals where the beneficiary was represented;
   d) The total number of non-beneficiary ALJ appeals; and
   e) The total number of non-beneficiary ALJ appeals where the non-

3

beneficiary was represented.

**RESPONSE:**

Please see attached chart.  In sum:

    a) The total number of ALJ appeals: 43,887
    b) The total number of beneficiary[1] ALJ appeals: 6,865
    c) The total number of beneficiary ALJ appeals where the beneficiary was represented: 2,602 (649 attorney[2], 1,953 other representative)
    d) The total number of non-beneficiary[3] ALJ appeals: 37,022
    e) The total number of non-beneficiary ALJ appeals where the non-beneficiary was represented: 14,368 (1,8,18 attorney, 12,550 other representative)

3.      Identify the number of ALJ appeals for fiscal year 2018, including:

    a) The total number of ALJ appeals;
    b) The total number of beneficiary ALJ appeals;
    c) The total number of beneficiary ALJ appeals where the beneficiary was represented;
    d) The total number of non-beneficiary ALJ appeals; and
    e) The total number of non-beneficiary ALJ appeals where the non-beneficiary was represented.

**RESPONSE:**

Please see attached chart.  In sum:

    a) The total number of ALJ appeals: 62,762
    b) The total number of beneficiary ALJ appeals: 6,265
    c) The total number of beneficiary ALJ appeals where the

---

[1] Beneficiary "Other" includes: Advocacy Group, Appointed representative using an Appointment of Representative form (AOR), Authorized Representative (e.g., power of attorney), Member of Congress, Estate, and Family.

[2] "Attorney" includes only those appeals where Attorney as requestor type was selected by staff in the case processing system when docketing the request for hearing. Some of the Requestors included in "Other" may be attorneys.

[3] Non-Beneficiary "Other" includes: Advocacy Group, Appointed representative using an Appointment of Representative form (AOR), Authorized Representative (e.g., power of attorney), State Medicaid Agency, Unspecified, and other.

4

beneficiary was represented: 2,062 (548 attorney, 1,514 other representative)
d) The total number of non-beneficiary ALJ appeals: 56,497
e) The total number of non-beneficiary ALJ appeals where the non-
beneficiary was represented: 20,171 (1,170 attorney, 18,461 other representative)

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

*s/Margaret A. Castro*
MARGARET A. CASTRO (0078968)
Assistant United States Attorney
Attorney for Defendant
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6972
E-mail: Margaret.Castro@usdoj.gov

# Office of Medicare Hearings and Appeals
# FY18 and FY19 Requests for Hearing by Requestor Type

| Appeals | 2018 | | | 2019 | | | Summary |
|---------|------|------|---------|------|------|---------|---------|
| | Beneficiary | Non-Beneficiary | Summary | Beneficiary | Non-Beneficiary | Summary | |
| Provider[1] | | 36,324 | **36,324** | 9 | 22,648 | **22,657** | **58,981** |
| Attorney[2] | 548 | 1,710 | **2,258** | 649 | 1,818 | **2,467** | **4,725** |
| Beneficiary | 4,203 | 2 | **4,205** | 4,254 | 6 | **4,260** | **8,465** |
| Other[3] | 1,514 | 18,461 | **19,975** | 1,953 | 12,550 | **14,503** | **34,478** |
| **Summary** | **6,265** | **56,497** | **62,762** | **6,865** | **37,022** | **43,887** | **106,649** |

1. Included in "Provider" are:  Provider, Non-Contract Provider, and Prescribing Physician.

2. "Attorney" includes only those appeals where Attorney as requestor type was selected by staff in the case processing system when docketing the request for hearing.  Some of the Requestors included in "Other" may be attorneys.

3. Beneficiary "Other" includes:  Advocacy Group, Appointed representative using an Appointment of Representative form (AOR), Authorized Representative (e.g., power of attorney), Member of Congress, Estate, and Family.

Non-Beneficiary "Other" includes:  Advocacy Group, Appointed representative using an Appointment of Representative form (AOR), Authorized Representative (e.g., power of attorney), State Medicaid Agency, Unspecified, and other.

Run Date:  September 17, 2020
Source of Data:  ECAPE and MAS – ALJ Lifecycle Star Package

## **VERIFICATION**

Rule 33, Federal rules of Civil Procedure, requires that your answers be in writing, under oath and signed. On the lines below please swear to the truth of your answers and enter the date on which you swear and sign.

By signing below, I swear that the answers given to the above Interrogatories are truthful.

Dated _10-26-2020_

_Brian J. Haring_
Brian J. Haring
Deputy Chief Administrative Law Judge
Office of Medicare Hearings and Appeals